UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, <br> *Plaintiff*, <br> v. <br><br> CITY OF SEATTLE, <br><br> SEATTLE DEPARTMENT OF FINANCE AND ADMINISTRATIVE SERVICES, <br><br> and <br><br> FRED PODESTA, in his official capacity as Director, Finance and Administrative Services, City of Seattle, <br> *Defendants*. | Case No. <br><br> COMPLAINT |

**INTRODUCTION**

1.     The City of Seattle seeks to turn well-settled antitrust and labor law on its head through an unprecedented Ordinance that would allow independent contractors to fix the price they pay for using ride-referral technology.  The illegal Ordinance—entitled an Ordinance Relating to Taxicab, Transportation Network Company, and For-Hire Vehicle Drivers—applies only to individuals working as independent contractors, and purports to enable those distinct economic actors to form a union to collude on the prices and terms of their contracts with

companies that provide ride-referral services. There are good reasons why this Ordinance is unprecedented and why none of the other approximately 40,000 municipal entities in this Nation has previously tried to authorize collective bargaining by independent contractors: such an action is barred by well-established law under the Sherman Act and the National Labor Relations Act, among other laws.

2.      The Chamber of Commerce of the United States of America files this civil action seeking (1) a declaration that the City's Ordinance is unlawful, (2) a temporary restraining order against its enforcement, issued before April 3, 2017, (3) a preliminary injunction against its enforcement, pending final judgment in this case, and (4) a permanent injunction against its enforcement. Absent judicial intervention, the City of Seattle and thousands of other municipalities would be free to adopt their own disparate regulatory regimes, which would balkanize the market for independent-contractor services and inhibit the free flow of commerce among private service providers around the Nation.

3.      The unfettered ability of individuals to go into business for themselves has long been an important engine of American economic growth. This entrepreneurial tradition is an exceptional feature that distinguishes our economy from much of the rest of the world.

4.      The power of America's entrepreneurial spirit has only grown as technology has transformed the way Americans can do business. One of the most recent manifestations of that trend is the so-called "on demand" economy, which harnesses several technological revolutions—such as the Internet, GPS, and smartphones and tablet computers—to connect individual service providers with customers. This innovation has dramatically increased the flexibility of independent contractors to conduct business where, when, and as much or as little as they choose in a variety of business enterprises—transporting passengers, performing delivery services, providing lodging, or other work—with as many (or as few) different entities or customers as they wish. As a result, the stay-at-home parent may work during school hours; the

COMPLAINT - 2

student may do so between classes; and others may work only as long as it takes to achieve a particular financial goal, such as remodeling a home or paying off credit card debt.

5. Federal law has traditionally allowed the competitive market to regulate these private agreements between independent economic actors free from governmental interference. This allows individuals the freedom to negotiate the arrangement that best suits his or her individual circumstances. Thus, Congress expressly determined that independent contractors should not be subject to collective bargaining obligations under the National Labor Relations Act ("NLRA"), amending the NLRA to make this exclusion explicit after the National Labor Relations Board ("NLRB" or "Board") and the courts held otherwise. And the Federal Trade Commission has likewise repeatedly made clear that collective bargaining amongst these independent service providers would constitute an illegal restraint on trade.

6. It is against this backdrop of market freedom that the "on demand" economy has flourished in recent years. Nowhere are these changes more apparent than in the for-hire transportation sector. Many companies now offer riders the ability to contact for-hire drivers through smartphone applications ("apps") that can immediately connect a rider with the driver nearest to her location, providing quick access to transportation. These arrangements, in turn, have increased flexibility and efficiency on the part of for-hire drivers.

7. These developments are not limited to technology companies. Many traditional taxicab and limousine companies have long used flexible independent-contractor arrangements to provide services to customers. And some traditional taxicab and limousine companies have likewise deployed their own apps for use by independent-contractor drivers and riders. As a result of these diverse approaches, for-hire transportation is more widely available, more convenient, and offers better service to the public than in years past. And just as importantly, it provides business opportunities for a broad and diverse group of individuals who value the flexibility that it provides and the entrepreneurial spirit that it rewards.

COMPLAINT - 3

8.    The City of Seattle's Ordinance would restrict the market freedom relied upon by all for-hire drivers who are part of independent-contractor arrangements, whether with a transportation-app company, a traditional taxicab company, or a limousine service.  Under the guise of regulating public safety, the Ordinance at issue would, for the first time anywhere in the United States, insert a third-party labor union into the relationship between independent contractors and companies and require agreements that would fix wages and prices in violation of the nation's antitrust and labor laws.  Indeed, the Ordinance explicitly requires for-hire drivers and their partners to reach anticompetitive agreements by engaging in collective bargaining that federal law does not permit.  Nothing in the Washington State law upon which the City relies authorizes the City's actions, and federal antitrust and labor laws explicitly prohibit them.

9.    If allowed to stand, Seattle's Ordinance would threaten one of the most vibrant, cutting edge sectors of the economy.  The most recent available data demonstrates that there are nearly 40,000 general purpose local governments in the United States.  *See* U.S. Census Bureau, Census of Governments (2012).  If Seattle is permitted to adopt and implement its Ordinance here, then approximately 40,000 other municipalities may attempt to do so as well.  But permitting thousands of separate and independent collective bargaining regimes for independent contractors would inflict significant costs upon the for-hire transportation sector and, more broadly, undermine the flexibility, efficiency, and choice that accompany independent contractor arrangements.  In short, Seattle's Ordinance reflects a broadside attack on the fundamental premises of independent contractor arrangements, as well as the nascent on-demand economy that relies on it.  Federal labor and antitrust laws were designed precisely to avoid this result, and to encourage innovation and the free flow of commerce among private service providers across the Nation.

10.    Accordingly, Plaintiff, the Chamber of Commerce of the United States of America ("Chamber"), seeks a declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that the City of Seattle's Ordinance Relating to Taxicab, Transportation Network Company, and For-

COMPLAINT - 4

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

Hire Vehicle Drivers, adding Section 6.310.735 to the Municipal Code, (1) violates and is preempted by federal antitrust law; (2) is preempted by the National Labor Relations Act, 29 U.S.C. § 151 et seq.; (3) violates the federal rights of the Chamber's members; (4) is not authorized by the Revised Code of Washington §§ 46.72.001 and 81.72.200; (5) violates the Washington Consumer Protection Act, Revised Code of Washington Chapter 19.86, and (6) violates the Washington Public Records Act, Washington Revised Code Chapter 42.56. Plaintiff also seeks immediate and also permanent injunctive relief prohibiting Defendants from enforcing the Ordinance.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this civil action under 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1337 because it arises under an Act of Congress regulating commerce. This Court has jurisdiction to review the state law claims under 28 U.S.C. § 1367, because they form part of the same case or controversy as the claims arising under the Constitution and laws of the United States.

12. This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy satisfies the statutory requirements, and the suit is between citizens of different States. Plaintiff is incorporated in the District of Columbia, and its principal place of business is in the District of Columbia. Defendants are citizens of Washington.

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to this action occurred in this judicial district and because the Defendants reside or are found in this judicial district.

## PARTIES

14. Plaintiff is a non-profit organization created and existing under the laws of the District of Columbia, headquartered at 1615 H Street, N.W., Washington, D.C. The Chamber is the world's largest federation of businesses and associations, directly representing 300,000

COMPLAINT - 5

members and indirectly representing the interests of more than three million U.S. businesses and professional organizations of every size, in every industry sector, and from every geographic region of the country. Of particular relevance here, the Chamber routinely advocates on matters of federal antitrust and labor relations policy and represents the interests of its members in antitrust and labor relations matters before the courts.

15.    Some of the Chamber's members operate taxicab, transportation network, and for-hire vehicle businesses within the jurisdictional limits of the City of Seattle, and thus are subject to the Ordinance. Some of these members contract with fifty (50) or more for-hire drivers, and thus are subject to the Ordinance's driver-reporting requirements, along with its collective-bargaining and anti-retaliation provisions.

16.    First, Chamber member Uber Technologies, Inc., along with its wholly owned subsidiaries Uber USA, LLC and Rasier, LLC (collectively, "Uber"), is a technology company that connects individuals looking for transportation ("riders") with independent transportation providers looking for passengers ("drivers"). Decl. of Brooke Steger ¶ 3. Uber's product is a smartphone application, the Uber App, which allows riders and drivers to connect based on their location. *Id.* For-hire drivers who use the Uber App to generate referrals are independent contractors, not Uber employees. *Id.* ¶ 9, 14. They use the Uber App to generate leads for their businesses. *Id.* ¶ 8–9. Uber contracts with more than fifty for-hire drivers in the Seattle area. *Id.* ¶ 15.

17.    Second, Chamber member Lyft, Inc. ("Lyft") is a technology company that local transportation providers can use to receive trip requests from members of the public. Lyft developed and licenses a mobile software application ("the Lyft App"), which allows riders to request and receive transportation services from drivers. Decl. of Todd Kelsay, ¶ 4–7. Drivers who use the Lyft App to generate referrals are independent contractors, not Lyft employees. *Id.* ¶ 8. Lyft contracts with more than fifty for-hire drivers in the Seattle area. *Id.* ¶ 10.

COMPLAINT - 6

18.     Third, Chamber member Eastside for Hire ("Eastside") provides dispatch services in the Seattle area.  Decl. of Bashi Katar ¶ 2.  Eastside uses advertising and preexisting client bases to generate transportation requests from passengers, who call, text, or email to request a ride, and refers these requests to drivers via mobile data terminal.  *Id.* ¶ 5.  Eastside contracts with more than fifty drivers, who are independent contractors, not employees.  *Id.* ¶¶ 4,7.

19.     In bringing this lawsuit, the Chamber seeks to vindicate the interests of these members and, more broadly, the interests of many more members and non-member businesses that would be harmed if thousands of municipalities were permitted to establish a balkanized system of labor law for independent contractors.  The individual members themselves are not indispensable to the proper resolution of the case.

20.     Defendant City of Seattle (the "City") is a municipality of the State of Washington.

21.     Defendant Seattle Department of Finance and Administrative Services ("SDFAS") is a municipal agency of the City and is the agency charged in the Ordinance with responsibility for administering and enforcing the portions of the Ordinance at issue in this action.

22.     Defendant Fred Podesta is the Director of SDFAS and the officer of SDFAS charged in the Ordinance with responsibility for administering and enforcing the portions of the Ordinance at issue in this action.  Mr. Podesta is sued in his official capacity.

**FACTUAL ALLEGATIONS**

**I.  THE FOR-HIRE TRANSPORTATION BUSINESS**

23.     Individuals use for-hire transportation services to meet many of their transportation needs, particularly in urban areas where owning and operating a vehicle may be impractical or expensive.

24.     Many drivers working in the for-hire transportation industry have traditionally operated as independent contractors, and this tradition continues today.  These drivers accept

COMPLAINT - 7

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

street hails or rely on taxicab companies or black-car or limousine services to connect them to customers. Taxi and limousine companies typically maintain an office or dispatch center where consumers needing service could call and request it, and the dispatch center then communicates with its drivers to fulfill rider requests.

25. In addition to traditional taxicab and limousine services, advancing technology over the last several years, and in particular the advent of smartphones, tablets, and their applications, has further expanded the flexibility that comes from working as an independent contractor, including in the for-hire transportation industry. Companies such as Uber and Lyft have developed ride-referral applications that allow a rider requesting service to automatically communicate his or her location, and for computer systems to match that potential rider with an available driver who is physically close to the customer. The applications permit a rider to link a credit or debit card to his or her account, which automatically deducts the correct fare for the ride taken. Finally, the applications also permit riders to provide real-time feedback regarding their experience, allowing almost immediate operational changes that better serve both riders and drivers. Drivers are also able to provide feedback regarding experiences with their riders.

26. These new ride-referral applications provide a number of benefits to the cities in which they operate and, particularly, to consumers. The Federal Trade Commission has acknowledged that these benefits include "providing customers with new ways to more easily locate, arrange, and pay for passenger motor vehicle transportation services," more efficiently allocating resources, helping to "meet unmet demand for passenger motor vehicle transportation services," and "improv[ing] service in traditionally underserved areas." Federal Trade Commission Comments on Chicago Proposed Ordinance O2014-1367, at 3 (Apr. 15, 2014), http://bit.ly/2iWIdHw. Seattle's Mayor, in a statement refusing to sign the Ordinance, likewise noted the "valuable new tools" that these arrangements provide to City residents. Mayor Comments on TNC Ordinance (Dec. 14, 2015), murray.seattle.gov/mayor-comments-on-tnc-ordinance.

COMPLAINT - 8

27.     To receive transportation requests via the new ride-referral applications, drivers pay a technology licensing fee to the company that owns the application, which is a percentage of the fare that the rider pays.  The companies that own the applications collect the fee and any other related fees from the riders on behalf of drivers, subtract their technology licensing fee, and remit the remainder to the drivers.  Fares vary based on the length of the ride, quality of vehicle requested, and the time of day and the day of the week.  These latter variations are based on supply and demand; weekend evenings are more popular times than mid-morning weekdays, for example, and thus the same ride may cost more if taken during the former than the latter.  This dynamic pricing ensures service reliability by correcting supply/demand imbalances—it guarantees that people who request a ride during a time of high demand will get one, and that more drivers simultaneously will hit the road to increase supply and lower prices once again.

28.     Drivers who receive ride requests from these software apps choose when they work, choose where they work, and operate in their own vehicle.  These flexible, driver-selected schedules permit a stay-at-home dad to work only while his children are at school, or a student to work between her classes or on weekends.  Drivers are not required to work any particular amount of time each week, allowing a parent to attend school functions, a student to decide not to work during finals, or an employee of another business to supplement his or her income temporarily.  The benefits to drivers from these flexible arrangements are significant and well-documented.  *See* Hall & Krueger, *An Analysis of the Labor Market for Uber's Driver-Partners in the United States* (Jan. 22, 2015), http://bit.ly/1zsBmfR.

29.     Drivers may, if they choose to, contract with more than one service, driving with a black-car company or a limousine service one day, Uber for one day (or one trip), Lyft the next day (or trip), and another comparable service for transporting either people or goods the next.  Indeed, many drivers simultaneously accept ride requests from more than one company, operating multiple software applications at the same time to ensure the greatest volume of trip requests.  Drivers are free to receive ride requests from any service they choose on a ride-by-ride

COMPLAINT - 9

basis, and turnover is significant; the population of drivers working with a particular service changes from week to week as new drivers sign up, and others decide to stop using the service, either temporarily or permanently.  In short, despite the Ordinance's one-size-fits-all approach, there is no "typical" driver.

30.     Thanks to the innovations pioneered by these software companies, barriers to entry for this work are low.  They generally require the individual to have attained a certain age (usually 18 or 21), have a valid drivers' license, pass a background check, and have a vehicle suitable for transporting passengers.  Communications with the transportation network company occur through a smartphone application designed, operated, maintained, and updated by the company.

31.     Since these technological changes revolutionized the for-hire transportation industry, millions of people worldwide have signed up with these app-based companies as drivers and potential riders.  Many consumers, particularly in urban areas, now use these services as their principal form of transportation.  And many workers who require a flexible work schedule and might otherwise be unable to find work or supplement their income now earn money working as for-hire drivers.

32.     Some drivers have challenged their status as independent contractors in various jurisdictions.  For example, a group of drivers in California have alleged that they are employees, rather than independent contractors, and thus are subject to various state and federal employment laws.  *E.g.*, Complaint, *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826 (N.D. Cal.).

33.     Similarly, the International Brotherhood of Electrical Workers previously filed a petition with the National Labor Relations Board ("NLRB" or "Board") claiming that Uber drivers are "employees" within the NLRA, and seeking to represent them.  *Uber USA, LLC*, NLRB Case No. 29-RC-168855 (Pet. filed Feb. 2, 2016).  And a few drivers have argued before the Board that they should be considered "employees" under the NLRA, rather than independent contractors.  *See Mamdooh "Abe" Ramzi Husein*, NLRB Case No. 14-CA-158833 (Pet. filed

COMPLAINT - 10

Aug. 27, 2015); *Catherine London & John Billington*, NLRB Case Nos. 20-CA-160720, 20-CA-160717 (Pets. filed Sept. 24, 2015). The NLRB has also petitioned for enforcement of administrative subpoenas against Uber, noting that a threshold issue in the cases pending before it is whether the drivers are employees or independent contractors, and that the Board has broadened the scope of its investigation to determine "whether *all* drivers subject to" Uber's licensing agreement are employees. Memorandum in Support of Application at 3, *NLRB v. Uber Techs., Inc.*, No. 3:16-cv-987 (N.D. Cal. Feb. 29, 2016). The NLRB has not yet definitively resolved whether or not these individuals are "employees" under the NLRA.

## II. THE ORDINANCE

34.     The Seattle City Council unanimously (8-0) passed the Ordinance Relating to Taxicab, Transportation Network Company, and For-Hire Vehicle Drivers on December 14, 2015. Having previously expressed concerns about the Ordinance's "several flaws," Mayor Murray refused to sign it, returning it to the Council unsigned on December 23, 2015. *See* Mayor Comments on TNC Ordinance (Dec. 14, 2015). The Ordinance became law pursuant to section 1.04.020 of the Seattle Municipal Code without the Mayor's approval on January 22, 2016.

35.     The Ordinance establishes a collective-bargaining scheme unique to the City of Seattle through which "for-hire drivers" collectively negotiate the terms of their contractual relationships with "driver coordinators." Ordinance § 1(I).

36.     A "driver coordinator" includes any entity that "contracts with" for-hire drivers "for the purpose of assisting them with, or facilitating them in, providing for-hire services to the public." *Id*. § 2. Driver coordinators include, but are not limited to, "taxicab associations, for-hire vehicle companies, and transportation network companies," (*id*.), including companies like Uber and Lyft.

COMPLAINT - 11

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

37.    The Ordinance applies only to for-hire drivers who are independent contractors, not employees.  Ordinance § 6 ("The provisions of this ordinance do not apply to drivers who are employees under 29 U.S.C. § 152(3)).

38.    The City's Director of Finance and Administrative Services ("Director"), currently Defendant Podesta, is authorized to administer and enforce the collective-bargaining regime, which proceeds in several steps.  *Id*.  First, an entity seeking to be designated as a drivers' union—or "qualified driver representative" ("QDR")—must submit a request to the Director pursuant to regulations to be issued by the Director.  *Id.* § 3(C).  Once the Director approves one or more QDRs, those QDRs can notify driver coordinators who contract with more than fifty drivers of their intent to seek to represent their drivers.  *Id*. § 3(C)(2).  Driver coordinators must then provide all QDRs that have given notice with the names, addresses, email addresses, phone numbers, and driver license numbers of "all qualifying drivers they hire, contract with, or partner with" as of that particular date, other than those with whom the driver coordinator has an employer/employee relationship.  *Id*. § 3(D); Director's Rule FHDR-1, http://bit.ly/2mphh8s.  The City has defined "qualifying driver" as a for-hire driver that has (1) contracted with a driver coordinator for the 90 days "immediately preceding the commencement date," and (2) has driven "at least 52 trips" in Seattle "during any three-month period in the 12 months preceding the commencement date."  Director's Rule FHDR-1.  The QDRs then have four months to obtain consent from a majority of listed drivers to represent them in dealings with the driver coordinator, including collective bargaining.  If a majority of a driver coordinator's drivers consent to the representation, the Director must certify the QDR as the "exclusive driver representative" ("EDR") "for all drivers for that particular driver coordinator," representing all drivers who do business with that driver coordinator and, correspondingly, preventing the driver coordinator from doing business with any drivers who do not wish to be represented by, or to work under the terms negotiated by, the EDR.  *Id*. § 3(F)(2).

COMPLAINT - 12

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

39.     The Ordinance permits drivers to authorize more than one QDR to represent them in dealings with the driver coordinator.  Accordingly, if more than one QDR obtains signatures from a majority of a particular coordinator's drivers, the Director is required to certify the QDR who received the most signatures as the EDR.  *Id*.

40.     The Ordinance permits a QDR to be certified as an EDR based on its having obtained authorization from a majority of the drivers contained on the list that the driver coordinator provides, regardless of whether those individuals still constitute a majority of the drivers of a particular driver coordinator as of the date of the certification months later.  The Ordinance permits a "majority" to be determined using "statistical methods" required by the Director; depending on how this provision is implemented, such methods may or may not produce selection of an EDR by an actual majority of drivers who contract with a particular driver coordinator.  *Id.* § 3(F)(1).  Worse, because of the City's definition of "qualifying driver," *supra* ¶ 38, there is no doubt that an EDR will be certified based on less than an actual majority.

41.     Once an EDR is certified, the driver coordinator is obligated to meet with the EDR "and negotiate in good faith certain subjects to be specified in rules or regulations promulgated by the Director, including, but not limited to, best practices regarding vehicle equipment standards; safe driving practices; the manner in which the driver coordinator will conduct criminal background checks of all prospective drivers; the nature and amount of payments to be made by, or withheld from, the driver coordinator to or by the drivers; minimum hours of work, conditions of work, and applicable rules." *Id*. § 3(H)(1).  The Director does not participate in the negotiation.

42.     If the EDR and the driver coordinator reach an agreement, they are required to submit it to the Director, who is charged with determining whether the agreement effectuates the Ordinance's policies.  If the Director determines that it does, then the agreement is binding on the parties.  If not, the Director sends it back to the parties with "a written explanation of the failure(s) and, at the Director's discretion, recommendations to remedy the failure(s)." *Id*.

COMPLAINT - 13

§ 3(H)(2)(b). No agreement between a driver coordinator and an EDR becomes effective until the Director "determines its adherence" to city law and policy. *Id.* § 3(H)(2)(c). However, the Ordinance does not give the Director authority to dictate an agreement's terms or otherwise supervise the EDR.

43.    When a collective-bargaining agreement becomes effective, a driver coordinator is not only bound by the terms of the agreement, but is also forbidden from making changes "to subjects" covered by the Ordinance without first "meeting and discussing those changes in good faith with the EDR, even if the driver coordinator and EDR have not included terms concerning such subjects in their agreement." *Id.* § 3(J)(3).

44.    If the driver coordinator and EDR do not reach an agreement, both entities are obligated to submit to "interest arbitration upon the request of the other," and the arbitrator then submits what he or she believes is "the most fair and reasonable agreement" to the Director for approval. *Id.* § 3(I)(1)–(3). Again, if the Director finds that the agreement "fails to fulfill" the Ordinance's requirements, he "shall remand the agreement to the interest arbitrator with a written explanation of the failure(s) and, at the Director's discretion, recommendations to remedy the failure(s)." *Id.* § 3(I)(4)(b). Still, the Ordinance likewise does not give the Director authority to directly negotiate or dictate the terms of an agreement, or otherwise supervise the EDR.

45.    The Ordinance expressly allows an EDR to demand that the agreement—later approved by the Director—"require membership of for-hire drivers in the EDRs entity/organization within 14 days of being hired, contracted with, or partnered with by the driver coordinator to provide for-hire transportation services to the public." *Id.* § 3(H)(4). Given the great diversity among the work schedules and preferences of for-hire drivers, this arrangement will allow a subset of drivers at a particular point in time to set terms for other drivers who do not wish to join a union and may be disadvantaged by the bargain struck.

46.    The Ordinance also contains a provision prohibiting any driver coordinator from engaging in any act of "retaliat[ion] against any for-hire driver for exercising the right to

COMPLAINT - 14

participate in the representative process," and from making any "offer to provide money or anything of value to any for-hire driver with the intent of encouraging the for-hire driver to exercise, or to refrain from exercising, that right." *Id*. § 3(K).  It is also unlawful for a driver coordinator to "[i]nterfere with, restrain, or deny the exercise of, or the attempt to exercise," any right the Ordinance protects. *Id*.  The Director has authority to enforce this provision, after investigation and a hearing, and to assess a penalty of up to $10,000 per day for non-compliance. *Id*., § 3(M).  The anti-retaliation provision may also be enforced through a private right of action brought in Washington State court. *Id*., § 3(M)(3).

47.     The Director is authorized to investigate alleged violations of the Ordinance, and to enforce it through, among other things, imposition of a "daily penalty of up to $10,000 for every day the violator fails to cure the violation." *Id*. § 3(M)(1).  The Ordinance's terms governing provision and use of driver lists, good faith bargaining and interest arbitration obligations, and anti-retaliation are also enforceable through a private right of action in Washington State court. *Id*. § (3)(M)(3).  Courts enforcing these provisions are permitted to award "all remedies available at law or in equity appropriate to remedy any violation," including reasonable attorneys' fees and costs. *Id*.

### III.  THE CITY'S IMPLEMENTATION OF THE ORDINANCE

48.     The City has implemented the Ordinance by funding it with a new tax, promulgating regulations, setting a commencement date, and designating at least one QDR.

49.     On July 1, 2016, the City implemented a new tax to fund the Ordinance, in the form of a four-cent increase (from $0.10 to $0.14) in the per-ride license fee that is assessed on and paid quarterly by transportation network companies.

50.     On December 29, 2016, the Director promulgated a set of regulations implementing the Ordinance. *See* Director's Rules FHDR-1–FHDR-4, http://bit.ly/2iFF1k5. The rules govern the process for designating an EDR, the subjects of collective bargaining, and other aspects of the Ordinance.  According to the regulations, the mandatory subjects of

COMPLAINT - 15

collective bargaining include "[t]he nature and amount of payments to be made by, or withheld from, the driver coordinator to or by the drivers." FHDR-4, http://bit.ly/2j7dsmr. Any subject not listed in the Ordinance or the regulations is a permissible subject of bargaining. *Id.*

51. Along with these regulations, the Director designated January 17, 2017, as the Ordinance's commencement date.

52. On March 3, 2017, the Director designated the International Brotherhood of Teamsters Local 117 as a QDR under the Ordinance. On March 7, Local 117 gave notice to Chamber members Uber Technologies, Lyft, Inc., and Eastside For Hire that Local 117 seeks to become an EDR for all drivers who contract with those companies.

## IV. INJURY FROM THE ORDINANCE

53. Under § 3(D) of the Ordinance, Uber, Lyft, and Eastside must disclose its driver information to Local 117 by April 2, 2017. Failure to comply will result in an administrative penalty of up to $10,000 per day, and is also enforceable through a private right of action. Ordinance § 3(M)(1)(d), 3(M)(3). Disclosure of these materials will injure Uber, Lyft, and Eastside, which treat this information as confidential, proprietary, trade secret information; and it will injure the drivers themselves, many of whom consider their personally identifiable information, and their work with these driver coordinators, to be confidential.

54. The Chamber's members have incurred substantial tax costs as a direct result of the Ordinance. Under the City's licensing fee, which was imposed to fund the collective-bargaining program, transportation network companies have been forced to pay an increase of $.04 per ride since July 1, 2016.

55. The Chamber's members have already incurred, and will continue to incur, substantial other costs as a direct result of the Ordinance. Because they work principally with independent contractors, these members have little to no experience with labor relations matters, including union organizing, negotiating contracts with unions, and other related matters. In order to prepare for the organizing and bargaining activity that the Ordinance contemplates, these

COMPLAINT - 16

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

companies are beginning to engage labor relations experts, and may be required to recruit and hire labor relations personnel for their own staff. The Chamber's members have also started to expend and will continue expending both time and money to educate their drivers about the disadvantages of choosing to be represented by an EDR.

56. Seattle's collective-bargaining Ordinance will seriously disrupt the business of the Chamber's members. Uber and Lyft have created an innovative business model that depends on partnering with independent contractors. The Ordinance's collective-bargaining scheme is a drastic departure from that business model, and complying with the Ordinance will require costly changes to these businesses. They will be required to navigate the union organization process, meet at the collective-bargaining table, negotiate over an open-ended list of subjects, form a collective-bargaining agreement, and comply with its terms. The Ordinance essentially requires driver coordinators to treat independent contractors as employees—a change so disruptive that it could cause these companies to become unprofitable in Seattle.

**COUNT ONE:  VIOLATION OF THE SHERMAN ANTITRUST ACT**

57. Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

58. Under section 1 of the Sherman Antitrust Act, a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States" is illegal. 15 U.S.C. § 1. As the Supreme Court has repeatedly held, this provision forbids independent economic actors—such as independent contractors—from colluding on the prices they would accept for their services or otherwise engaging in concerted anticompetitive action in the marketplace. *See, e.g.*, *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 457–58 (1986); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 693–95 (1978). Specifically, collective bargaining by independent contractors over the price of a service is per se illegal under section 1 of the Sherman Act. *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692–93.

COMPLAINT - 17

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

59. The Ordinance unlawfully authorizes for-hire drivers to engage in this per se illegal concerted action by forming a cartel (under the aegis of a QDR), speaking as a single unit through an exclusive representative (an EDR), and engaging in horizontal fixing of prices and contractual terms.

60. The anticompetitive behavior contemplated by the Ordinance restrains or substantially affects interstate commerce because, for example, for-hire drivers and driver coordinators in Seattle serve out-of-state passengers, transport passengers across state lines, generate revenues from out-of-state sources, and use interstate highways and interstate telecommunications equipment. Drivers frequently receive ride requests for rides that cross county and state borders.

61. Through their enactment and enforcement of the Ordinance, including their approval and endorsement of concerted action by EDRs and of the terms of anticompetitive agreements, Defendants have committed and conspired to commit violations of the Sherman Act.

62. The collective-bargaining scheme created through the Ordinance will have the anticompetitive effect of shielding drivers from competition. To give just a few examples, drivers could negotiate for a cap on the number of active drivers, limits on the types of vehicles that can be used, or limits on the maximum or minimum number of hours that drivers must be available. Each of these terms would limit the entry of new drivers and reduce the availability of transportation for riders.

63. As a direct result of the Defendants' illegal conspiracy and restraint of competition, Plaintiff's members will suffer injury of a type the antitrust laws are intended to prevent. For example, unions such as the Teamsters will seek to reduce the prices paid to app-based companies for the use of their ride referral applications. As a result of the collective-bargaining process, those companies also will incur additional costs of doing business with the conspirators, such as reimbursement of driver's expenses or payment of other benefits. Traditional for-hire companies that provide dispatch services for independent-contractor drivers

COMPLAINT - 18

will suffer similar injuries, as they will be forced to accept reduced prices and incur additional costs for offering dispatch service to drivers.  All of these increased costs, which are due to decreased competition among independent contractors, threaten the viability of companies that provide ride-referral services.  And ultimately, the decrease in competition will harm consumers, who will pay more for personal transportation but receive poorer service.

64.    The state-action doctrine does not immunize Defendant's anticompetitive conduct.  That doctrine provides antitrust immunity only if "the actions in question are an exercise of the State's sovereign power."  *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1110 (2015).  For purposes of this exception, private conduct is an exercise of the State's sovereign power only if (1) the conduct is authorized by a "clearly articulated" and "affirmatively expressed" state policy, and (2) the conduct is "actively supervised" by the State.  *Id*.

65.    Neither of those requirements is met here.  No provision of Washington law clearly articulates or affirmatively authorizes collective bargaining for independent contractors generally, or specifically authorizes for-hire drivers to collectively bargain with driver coordinators over the prices and terms for which drivers' services will be offered.  Furthermore, the Ordinance does not (and cannot) ensure that the State of Washington will actively supervise the collective bargaining process and results to the extent required.  *Id*. at 1116.

66.    The anticompetitive conduct the Ordinance requires is also not immunized from antitrust liability by either the statutory or non-statutory labor exemptions to the antitrust laws.  Among other things, these exemptions do not protect combinations of independent business people, as opposed to combinations of employees covered by federal labor law.  *Am. Medical Ass'n v. United States*, 317 U.S. 519, 536 (1943).  The Ordinance exempts from coverage anyone who is in an employer/employee relationship under federal labor law (see Ordinance § 6), and consequently does not encompass the relationships to which the federal antitrust labor exemptions apply.

COMPLAINT - 19

67.     As a result of Defendants' violation of the Sherman Antitrust Act as alleged herein, Plaintiff is entitled to injunctive and declaratory relief and an award of its attorneys' fees pursuant to 15 U.S.C. § 26.

**COUNT TWO:  PREEMPTION UNDER THE SHERMAN ANTITRUST ACT**

68.     Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

69.     The Supremacy Clause of the Constitution of the United States provides that federal law is the "supreme Law of the Land" and therefore it preempts state and local laws that interfere with or are contrary to federal law.  U.S. Const. art. VI, cl. 2.  A preempted state law conflicts with and violates the U.S. Constitution.

70.     The Ordinance unlawfully authorizes for-hire drivers to engage in this *per se* illegal concerted action by forming a cartel (under the aegis of a QDR), speaking as a single unit through an exclusive representative (an EDR), and engaging in horizontal fixing of prices and contractual terms.  And it requires driver coordinators to participate in such activity by compelling them to bargain over the price and terms for which the independent contractors' services will be offered to the public and forbidding any driver from entering into a different arrangement with a driver coordinator with whom he contracts.

71.     By purporting to authorize concerted anticompetitive conduct in violation of the Sherman Act, and by placing pressure on private parties to violate the Sherman Act in order to comply with the Ordinance, the Ordinance conflicts with and is preempted by the Sherman Act.

**COUNT THREE:  *MACHINISTS* PREEMPTION UNDER THE
NATIONAL LABOR RELATIONS ACT**

72.     Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

COMPLAINT - 20

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

73. The principal federal statute regulating labor relations is the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The NLRA sets forth the rules governing employees' rights to bargain collectively with their employer regarding the terms and conditions of employment, and proscribes as unfair labor practices certain activities by both employers and labor organizations. *See* 29 U.S.C. §§ 157, 158.

74. The NLRA preempts any state regulation of broad swaths of labor-related activity, such as collective bargaining. *See Chamber of Commerce v. Brown*, 554 U.S. 60 (2008); *Machinists v. Wisc. Emp't Relations Comm'n*, 427 U.S. 132, 140 (1976). In *Machinists*, the Court recognized that Congress intended certain conduct to be unregulated by government and left to "the free play of economic forces," and that "Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." *Brown*, 554 U.S. at 65. Accordingly, States may not regulate "within a zone protected and reserved for market freedom" by the NLRA. *Id.* at 66.

75. In determining whether Congress meant to insulate a particular zone of activity from state regulation, "[w]hat Congress left unregulated is as important as the regulations that it imposed." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 (1989).

76. Here, Congress expressly determined that independent contractors should be unregulated and excluded them from collective-bargaining requirements. 29 U.S.C. § 152(3) ("The term 'employee' . . . shall not include any individual . . . having the status of an independent contractor."). This provision reflects Congress's intent to ensure that independent contractors remain regulated by "the free play of economic forces," or market forces, rather than by collective bargaining. Independent contractors are of a fundamentally different character than the other categories of employees, such as agricultural workers and public employees, that are excluded from the NLRA's coverage, and Congress intended that they remain entirely unregulated.

COMPLAINT - 21

77.     If Defendants are permitted to implement and enforce the Ordinance, other local governments may also seek to regulate collective bargaining for independent contractors in a manner different from the one chosen by the City of Seattle.  Subjecting independent contractor relationships to thousands of different bargaining schemes is contrary to Congressional intent in enacting the NLRA.  Doing so would be particularly chaotic for Chamber members who operate across the country, but would be problematic even for those operating in a more restricted geographic area, who may be forced to follow different rules in Seattle than, for example, Tacoma.  The NLRA was enacted to eliminate, rather than impose, such significant burdens on commerce.

78.     In addition to covering those whom Congress did not intend should be covered, the Ordinance imposes other requirements that are antithetical to the NLRA's comprehensive collective bargaining scheme.  In particular, Congress has explicitly left unregulated both the terms of collective bargaining agreements, and each side's use of economic leverage to convince the other to reach agreement.  *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 485–89 (1960).  The Ordinance regulates both:  it regulates the terms of collective bargaining agreements by permitting the Director to disapprove of the parties' negotiated agreement, and it regulates each side's use of economic leverage by requiring interest arbitration and imposing substantial monetary penalties for failures to comply with certain of its provisions.

79.     In sum, the Ordinance conflicts with federal labor policy as embodied in the NLRA because it imposes a collective-bargaining scheme on independent contractors, whose labor practices Congress intended should remain unregulated, and also regulates both the content of collective bargaining agreements and the economic leverage each side may use in reaching agreement, both of which are unregulated by the NLRA.  The Ordinance is therefore preempted.

COMPLAINT - 22

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

## COUNT FOUR:  *GARMON* PREEMPTION UNDER THE
## NATIONAL LABOR RELATIONS ACT

80.    Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

81.    The NLRA also preempts state resolution of issues committed to the exclusive jurisdiction of the National Labor Relations Board, as well as state regulation of any activity arguably protected or prohibited by Sections 7 and 8 of the NLRA.  *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).

82.    An individual need only be "arguably" covered by the NLRA in order for a state's regulation of that individual to be preempted.  *Id*. at 245–47; *see also Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261 (9th Cir. 1994).

83.    On its face, the Ordinance does not apply to individuals who are employees under the NLRA; it applies only to independent contractors.  *See* § 6 ("The provisions of this Ordinance do not apply to drivers who are employees under 29 U.S.C. § 152(3)").

84.    To determine whether a driver coordinator has complied with the Ordinance's requirement to provide a QDR with a list of covered drivers, and has otherwise complied with the Ordinance's provisions, the Director will be required to determine whether the drivers at issue are "employees" under the NLRA and are thus exempt from the Ordinance's coverage, or whether they are independent contractors and within the Ordinance's scope.  *See* § 6; § 3(M). This determination is subject to judicial review in the state courts.  *Id*., § 3(M).  The determination, however, of whether an individual is subject to the NLRA is one that Congress left to the exclusive jurisdiction of the NLRB.  *See, e.g., Marine Eng'rs Beneficial Ass'n v. Interlake Steamship Co.*, 370 U.S. 173 (1962) (determination as to whether individuals are supervisors exempt from NLRA coverage is within the NLRB's exclusive jurisdiction).

85.    The NLRB has not definitively resolved the employee status of drivers who receive ride requests from software applications.  Therefore, the Ordinance injects the state

COMPLAINT - 23

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

courts into matters subject to the NLRB's exclusive jurisdiction, and presently pending before the NLRB, before the NLRB has resolved the question.  As a result, the Ordinance is preempted by federal labor law.  *See Marine Eng'rs Beneficial Ass'n*, 370 U.S. at 185 ("The need for protecting the exclusivity of NLRB jurisdiction is obviously greatest when the precise issue brought before a court is in the process of litigation through procedures originating in the Board. While the Board's decision is not the last word, it must assuredly be the first.").

86.    Section 8(e) of the NLRA prohibits agreements between labor organizations and employers where the employer agrees "to cease doing business with any other person."  29 U.S.C. § 158(e).    Section 8(b)(4) of the NLRA prohibits a labor organization from "threaten[ing], coerc[ing], or restrain[ing] any person engaged in commerce or in an industry affecting commerce" for the purpose of "forcing or requiring . . . a self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section" or "forcing or requiring any person . . . to cease doing business with any other person . . ." 29 U.S.C. § 158(b)(4).

87.    The Ordinance requires driver coordinators to enter into agreements with EDRs that will prevent driver coordinators from doing business with drivers who choose not to be represented by, or who choose not to work under the terms of agreements negotiated by, the EDRs.  The Ordinance also permits agreements that would force self-employed drivers to become members of an EDR should they wish to contract with a particular driver coordinator. By requiring such agreements, which arguably violate Sections 8(e) and 8(b)(4) of the NLRA, the Ordinance is preempted by federal labor law.

**COUNT FIVE:  VIOLATION OF FEDERAL RIGHTS, 42 U.S.C. § 1983**

88.    Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

COMPLAINT - 24

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

89. Federal law provides a civil cause of action to any person who is deprived by another, acting under color of state law, of rights or privileges guaranteed by the Constitution or laws of the United States. *See* Rev. Stat. § 1979, 42 U.S.C. § 1983.

90. Defendants, acting under color of state and local law, and through their enactment, threatened enforcement, and enforcement of the Ordinance as alleged herein, have deprived Plaintiff's members of their rights under the NLRA to be free from "governmental interference with the collective-bargaining process," *Golden State Transit*, 493 U.S. at 109, and their rights under the antitrust laws to be free from combinations and conspiracies in restraint of trade.

91. Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, Plaintiff is therefore entitled to a declaration that Defendants, by their enactment, threatened enforcement, and enforcement of the Ordinance, have violated the rights of Plaintiff's members under the NLRA and the federal antitrust laws.

92. As a further result of Defendants' violation of the rights of Plaintiff's members as alleged herein, Plaintiff is entitled to an award of its attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT SIX:  MUNICIPAL ACTION UNAUTHORIZED BY WASHINGTON LAW

93. Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

94. The authority of a municipality in Washington "is limited to those powers expressly granted and to powers necessary or fairly implied in or incident to the power expressly granted" by state law. *Arborwood Idaho, LLC v. City of Kennewick*, 89 P.3d 217, 225 (Wash. 2004).

95. The Ordinance is not authorized by the Washington state statutes upon which the City relied to pass it.  Those statutes allow local regulation of for-hire vehicles operating within

COMPLAINT - 25

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

their jurisdiction, including:  (a) regulating entry into the business and licensure; (b) controlling rates charged to riders for transportation services; (c) regulating routes traveled by for-hire vehicles; (d) establishing safety and equipment requirements; and (e) other requirements necessary to ensure safe and reliable for-hire transportation service.  *See* R.C.W. § 46.72.160 (for-hire vehicles); R.C.W. § 81.72.210 (taxis).

96.    The Ordinance goes beyond the enumerated grants of regulatory power in R.C.W. §§ 46.71.160 and 81.72.210.  First, the Ordinance attempts to regulate third-party businesses that independently contract with the drivers of for-hire vehicles, but the City has no such authority.  Second, the Ordinance attempts to require collective bargaining for wages, hours and working conditions of for-hire drivers, but the City has no such authority.

97.    Accordingly, the City lacks authority to promulgate and enforce the Ordinance.

## COUNT SEVEN:  VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT

98.    Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

99.    Washington's Consumer Protection Act prohibits "[e]very contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce."  R.C.W. § 19.86.030.

100.    As with the Sherman Act, horizontal price fixing is a per se violation of the Consumer Protection Act.  *See Ballo v. James S. Black Co.*, 692 P.2d 182, 186 (Wash. Ct. App. 1984).

101.    The Ordinance unlawfully authorizes for-hire drivers to engage in *per se* illegal concerted action by forming a cartel (under the aegis of a QDR), speaking as a single unit through an exclusive representative (an EDR), and engaging in horizontal fixing of prices and contractual terms.  And it requires driver coordinators to participate in such activity by compelling them to bargain over the price and terms for which the independent contractors'

COMPLAINT - 26

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

services will be offered to the public and forbidding any driver from entering into a different arrangement with a driver coordinator with whom he contracts.

102.    By purporting to authorize concerted anticompetitive conduct in violation of the Consumer Protection Act, and by placing pressure on private parties to violate the Consumer Protection Act in order to comply with the Ordinance, the Ordinance conflicts with and is preempted by the Consumer Protection Act.

103.    Plaintiff's members will suffer injury as a direct result of the Ordinance's restraint of competition.  For example, under the Ordinance, unions such as the Teamsters will seek to reduce the prices paid to app-based companies for the use of their ride referral applications.  As a result of the collective-bargaining process, those companies also will incur additional costs of doing business with the conspirators, such as reimbursement of driver's expenses or payment of other benefits.  Traditional for-hire companies that provide dispatch services for independent-contractor drivers will suffer similar injuries, as they will be forced to accept reduced prices and incur additional costs for offering dispatch service to drivers.  All of these increased costs, which are due to decreased competition among independent contractors, threaten the viability of companies that provide ride referral services.  And ultimately, the decrease in competition will harm consumers, who will pay more for personal transportation.

104.    The state-action provision does not immunize the anticompetitive conduct that the Ordinance compels.  *See* R.C.W. § 19.86.160.  Under Washington law, the state-action provision must be construed narrowly, and municipalities cannot authorize anticompetitive conduct by private parties absent clear and express authorization from the State.  *Robinson v. Avis Rent A Car System, Inc.*, 22 P.3d 818, 821-23 (Wash. Ct. App. 2001).  The City has no authorization from the State to authorize independent drivers to fix prices and to compel driver coordinators to participate in that collusion.

COMPLAINT - 27

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

**COUNT EIGHT:  VIOLATION OF WASHINGTON PUBLIC RECORDS ACT**

105.    Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

106.    Washington's Public Records Act prohibits disclosure of public records that are protected by any "other statute which exempts or prohibits disclosure of specific information or records."  R.C.W. § 42.56.070(1).

107.    Washington's Trade Secret Act is an "other statute" that prohibits disclosure of trade secrets.  *See* R.C.W. § 19.108.010(4).

108.    The Ordinance compels driver coordinators to provide "all QDRs" with "the names, addresses, email addresses (if available), and phone number (if available) of all qualifying drivers they hire, contract with, or partner with."  Ordinance § 3(D).

109.    The lists of driver information held by the Chamber's members are trade secrets because they (1) contain a compilation of information that (2) "derives independent economic value" from not being known to competitors, and (3) prior to the Ordinance, the information had been a closely guarded secret.  R.C.W. § 19.108.010(4).

110.    Under the Ordinance, the driver lists are "public records."  R.C.W. § 42.56.010. For example, they contain "information relating to" the City's collective bargaining scheme, which is a "governmental or proprietary function," and they are "used" by the City to implement the collective bargaining scheme.  *Id.*

111.    The Ordinance conflicts with and is preempted by the Public Records Act because the Ordinance compels disclosure of the driver lists, which are trade secrets contained in public records and are protected from disclosure under R.C.W. § 42.56.070(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks for judgment against Defendants, and respectfully prays that the Court:

COMPLAINT - 28

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

A.    Issue a judgment declaring that Seattle City Ordinance No. 118499 (Municipal Code Ch. 6.310.735) is unenforceable in its entirety because it:

1.    Violates and is preempted by the Sherman Antitrust Act as an unlawful restraint of trade and not exempt from the antitrust laws by virtue of state action immunity or immunity under the statutory and non-statutory labor exemptions to the antitrust laws;

2.    Is preempted by the National Labor Relations Act in that it attempts to regulate the activity of independent contractors that Congress intended should go unregulated by labor law; it attempts to regulate other aspects of employment, such as the content of collective bargaining agreements and the use of economic leverage in negotiations, that Congress intended should remain unregulated; it requires the Director and Washington State courts to resolve issues committed to the exclusive jurisdiction of the National Labor Relations Board; and it requires driver coordinators to enter into agreements that are arguably prohibited by Section 8 of the National Labor Relations Act; and

3.    Violates the rights of Plaintiff secured by the Constitution and laws of the United States; and

4.    Is unauthorized by R.C.W. §§ 46.71.160 and 81.72.210, and, as such, the City had no authority to enact it; and

5.    Violates and is preempted by the Washington Consumer Protection Act because the Ordinance authorizes an illegal conspiracy in restraint of trade; and

6.    Violates and is preempted by the Washington Public Records Act.

B.    Before April 3, 2017, temporarily enjoin Defendants from implementing, enforcing or otherwise applying the Ordinance;

C.    Pending final judgment in this case, preliminarily enjoin Defendants from implementing, enforcing or otherwise applying the Ordinance;

D.    Permanently enjoin Defendants from implementing, enforcing or otherwise applying the Ordinance;

COMPLAINT - 29

E.    Award costs and attorneys' fee pursuant to any applicable statute or authority; and

F.    Issue such other relief as the Court may deem just and appropriate.

Dated:  March 9, 2017                    Respectfully submitted,

By:    *s/ Timothy J. O'Connell*

Lily Fu Claffee
(D.C. Bar No. 450502)
(pro hac vice pending)

Kate Comerford Todd
(D.C. Bar No. 477745)
(pro hac vice pending)

Steven P. Lehotsky
(D.C. Bar No. 992725)
(pro hac vice pending)

Warren Postman
(D.C. Bar. No. 995083)
(pro hac vice pending)

U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062
(202) 463-3187
slehotsky@uschamber.com

Timothy J. O'Connell, WSBA 15372
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900
(206) 386-7500 FAX
Tim.oconnell@stoel.com

Michael A. Carvin
(D.C. Bar No. 366784)
(pro hac vice pending)

Jacqueline M. Holmes
(D.C. Bar No. 450357)
(pro hac vice pending)

Christian G. Vergonis
(D.C. Bar No. 483293)
(pro hac vice pending)

Robert Stander
(D.C. Bar No. 1028454)
(pro hac vice pending)

JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
(202) 879-3939
(202) 616-1700 FAX
mcarvin@jonesday.com

ATTORNEYS FOR PLAINTIFF

COMPLAINT - 30