1

2

3

4

5

6

7

8 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
9 AT SEATTLE

10

11 CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,
12
                    Plaintiff,
13        v.

14 CITY OF SEATTLE *et al.*

15                    Defendants.

16

17

18

19

20

21

22

23

24

25

26

Case No. 2:17-cv-00370

PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING
ORDER AND/OR PRELIMINARY
INJUNCTION

**ORAL ARGUMENT REQUESTED**

**TEMPORARY RESTRAINING
ORDER NOTED ON CALENDAR:
MARCH 9, 2017**

**PRELIMINARY INJUNCTION
NOTED ON CALENDAR:
MARCH 31, 2017**

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION
Case No.

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    A.    Ride-Referral And Dispatch Services In Seattle ................................................ 2

    B.    The Ordinance ..................................................................................................... 3

    C.    Prior Litigation ................................................................................................... 4

    D.    Implementation Of The Ordinance And Recent Developments .......................... 4

ARGUMENT ....................................................................................................................... 5

I.    THE CHAMBER IS LIKELY TO SUCCEED ON THE MERITS ............................. 5

    A.    The Sherman Act Preempts the Ordinance ........................................................ 5

          1.    The Ordinance Authorizes Price Fixing, A Per Se Antitrust Violation ................................................................................. 6

          2.    The State-Action Doctrine Does Not Apply .......................................... 7

    B.    The National Labor Relations Act Preempts the Ordinance .............................. 13

          1.    The Ordinance Is Preempted Under *Machinists* .................................... 14

          2.    The Ordinance Is Preempted Under *Garmon* ......................................... 20

II.    ABSENT AN INJUNCTION, IRREPARABLE INJURY IS LIKELY ........................ 22

III.    THE BALANCE OF HARDSHIPS SHARPLY FAVORS THE CHAMBER .............. 23

IV.    THE PUBLIC INTEREST SUPPORTS AN INJUNCTION ......................................... 24

V.    THE "SERIOUS QUESTIONS" TEST WARRANTS PRELIMINARY RELIEF ........ 24

CONCLUSION .................................................................................................................... 24

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - i
Case No.

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

**TABLE OF AUTHORITIES**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................5, 24

*Am. Trucking Ass'ns., Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ................22, 23

*Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 3328 (1982) ..........................................6

*Beasley v. Food Fair of N.C., Inc.*, 416 U.S. 653 (1974) ...............................................16

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010) ...........................22

*Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261 (9th Cir. 1994) ............................................21

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980) .......................12

*Chalk v. United States Dist. Ct.*, 840 F.2d 701 (9th Cir. 1988) ....................................23

*Chamber of Commerce v. Brown*, 554 U.S. 60 (2008)..........................................14, 18

*Columbia River Packers Ass'n v. Hinton*, 315 U.S. 143 (1942).................................6, 7

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*,
    111 F.3d 1427 (9th Cir. 1996) .....................................................................8,9, 11

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937 (9th Cir. 1996) .................................9

*Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177 (2007).....................................................17

*Fisher v. City of Berkeley*, 475 U.S. 260 (1986)........................................................13

*FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003 (2013) .......................................... *passim*

*FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992) .................................................12, 13

*Golden State Transport Corp. v. City of Los Angeles*, 475 U.S. 608 (1986)..............................18

*HHS v. Alley*, 556 U.S. 1149 (2009) ...........................................................................22

*Idaho Bldg. & Constr. Trades Council, AFL-CIO v. Inland Pac. Chapter of
    Associated Builders & Contractors, Inc.*, 801 F.3d 950 (9th Cir. 2015).............................21

*Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389 (9th Cir. 2015)....................................5

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - ii
Case No.

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ...................................6, 7

*L.A. Meat & Provision Drivers Union v. United States*, 371 U.S. 94 (1962)................................6

*Machinists v. Wis. Emp't Relations Comm'n*, 427 U.S. 132 (1976)...................................... *passim*

*Marine Eng'rs Beneficial Ass'n v. Interlake S.S. Co.*, 370 U.S. 173 (1962) ...............................21

*Medic Air Corp. v. Air Ambulance Auth.*, 843 F. 2d 1187 (9th Cir. 1988)...................................10

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).........................................................24

*N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999) .........................................22

*NLRB v. Friendly Cab Co.*, 512 F.3d 1090 (9th Cir. 2008).........................................15

*NLRB v. Hearst Publ'ns*, 322 U.S. 111 (1944).......................................................15, 18

*NLRB v. Hendricks Cty. Rural Elec. Membership Corp.*, 454 U.S. 170 (1981)..........................15

*NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477 (1960) ...........................................19, 20

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) ...........................................15

*NLRB v. United Ins. Co. of Am.*, 390 U.S. 254 (1968) ......................................15, 16, 18

*Pac. Aero. & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188 (E.D. Wash. 2003)..........................22

*Parker v. Brown*, 317 U.S. 341 (1943) ...............................................................8, 18

*Patrick v. Burget*, 486 U.S. 94 (1988) ...............................................................8, 12

*Providence Journal Co. v. FBI*, 595 F.2d 889 (1st Cir. 1979)..........................................22

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982).....................................................5, 7

*Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004).........................................................24

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ...............................................22, 23

*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959)............................13, 18, 20, 21

*Springs Ambulance Serv. v. City of Rancho Mirage*, 745 F.2d 1270 (9th Cir. 1984)...............8, 11

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - iii
Case No.

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ...........................5

*Tom Hudson & Assocs., Inc. v. City of Chula Vista*, 746 F.2d 1370 (9th Cir. 1984) ..................13

*Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985) ......................................................12, 13

*United Farm Workers of Am. v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249
    (9th Cir. 1982)................................................................................................................17

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985).....................................16

*United States v. Women's Sportswear Mfrs. Ass'n*, 336 U.S. 460 (1949) .....................................7

*Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427 (2014) ..........................................................18

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ......................................................24

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ..............................................................12

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................................................5

**STATUTES**

15 U.S.C. § 1 .............................................................................................................................6, 9

29 U.S.C. § 152.......................................................................................................................14, 16

29 U.S.C. § 157...............................................................................................................................13

29 U.S.C. § 158.................................................................................................................13, 19, 20

RCW 46.72.001 ...............................................................................................................................10

RCW 46.72.160 ...............................................................................................................................10

Seattle Ordinance No. 118793 ........................................................................................................4

Seattle Ordinance No. 124968 ................................................................................................. *passim*

49 Stat. 450 .....................................................................................................................................17

Taft Hartley Act, 61 Stat. 136, 29 U.S.C. § 152 ..........................................................................16

Taft-Hartley Act of 1947, Pub. L. No. 80–101, 61 Stat. 136..........................................................15

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - iv
Case No.

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

Washington Public Records Act, RCW 19.56.070 ..........................................................22

**OTHER AUTHORITIES**

H.R. Rep. No. 80-245 (1947) ...........................................................................16

Letter to Wash. Rep. Brad Benson  (Feb. 8, 2002), .........................................7

Letter to Ohio Rep. Dennis Stapleton  (Oct. 16, 2002) ....................................7

S. Rep. No. 79-1184 (1934) ............................................................................17

Testimony of David Wales (Oct. 18, 2007) ...............................................7, 11, 12

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - v
Case No.

1  Plaintiff Chamber of Commerce of the United States of America hereby moves for a

2  temporary restraining order and/or a preliminary injunction enjoining Defendants (collectively,

3  the "City") from implementing or enforcing Seattle Ordinance No. 124968 pending final

4  judgment in this case.  The Chamber asks the Court to enter this order by April 3, 2017.  To

5  maintain the status quo, the Chamber requests that this Court at a minimum temporarily enjoin

6  the Ordinance pending briefing and resolution of this motion.  Unless enjoined, on April 3 the

7  Ordinance will require certain Chamber members to disclose the confidential information of for-

8  hire drivers who contract with them, causing irreparable harm.

9  **INTRODUCTION**

10  In less than four weeks, the Ordinance will, absent prompt judicial intervention, wreak

11  irreparable harm that threatens the very existence of the for-hire and rideshare transportation

12  system in western Washington through compulsory production of confidential, trade secret

13  information and forced compliance with a novel regulatory scheme that is preempted by federal

14  antitrust and labor law.  The Ordinance should be enjoined before it ever goes into effect.

15  For-hire drivers are independent contractors who connect with passengers through a ride-

16  referral service, *e.g.*, a dispatch center or smartphone application ("app"), provided by a third-

17  party company, known under Seattle law as a driver coordinator.  Out of step not only with well-

18  settled principles of antitrust and labor law but also with municipalities around the country, the

19  City attempts to treat these independent contractors as if they were employees of the driver

20  coordinators with whom they contract.  Specifically, the City's one-of-a-kind ordinance

21  authorizes drivers to unionize and collude through collective bargaining over the price terms of

22  their contracts with driver coordinators.  The Ordinance turns labor law on its head, treating

23  independent businesses as employees, and flouts antitrust law, allowing independent economic

24  actors to fix prices.  As such, the Ordinance is preempted by both the Sherman Act and the

25  National Labor Relations Act.

26

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 1
Case No.

1        On March 7, 2017, Teamsters Local 117 demanded that Chamber members Uber, Lyft,

2  and Eastside turn over—by April 3, 2017—their confidential list of contracted drivers (including

3  personal identifying information) so the Teamsters can attempt to unionize these independent

4  contractors.  The Chamber satisfies all the criteria for obtaining an order to preserve the status

5  quo while the Court adjudicates the merits.  First, the Chamber is likely to succeed on its claims

6  that the Ordinance is preempted by federal antitrust and labor law.  Second, Chamber members

7  will suffer irreparable harm by being forced to comply with a preempted law, disclose

8  confidential information, and incur costs and expenses not fully compensable by money damages.

9  Third, the balance of hardships sharply favors the Chamber and its members, especially given the

10  City's prior successful efforts to block an earlier, unaccelerated adjudication of this controversy.

11  Finally, the public interest supports the issuance of preliminary relief.

12  **BACKGROUND**

13  **A.**    **Ride-Referral And Dispatch Services In Seattle**

14        For-hire drivers must connect with riders.  Traditionally, drivers relied upon street hails,

15  taxi stands, or a physical dispatch service.  Taxicab associations and limousine companies often

16  maintain dispatch centers where riders call to request service that is provided by affiliated drivers.

17  Chamber member Eastside for Hire, Inc. ("Eastside") is a traditional dispatch service that

18  contracts with drivers to provide ride-referral services.  *See* Decl. of Bashi Katar ¶ 5.  The

19  company uses advertising and a client base to generate passenger transportation requests by

20  telephone or email, and refers the requests to drivers using a mobile data terminal.  *Id.* ¶ 6.  The

21  drivers are independent contractors, not Eastside employees.  *Id.* ¶ 8.

22        The smartphone made possible a new type of ride-referral system.  Digital ride-referral

23  applications allow a potential rider to communicate her location through a smartphone, and for

24  computer systems to match that rider with an available driver who is nearby.  Prominent

25  examples are the "Uber App," and the "Lyft App," developed by Chamber members Uber

26  Technologies, Inc. (with its subsidiaries, "Uber") and Lyft respectively.  *See* Decl. of Brooke

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 2
Case No.

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1  Steger. ¶ 3; Decl. of Todd Kelsay ¶ 4.  Local transportation providers contract with Uber or Lyft

2  (or both) to use the respective App for transportation requests and fare-payment-processing

3  services, in exchange for paying a service fee.  Steger Decl. ¶¶ 3, 8–10; Kelsay Decl. ¶¶ 5–7.  All

4  drivers who use the Uber and Lyft Apps are independent contractors, and neither Uber or Lyft

5  employs drivers or operates commercial vehicles.  Steger Decl. ¶¶ 14–15; Kelsay Decl. ¶¶ 8, 10.

6  **B.      The Ordinance**

7        Professing concern about the impact on driver earnings of increased competition in the

8  for-hire transportation market, and incorrectly viewing the relationship between driver

9  coordinators and drivers as akin to that of employer and employees, Seattle Council members

10  enacted Ordinance 124968.  The Ordinance requires "driver coordinators" to collectively bargain

11  with "for-hire drivers."  Ordinance § 1(I).  A "driver coordinator" is "an entity that hires,

12  contracts with, or partners with for-hire drivers" to assist them in "providing for-hire services to

13  the public."  Ordinance § 2.  The Ordinance applies only to drivers who contract with a driver

14  coordinator "other than in the context of an employer-employee relationship," *id.* § 3(D)—*i.e.*, to

15  independent contractors—and gives them the power to unionize and collectively bargain as if

16  they were employees under the federal labor laws.

17        The collective-bargaining process begins when a union applies to be a "Qualified Driver

18  Representative" (QDR) to the City's Director of Finance and Administrative Services (Director).

19  *Id.* § 3(C).  Once the Director approves a QDR, any driver coordinator that contracts with "50 or

20  more for-hire drivers in the 30 days prior to the [Ordinance's] commencement date" must, at the

21  demand of a QDR, disclose "within 75 days of the commencement date" the names, addresses,

22  email addresses, phone numbers, and driver license numbers of "all qualifying drivers they hire,

23  contract with, or partner with."  *Id.* § 3(D); Director's Rule FHDR-1, http://bit.ly/2mphh8s.  The

24  QDR contacts those drivers, and if a majority consent to the QDR's exclusive representation, the

25  Director must certify it as the "Exclusive Driver Representative" (EDR) "for all drivers for that

26  particular driver coordinator."  *Id.* § 3(F)(2).  This designation prevents the driver coordinator

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 3
Case No.

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1  from doing business with any drivers who do not wish to be represented by, or to work under the

2  terms negotiated by, the EDR.  *Id.* § 2.

3      Once an EDR is certified, the driver coordinator must meet with it to negotiate over

4  various subjects, including the "payments to be made by, or withheld from, the driver

5  coordinator to or by the drivers," and "minimum hours of work."  *Id.* § 3(H)(1).  The Director

6  does not participate in the negotiation but merely determines whether to approve any agreement

7  as consistent with City policy.  *Id.* § 3(H)(2)(c).  If the coordinator and union do not reach

8  agreement, the matter goes to binding arbitration, and the arbitrator submits what he believes is

9  "the most fair and reasonable agreement" to the Director for approval.  *Id.* § 3(I)(1)–(4).

10     **C.    Prior Litigation**

11     This Court dismissed without prejudice the Chamber's prior suit challenging the

12  Ordinance, accepting the City's argument that the case was not ripe because no QDR had yet

13  sought designation or demanded driver lists.  *See* No. 2:16-cv-00322, Doc. 63 at 8 (W.D. Wash.

14  Aug. 9, 2016).  The Chamber had opposed dismissal in part because, under the Ordinance's

15  compressed timetable, waiting until a QDR has demanded driver lists would needlessly force the

16  Chamber to seek injunctive relief on an expedited basis.  *Id.*, Tr., Doc. 60, at 12 (Aug. 3, 2016).

17     **D.    Implementation Of The Ordinance And Recent Developments**

18     Soon after the Court dismissed the Chamber's complaint, the City Council set January

19  17, 2017, as the Ordinance's commencement date.  *See* Seattle Ordinance No. 118793,

20  http://bit.ly/2jRlaP1.  On March 3, 2017, the City designated Teamsters Local 117 as a QDR.

21  The Teamsters notified Uber, Lyft, and Eastside on March 7, 2017, that it intends to become the

22  EDR of all drivers who contract with those companies, and demanded that each company turn

23  over its confidential driver information.  Kelsay Decl. ¶ 12; Steger Decl. ¶ 17; Katar Decl. ¶12 .

24  These companies keep this information strictly confidential and maintain it as a trade secret.

25  Kelsay Decl. ¶ 13–17; Steger Decl. ¶ 17; Katar Decl. ¶12.]  Uber, Lyft, and Eastside now have

26  until April 3, 2017, to disclose that information to the Teamsters.  Ordinance § (3)(D).

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 4
Case No.

z
**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

**ARGUMENT**

2          Because it authorizes independent contractors to form unions and fix prices, the

3   Ordinance is preempted by both antitrust and labor laws.  If not enjoined, the Ordinance will

4   cause severe and uncompensable injury to the Chamber's members.  This is therefore a classic

5   case for injunctive relief:  a likelihood of success on the merits, coupled with irreparable harm.

6          A plaintiff is entitled to a preliminary injunction if (1) "he is likely to succeed on the

7   merits," (2) he "is likely to suffer irreparable harm" absent preliminary relief, (3) "the balance of

8   equities tips in his favor," and (4) an "injunction is in the public interest."  *Winter v. Natural Res.*

9   *Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  These factors interrelate on a "sliding scale"; if the

10  "balance of hardships … tips sharply towards the plaintiff" (and the other factors are satisfied),

11  an injunction should issue if there are "serious questions going to the merits."  *Alliance for the*

12  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *accord Int'l Franchise Ass'n, Inc.*

13  *v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015).  The standard for a temporary restraining

14  order is "substantially identical."  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d

15  832, 389 n.7 (9th Cir. 2001).  These factors favor granting an injunction here.

16  **I.      THE CHAMBER IS LIKELY TO SUCCEED ON THE MERITS**

17          **A.      The Sherman Act Preempts the Ordinance**

18          Absent state-action immunity, federal antitrust law preempts municipal laws that mandate

19  or authorize private parties to commit "*per se* violation[s]" of the Sherman Act.  *Rice v. Norman*

20  *Williams Co.*, 458 U.S. 654, 661 (1982).  The Ordinance does that by authorizing for-hire drivers

21  who are independent contractors to form unions and collectively bargain over the price terms of

22  their contracts with driver coordinators.  This is horizontal price-fixing—a classic *per se* antitrust

23  violation.  The Supreme Court has repeatedly affirmed that the antitrust laws prohibit

24  independent contractors from forming or joining unions to collectively bargain, and the Federal

25  Trade Commission has consistently maintained that state and local enactments authorizing

26  collective bargaining by independent contractors violate the antitrust laws.

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 5
Case No.

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1   The Ordinance is therefore preempted unless Defendants can establish an entitlement to

2   state-action immunity.  This doctrine allows a municipality to mandate or authorize a violation of

3   the antitrust laws if the challenged conduct is "clearly articulated and affirmatively expressed as

4   state policy" and is "actively supervised by the State."  *FTC v. Phoebe Putney Health Sys., Inc.*,

5   133 S. Ct. 1003, 1010 (2013).  But the Ordinance satisfies neither condition, because state law

6   nowhere expresses a policy of permitting collective bargaining by for-hire drivers, and no state

7   official (nor even any City official) actively supervises the collective-bargaining process.

8           **1.      The Ordinance Authorizes Price Fixing, A *Per Se* Antitrust Violation**

9           The Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint

10  of trade or commerce among the several States."  15 U.S.C. § 1.  Certain collusive practices are

11  condemned as *per se* violations, which means that they are unlawful on their face, without the

12  need for a factfinder to decide whether they are reasonable under the circumstances.  *Ariz. v.*

13  *Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 342–48 (1982).  "Foremost in the category of per se

14  violations is horizontal price fixing among competitors"—*i.e.*, agreements among competitors to

15  establish the price to be paid for a good or a service.  *Knevelbaard Dairies v. Kraft Foods, Inc.*,

16  232 F.3d 979, 986 (9th Cir. 2000).  And when a *per se* violation occurs, "there is no need to

17  define a relevant market or to show that the defendants had power within the market."  *Id.*

18          These prohibitions on price fixing apply to efforts by individual independent contractors

19  to join or form unions to collectively bargain with companies over prices for goods and services.

20  For example, independent grease peddlers violated the Sherman Act by joining a union and

21  collectively bargaining over the price at which they would resell restaurant grease to grease

22  processors.  *See L.A. Meat & Provision Drivers Union v. United States*, 371 U.S. 94, 96–98

23  (1962).  Independent fishermen violated the Sherman Act by forming a union and collectively

24  bargaining about the terms and conditions under which they would sell fish to processors and

25  canneries.  *See Columbia River Packers Ass'n v. Hinton*, 315 U.S. 143, 144–46 (1942).  And

26  independent "stitching contractors" violated the Sherman Act by forming a union and

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1    collectively bargaining over the provision of stitching services to clothing sellers.  *See United*

2    *States v. Women's Sportswear Mfrs. Ass'n*, 336 U.S. 460, 463–64 (1949).

3         The FTC has consistently relied on these principles to condemn collective-bargaining

4    measures similar to the Ordinance on the grounds that "collective bargaining over prices

5    amounts to *per se* illegal price fixing."  Letter to Wash. H. Rep. Brad Benson 5 (Feb. 8, 2002),

6    http://bit.ly/2lsuMQP.  For instance, the FTC concluded that Washington State legislation

7    authorizing physicians to collectively bargain with health insurers would permit "precisely the

8    sort of conduct" that is a *per se* antitrust violation:  horizontal price fixing.  *Id.* at 2.  The FTC

9    reaffirmed this position when it opposed an Ohio bill allowing home health-care providers to

10   collectively bargain over insurance reimbursements.  Letter to Ohio H. Rep. Dennis Stapleton 7

11   (Oct. 16, 2002), http://bit.ly/2lsvRrT.  And the FTC has reiterated this in congressional testimony.

12   *See, e.g.*, Testimony of David Wales 7 (Oct. 18, 2007), http://bit.ly/2m9Pady.

13        The Ordinance undeniably authorizes *per se* illegal conduct.  It allows for-hire drivers

14   who are independent contractors to join together in a union (the EDR) and, through the union, to

15   agree with one another on, and collectively bargain over, the price terms of their contracts with

16   the driver coordinators.  Ordinance § 3(H)(1).  Like the illegal grease peddlers' union in *Los*

17   *Angeles Meat & Provision Drivers Union*, the illegal fishermen's union in *Columbia River*

18   *Packers Ass'n*, the illegal stitchers' union in *Women's Sportswear*, and the physicians' and

19   home-health-care workers' unions condemned by the FTC, this "collective bargaining over

20   prices amounts to *per se* illegal price fixing."[1]

21              **2.**       **The State-Action Doctrine Does Not Apply**

22        Because the Ordinance authorizes *per se* illegal conduct, it is preempted, *see Rice*,

23   458 U.S. at 661, unless the City demonstrates that the conduct at issue is entitled to state-action

24              [1] Because the antitrust laws apply to price fixing by sellers *and* buyers, *Knevelbaard*
25   *Dairies*, 232 F.3d at 986, it is *per se* illegal price fixing whether characterized as an agreement
     over the price drivers pay coordinators to use a ride-referral service (*see* Steger Decl. ¶ 3; Guled
26   Decl. ¶ 4), or the price coordinators pay drivers to provide driving services.

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 7
Case No.                                              **STOEL RIVES LLP**
                                                           ATTORNEYS
                                        600 University Street, Suite 3600, Seattle, WA  98101
                                              *Telephone (206) 624-0900*

1 immunity.  The City's transparent effort to cloak the Ordinance's price-fixing scheme with the

2 imprimatur of state action fails.  Under the state-action doctrine, States are immune from

3 antitrust liability when acting in their sovereign capacity.  *See Parker v. Brown*, 317 U.S. 341

4 (1943).  In contrast, non-state actors carrying out a State's regulatory program may claim state-

5 action immunity only by satisfying a "rigorous two-pronged test."  *Patrick v. Burget*, 486 U.S.

6 94, 100 (1988).  Their challenged conduct is immune only if it is both (1) "clearly articulated and

7 affirmatively expressed as state policy," and (2) "actively supervised by the State."  *Phoebe*

8 *Putney*, 133 S. Ct. at 1010.  These requirements must be narrowly applied, for "state-action

9 immunity is disfavored."  *Id.* (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992)).  If

10 the otherwise unlawful conduct the Ordinance authorizes fails to satisfy either of these

11 requirements, the Ordinance is preempted.  Neither requirement is satisfied here.

12      **(a)**   **The Ordinance fails the clear-articulation requirement**

13    **i.**   To prove that anticompetitive conduct is clearly articulated and affirmatively

14 expressed, the City must demonstrate that the state explicitly authorized the specific conduct in

15 question.  *See Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1441 (9th

16 Cir. 1996).  A mere "inference" that the state intended to approve the conduct is insufficient;

17 there must be a "forthright and clear statement."  *Id.* at 1439.  Moreover, "state-law authority to

18 act is [alone] insufficient to establish state-action immunity"; the City must also show that an

19 "anticompetitive effect was the 'foreseeable result' of what the State authorized" the

20 municipality to do.  *Phoebe Putney*, 133 S. Ct. at 1011–12; *see also Columbia Steel*, 111 F.3d at

21 1444.  A particular anticompetitive effect is not foreseeable unless the State "affirmatively

22 contemplated" that the municipality would displace competition in a specific way, *Phoebe*

23 *Putney*, 133 S. Ct. at 1011, and contemplated "the kind of actions alleged to be anticompetitive,"

24 *Springs Ambulance Serv. v. City of Rancho Mirage*, 745 F.2d 1270, 1273 (9th Cir. 1984).  These

25 standards must be rigorously applied because "a broad interpretation of the doctrine may

26

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 8
Case No.

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1    inadvertently extend immunity to anticompetitive activity which the states did not intend to

2    sanction." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 941 (9th Cir. 1996).

3         In *Phoebe Putney*, for example, the Supreme Court considered whether a state statute

4    clearly articulated and affirmatively expressed a state policy allowing a municipal hospital

5    authority to acquire a private competitor in a transaction that would violate the antitrust laws.

6    The statute at issue authorized the municipal hospital authority to exercise a broad range of

7    powers, including the express power "to acquire" other hospitals. 133 S. Ct. at 1007–08

8    (quotations and brackets omitted). Even this was insufficient to authorize the merger, the Court

9    unanimously concluded, because although the statute authorized hospital acquisitions generally,

10   it did not "clearly articulate and affirmatively express" a specific policy of allowing acquisitions

11   "that will substantially lessen competition." *Id.* at 1012. And in *Columbia Steel*, the Ninth

12   Circuit held that a state agency's order approving an exchange of facilities by two electric

13   utilities to eliminate duplication within given service areas did not immunize the utilities from

14   claims that the utilities had unlawfully divided the market, because, even though the exchange

15   may have been "as a practical matter, the factual equivalent of an allocation of exclusive service

16   territories," the order "did not specifically and clearly authorize . . . a division of the . . . market

17   into exclusively served territories." 111 F.3d at 1441 (quotations and brackets omitted).

18       **ii.**    Here, as in *Phoebe Putney* and *Columbia Steel*, the general authorizations of

19   Washington state law fall far short of expressly authorizing the challenged conduct or

20   affirmatively contemplating that the City would displace competition in the specific manner that

21   it did. No provision of state law even arguably authorizes municipalities to regulate "the nature

22   and amount of payments" between for-hire drivers and driver coordinators, Ordinance § 3(H)(1),

23   let alone to permit those payments to be set through a *per se* anticompetitive collective-

24   bargaining process. Indeed, the Washington statutory provisions cited in the Ordinance, *see*

25   Ordinance § 1, do not even mention driver coordinators or collective bargaining, but instead

26

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 9
Case No.

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone* (206) 624-0900

1 merely give municipalities a degree of general regulatory authority over persons and businesses

2 providing for-hire transportation services.  *See* RCW 46.72.160(1)–(6).

3   For example, the statute grants municipalities the power to "control[] the rates charged"

4 and "the manner in which rates are calculated and collected."  RCW 46.72.160(3).  But this

5 refers to the rates or fares that drivers charge to *passengers*, not to any payments between drivers

6 and driver coordinators.  And it certainly says nothing about fixing prices through collective

7 bargaining.  Other provisions authorize municipalities to "[e]stablish[] safety and equipment

8 requirements," and "[a]ny other requirements adopted to ensure safe and reliable for hire vehicle

9 transportation service."  RCW 46.72.160(5), (6).  Again, these provisions apply to transportation

10 providers, not ride-referral companies, and they say nothing about either collective bargaining or

11 payments between drivers and driver coordinators.

12   The statutory provision expressing "the intent of the legislature to permit political

13 subdivisions of the state to regulate for hire transportation services without liability under federal

14 antitrust laws" (RCW 46.72.001) does not alter this result.  This statement appears in the

15 statute's prefatory "Finding and intent" provision, and thus demonstrates only that the State

16 contemplated antitrust immunity to the extent that municipalities enact the sorts of regulations

17 specifically enumerated in the statute's operative provision, RCW 46.72.160.  Thus, this

18 provision might be sufficient to confer antitrust immunity on a municipal fare schedule

19 promulgated pursuant to the power to "[c]ontrol[] . . . rates" charged to passengers.  But it is

20 plainly insufficient to immunize the City's delegation to private drivers the power to fix the price

21 of a ride-referral service between themselves and driver coordinators through an anticompetitive

22 collective-bargaining process.  After all, "the authorization of discrete forms of anticompetitive

23 conduct pursuant to a regulatory structure[] does not establish that the State has affirmatively

24 contemplated other forms of anticompetitive conduct that are only tangentially related."  *Phoebe*

25 *Putney*, 133 S. Ct. at 1016; *see also Medic Air Corp. v. Air Ambulance Auth.*, 843 F. 2d 1187,

26

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 10
Case No.

1189 (9th Cir. 1988) (state-action immunity for monopoly provider of air-ambulance *dispatching*

did not extend to dispatcher's anticompetitive conduct in providing air-ambulance *services*).

 **iii.** Defendants cannot save the Ordinance by referring to language in its preamble and findings stating that the Ordinance is within the City's power to "ensure safe and reliable for hire vehicle transportation services" because the City assumes drivers who secure better payment terms from driver coordinators will be more satisfied with their economic situations and hence likelier to provide safer and more reliable service. The City's rationale makes no sense. For immunity to apply, the state legislature must have made a "forthright and clear statement" authorizing the conduct, *Columbia Steel*, 111 F.3d at 1439, and must have affirmatively "contemplated the kind of actions alleged to be anticompetitive," *Springs Ambulance*, 745 F.2d at 1273. The City's transparent end-run around the "clear articulation" requirement fails because a clear statement is entirely lacking, and because the legislature could hardly have contemplated that its authorization to regulate safety and reliability would be used to regulate payments between drivers and driver coordinators, let alone to delegate to drivers the power to fix the prices of those payments through anticompetitive collective bargaining. If, as in *Phoebe Putney*, the power to acquire hospitals does not include the power to acquire hospitals anticompetitively, then the power to regulate safety and reliability certainly does not include the power to authorize private parties to engage in horizontal price fixing.

 The FTC has consistently rejected, in similar contexts, efforts to disguise collective bargaining regimes as safety regulations. As the agency explained in testimony before Congress, collective bargaining cannot "solve issues regarding the ultimate safety or quality of products or services that consumers receive." Testimony of David Wales, at 8 (Oct. 18, 2007), http://bit.ly/2m9Pady . We do not, for example, "rely on [unions] to bargain for safer, more reliable, or more fuel-efficient cars." *Id.* Rather, "[c]ollective bargaining rights are designed to raise the incomes and improve the working conditions of union members," not to "ensure the safety or quality of products or services." *Id.*

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1    At bottom, the City seeks to fundamentally alter the status of independent drivers by

2    enabling them to form drivers' unions and bargain for wages like employees.  The state

3    legislature plainly did not "affirmatively contemplate" such a sea change merely by authorizing

4    municipalities to ensure "safe and reliable" transportation service.  Just as Congress does not

5    "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), the

6    state legislature does not hide collective-bargaining regimes in safety regulations.

7                    **(b)      The Ordinance fails the active-supervision requirement**

8            The collective-bargaining regime also fails the "active supervision" requirement.  The

9    government cannot simply delegate to private parties the task of implementing an

10   anticompetitive program; rather, it must be "implemented in its specific details" "by the State."

11   *Ticor Title*, 504 U.S. at 633.  "Actual state involvement, not deference to private price-fixing

12   arrangements . . . is the precondition for immunity."  *Id.*  This requirement ensures that "the State

13   has exercised sufficient independent judgment and control so that the details of the rates or prices

14   have been established as a product of deliberate state intervention, not simply by agreement

15   among private parties."  *Id.* at 634–35.  The ultimate question is whether the anticompetitive

16   prices come from private parties or are instead of "the State's own" devising.  *Id.* at 635.

17           Under the Ordinance, collective bargaining is a private process; the Director's only role is

18   to approve or disapprove an agreement submitted to him after the parties (or an arbitrator) have

19   agreed to terms.  *Supra* p. 4.  This rubber-stamp review is not "active supervision" by the State.

20           As an initial matter, the Director is not a state official; he is a municipal one.  But "where

21   state *or municipal* regulation [of] a private party is involved . . . active *state* supervision must be

22   shown."  *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46 n.10 (1985) (emphasis added);

23   *see also Patrick*, 486 U.S. at 101 ("the active supervision requirement mandates that *the State*

24   exercise ultimate control" (emphasis added)); *Cal. Retail Liquor Dealers Ass'n v. Midcal

25   Aluminum, Inc.*, 445 U.S. 97, 105 (1980) ("the policy must be 'actively supervised' by the State

26   itself").  Municipalities are *not* substitutes for States and cannot simply step into the shoes of the

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1 State for purposes of state supervision—they "are not beyond the reach of the antitrust laws . . .

2 because they are not themselves sovereign." *Town of Hallie*, 471 U.S. at 38. The absence of any

3 involvement by state officials deprives Defendants of antitrust immunity.[2]

4       Even if a municipal official can fulfill the *state*-supervision requirement, the Director's

5 role under the ordinance is insufficient because he does not participate in collective bargaining

6 itself. He has only a veto power, and no independent authority to specify the terms of a

7 collective-bargaining agreement. Absent that authority, the Director is insufficiently involved

8 "in the mechanics" of the anticompetitive price fixing scheme, *Ticor*, 504 U.S. at 633, and the

9 arrangement cannot be considered "the State's own," *id.* at 635. State-action immunity therefore

10 cannot shield the Defendants' collective-bargaining regime from scrutiny under the Sherman Act,

11 as the collective-bargaining scheme "is really a private price-fixing conspiracy, concealed under

12 a gauzy cloak of state involvement." *Fisher v. City of Berkeley*, 475 U.S. 260, 269 (1986).

13       **B.    The National Labor Relations Act Preempts the Ordinance**

14       The National Labor Relations Act ("NLRA") governs employees' rights to bargain

15 collectively with their employer and proscribes as unfair labor practices certain activities by both

16 employers and labor organizations. *See* 29 U.S.C. §§ 157, 158. The NLRA preempts the

17 Ordinance in two ways: *first*, by regulating activities—agreements between businesses and

18 independent contractors—that the statute leaves "unregulated" and subject to the "free play of

19 economic forces," *Machinists v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 140 (1976)

20 ("*Machinists* preemption"), and, *second*, by impermissibly injecting local officials and state

21 courts into matters—determining whether for-hire drivers are "employees" under the NLRA—

22 that are subject to the NLRB's exclusive jurisdiction, *see San Diego Bldg. Trades Council v.*

23 *Garmon*, 359 U.S. 236, 244-45 (1959) ("*Garmon* preemption").

24 ────────────────

25     [2] Some courts have assumed that municipal supervision of private parties is sufficient, but
the issue was not squarely raised or decided in those cases. *See, e.g.*, *Tom Hudson & Assocs.,*

26 *Inc. v. City of Chula Vista*, 746 F.2d 1370, 1374 (9th Cir. 1984).

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 13
Case No.

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1     **1.      The Ordinance Is Preempted Under *Machinists***

2          (a)     **Congress intended that independent contractors remain
                    unregulated**

3     *Machinists* preemption precludes state and local governments from enforcing laws

4     regulating conduct that Congress intended remain unregulated and "controlled by the free play of

5     economic forces." *Machinists*, 427 U.S. at 140; *Chamber of Commerce v. Brown*, 554 U.S. 60,

6     65 (2008). "'An appreciation of the true character of the national labor policy expressed in the

7     NLRA'" indicates that "Congress struck a balance of protection, prohibition, and laissez-faire in

8     respect to union organization, collective bargaining, and labor disputes that would be upset if a

9     state could also enforce statutes or rules of decision resting upon its views concerning

10    accommodation of the same interests." *Machinists*, 427 U.S. at 140 n.4 (quotations omitted).

11    Accordingly, state and local governments may not regulate "within a zone protected and reserved

12    for market freedom" by the NLRA. *Brown*, 554 U.S. at 66.

13         The statutory text, purpose, history, and structure of the NLRA all demonstrate that

14    Congress excluded independent contractors from unionization and collective-bargaining

15    schemes—state and federal—rather than allow municipalities to set up their own regulatory

16    programs. Congress expressly excluded "any individual . . . having the status of an independent

17    contractor" from the definition of "employee." 29 U.S.C. §152(3). This reflects Congress's

18    intent to ensure that the relationships between independent contractors and those with whom they

19    do business remain regulated by "the free play of economic forces," or market forces.

20         Requiring independent contractors to collectively bargain is also inconsistent with the

21    fundamental purpose of labor regulation under the NLRA. The Supreme Court "[l]ong ago . . .

22    stated the reason for labor organizations," explaining that "they were organized out of the

23    necessities of the situation; that a single employee was helpless in dealing with an employer; that

24    he was dependent ordinarily on his daily wage for the maintenance of himself and family; [and]

25    that, if the employer refused to pay him the wages that he thought fair, he was nevertheless

26

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1 unable to leave the employ and resist arbitrary and unfair treatment." *NLRB v. Jones & Laughlin*

2 *Steel Corp.*, 301 U.S. 1, 33 (1937). These rationales do not apply to independent contractors,

3 who do not depend on an employer for a daily wage. Instead, independent contractors boast the

4 "ability to operate an independent business and develop entrepreneurial opportunities." *NLRB v.*

5 *Friendly Cab Co.*, 512 F.3d 1090, 1098 (9th Cir. 2008). They are "free to work or not work . . .

6 when they choose; they may 'moonlight' by working for other [companies]; [and] they are free

7 to make their own arrangements with clients and to develop their own goodwill." *Id.* (quotations

8 omitted). They enjoy the opportunity for profit and related upsides of a successful business, but

9 they also bear the risk of loss if the venture fails to thrive as planned. *Id.* Collective-bargaining

10 schemes designed to protect economically dependent employees and guarantee stability do not

11 translate to the entrepreneurial world of independent contractors, who are risk-taking

12 businesspersons striving to profit in the free market.

13 The history of the NLRA's independent-contractor exclusion strongly suggests that

14 Congress meant to exclude independent contractors from both federal and state collective-

15 bargaining regimes. As originally enacted in 1935, the NLRA (also known as the Wagner Act)

16 did not expressly exclude independent contractors from its list of covered "employees." *See*

17 *NLRB v. Hendricks Cty. Rural Elec. Membership Corp.*, 454 U.S. 170, 177–78 (1981). The

18 Supreme Court broadly interpreted the term "employee," holding that "newsboys" qualified even

19 thought they would likely be independent contractors under common-law standards. *NLRB v.*

20 *Hearst Publ'ns*, 322 U.S. 111, 120, 130–31 (1944). "The mischief at which the Act [was] aimed,"

21 the Court reasoned, was not "confined exclusively to 'employees' within the traditional legal

22 distinctions separating them from 'independent contractors.'" *Id.* at 126.

23 "Congressional reaction to this construction of the Act was adverse." *NLRB v. United Ins.*

24 *Co. of Am.*, 390 U.S. 254, 256 (1968). Congress passed the Taft-Hartley Act of 1947, Pub. L. No.

25 80–101, 61 Stat. 136, which amended the NLRA to "specifically exclud[e] 'any individual

26 having the status of an independent contractor' from" the Act's "definition of 'employee.'"

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 15
Case No.

1  *United Ins. Co. of Am.*, 390 U.S. at 256.  The House Report emphasized that "there has always

2  been a difference, and a big difference, between 'employees' and 'independent contractors'":

> "Employees" work for wages or salaries under direct supervision.  "Independent
> contractors" undertake to do a job for a price, decide how the work will be done,
> usually hire others to do the work, and depend for their income not upon wages,
> but upon the difference between what they pay for goods, materials, and labor and
> what they receive for the end result, that is, upon profits.

6  H.R. Rep. No. 80-245, at 18 (1947).  These fundamental differences between employees and

7  independent contractors are the reason Congress excluded independent contractors from the

8  NLRA's coverage.  Because Congress intended independent contractors to remain free from the

9  strictures of collective bargaining, it quickly "correct[ed]" their inclusion in the NLRA's

10  collective-bargaining regime.  *Id.*  This legislative history confirms that Congress never intended

11  to subject independent contractors to the collective-bargaining process that governs employees;

12  rather, Congress intended that independent contractors remain free to operate as entrepreneurs,

13  unregulated by federal or state collective-bargaining laws.

14      The NLRA's exemption for "any individual employed as a supervisor" reinforces this

15  conclusion.  29 U.S.C. § 152(3).  The Supreme Court has interpreted the supervisor exemption

16  broadly to preempt state labor laws relating to supervisors, and a collective-bargaining scheme

17  for supervisors would clearly be preempted.  *Beasley v. Food Fair of N.C., Inc.*, 416 U.S. 653,

18  662 (1974).  Congress exempted both supervisors and independent contractors at the same time

19  in the Taft Hartley Act, 61 Stat. 136–37, 29 U.S.C. § 152(3), and the two parallel exemptions

20  "should be read *in pari materia*" and interpreted to have the same scope.  *United States v.*

21  *Riverside Bayview Homes, Inc.*, 474 U.S. 121, 138 n.11 (1985).  Not only were the exemptions

22  enacted together, but Congress's reasoning for exempting supervisors applies with greater force

23  to independent contractors:  they "have demonstrated their ability to take care of themselves

24  without depending upon the pressure of collective action" and "have abandoned the 'collective

25  security' of the rank and file voluntarily, because they believed the opportunities thus opened to

26  them to be more valuable" than the benefits of employment.  H.R. Rep. No. 80-245, at 17.

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 16
Case No.

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1        Both supervisors and independent contractors differ from other categories of individuals

2  whom Congress excluded from the NLRA's definition of employee:  public employees,

3  agricultural workers, and domestic workers.  Unlike independent contractors, these groups are

4  traditional "employees," but were excluded from the Act's coverage when the NLRA was first

5  enacted, 49 Stat. 450, for very different reasons than independent contractors were later excluded.

6  The decision not to regulate the relationships between state and local governments and their

7  employees respects principles of federalism and otherwise reflects a sound congressional choice

8  to refrain from inserting the federal government between a state or local government and its

9  employees. *See Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 181 (2007) ("The [NLRA]

10  leaves States free to regulate their labor relationships with their public employees.").  And

11  Congress was simply indifferent about agricultural workers and domestic employees, excluding

12  them because the NLRA was meant to cover "only those disputes which are of a certain

13  magnitude and which affect commerce."  S. Rep. No. 79-1184, at 3 (1934).  Unlike independent

14  contractors or supervisors, there is no indication that Congress intended to create national labor

15  policy for these groups, and states remain free to "apply their own views of proper public policy

16  to the collective bargaining process insofar as it is subject to their jurisdiction." *United Farm*

17  *Workers of Am. v. Ariz. Agric. Emp't Relations Bd.*, 669 F.2d 1249, 1257 (9th Cir. 1982).

18        By contrast, Congress voiced significant concerns when the Supreme Court interpreted

19  the NLRA to include independent contractors, because they are fundamentally different from

20  employees.  Unlike employees, they do not work under the control of others; they work for

21  themselves and, indeed, may be deemed *employers* under the NLRA.  *See* The Developing Labor

22  Law: The Board, the Courts, and the National Labor Relations Act, 6th Edition, p. 2441,

23  Bloomberg BNA (database updated 2015) ("Although independent contractors are not covered

24  by the Act as *employees*, they are covered as *employers* when they fall within the definition of

25  'employer' contained in Section 2(2).").  Their contractual arrangements have traditionally been

26  governed by market forces, and by excluding them from the NLRA, Congress intended for those

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 17
Case No.

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1    arrangements to remain regulated, if at all, only by "the free play" of those forces.  Because it

2    imposes disclosure obligations, union organizing, and collective bargaining on independent

3    contractor relationships, which the NLRA leaves unregulated, the Ordinance is preempted.

4        If the City implements and enforces the Ordinance, other local governments may also

5    seek to regulate collective bargaining for for-hire drivers.  Subjecting independent-contractor

6    relationships to thousands of different bargaining schemes is contrary to congressional intent in

7    enacting the NLRA to leave these relationships unregulated.  *See Brown*, 554 U.S. at 73–74;

8    *Golden State Trans. Corp. v. City of Los Angeles*, 475 U.S. 608, 613 (1986); *Machinists*, 427 U.S.

9    at 139.  Doing so would be particularly chaotic for Chamber members who operate across the

10   country, but would be problematic even for those operating in a more restricted geographic area,

11   who may be forced to follow different rules in Seattle than Tacoma.  The NLRA was enacted to

12   eliminate, rather than impose, such significant burdens on commerce.  *See Brown*, 554 U.S. at 76

13   (Congress, unlike the states, can create exceptions to federal policy "in a manner that preserves

14   national uniformity without opening the door to a 50-state patchwork of inconsistent labor

15   policies");  *Garmon*, 359 U.S. at 242 ("Congress has entrusted administration of the labor policy

16   for the Nation to a centralized administrative agency"); *Hearst*, 322 U.S. at 123 ("The [NLRA] is

17   federal legislation, administered by a national agency, intended to solve a national problem on a

18   national scale."), *abrogated in part on other grounds by United Ins. Co. of Am.*, 390 U.S. 254.

19       Finally, the sheer novelty of the City's attempt to regulate independent contractors should

20   raise red flags.  Plaintiff is unaware of any other state or local law authorizing independent

21   contractors to collectively bargain; the City's theory is unprecedented.  Given the many decades

22   of union efforts to organize various types of workplaces, including multiple efforts to claim that

23   individuals working as independent contractors are actually employees, it is implausible that

24   unions have inexplicably ignored for decades a prime opportunity to expand their membership.

25   *Cf. Util. Air Regulatory Gr. v. EPA*, 134 S. Ct. 2427, 2444 (2014) ("When an agency claims to

26   discover in a long-extant statute an unheralded power to regulate a significant portion of the

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

American economy, we typically greet its announcement with a measure of skepticism.").

        **(b)**       **The Ordinance imposes requirements that conflict with the NLRA's comprehensive scheme**

    *Machinists* preemption applies here for a second, independent reason. Congress has explicitly left unregulated both the substantive terms of collective bargaining agreements and each side's use of economic leverage in bargaining. *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 485–89 (1960). The Ordinance regulates both.

    The Ordinance permits the City to influence the substantive terms of the parties' agreements in two ways. First, if the parties fail to reach agreement within ninety days, the Ordinance permits either party to have an arbitrator decide the contract's terms. Ordinance § 3(I). Second, the Ordinance requires the Director to review and approve all collective-bargaining agreements. *Id.* § 3(H)(2). The agreement is not effective until the Director approves it, and he may withdraw approval if an agreement no longer satisfies specified conditions. *Id.* § 3(H)(2)(c); (J)(1). These provisions directly contradict Congress's instruction that the parties to a collective-bargaining agreement "should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences." *Ins. Agents' Int'l Union*, 361 U.S. at 488. Thus, while the NLRA regulates the *subjects* over which the parties must bargain, 29 U.S.C. § 158(d), "labor policy is not . . . erected on a foundation of government control of the results of negotiations," and it does not allow government to "act at large in equalizing disparities of bargaining power between employer and union." *Ins. Agents*, 361 U.S. at 490. Yet that is precisely what the Ordinance attempts to do; it allows an arbitrator to impose agreement terms at the request of only one party after that party has proven it lacks the bargaining power to obtain desired terms on its own. And it allows the City to regulate the "substance of the [parties'] agreement" by giving the Director veto power over the parties' negotiated terms. Ordinance § 3(H)(2). While the Director has very limited authority under this scheme, the authority that he does have conflicts with the NLRA's intention to leave the

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1    substantive terms of the parties' agreement regulated only by the free play of economic forces.

2           The Ordinance's interest-arbitration provision also conflicts with the NLRA in another,

3    independent way.  By requiring the parties to submit to arbitration, the Ordinance restricts each

4    side's use of traditional tools of economic leverage.  *See* Ordinance, § 3(I); *see also id.* § 3(K)

5    (prohibiting driver coordinators from taking certain measures in response to driver actions).

6    These requirements directly conflict with the NLRA, which states that a party's obligation to

7    bargain in good faith "does not compel either party to agree to a proposal or require the making

8    of a concession."  29 U.S.C. § 158(d).  It also conflicts with the recognition that "[t]he presence

9    of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and

10   parcel of the system that the [NLRA] [has] recognized."  *Ins. Agents' Int'l Union*, 361 U.S. at

11   489.  "To sanction state regulation of such economic pressure deemed by the federal Act

12   desirably left for the free play of contending economic forces, is not merely to fill a gap by

13   outlawing what federal law fails to outlaw; it is denying one party to an economic contest a

14   weapon that Congress meant him to have available."  *Machinists*, 427 U.S. at 150.  "Accordingly,

15   such regulation by the State is impermissible because it stands as an obstacle to the

16   accomplishment and execution" of congressional objectives.  *Id.* at 150–51.

17                   **2.     The Ordinance Is Preempted Under *Garmon***

18          The NLRA preempts state resolution of issues committed to the exclusive jurisdiction of

19   the National Labor Relations Board.  *Garmon*, 359 U.S. 236.  "Congress has entrusted

20   administration of the labor policy for the Nation to a centralized administrative agency, armed

21   with its own procedures, and equipped with its specialized knowledge and cumulative

22   experience."  *Id.* at 242.  In granting the NLRB primary jurisdiction, "Congress evidently

23   considered that centralized administration of specially designed procedures was necessary to

24   obtain uniform application of its substantive rules and to avoid these diversities and conflicts

25   likely to result from a variety of local procedures and attitudes towards labor controversies."  *Id.*

26   at 242–43.  *Garmon* preemption is "'intended to preclude state interference with the [NLRB's]

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1  interpretation and active enforcement of the integrated scheme of regulation established by the

2  NLRA.'"  *Idaho Bldg. & Constr. Trades Council, AFL-CIO v. Inland Pac. Chapter of Associated*

3  *Builders & Contractors, Inc.*, 801 F.3d 950, 956 (9th Cir. 2015).

4       Here, the Ordinance is preempted because it requires local officials and state courts to

5  decide whether for-hire drivers are "employees" under the NLRA.  *See Marine Eng'rs Beneficial*

6  *Ass'n v. Interlake S.S. Co.*, 370 U.S. 173, 177–85 (1962) (NLRB has exclusive jurisdiction over

7  whether individuals are "supervisors" or "employees"); *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261,

8  1274 (9th Cir. 1994) (question of whether workers are agricultural laborers or employees

9  preempted).  The Ordinance does not apply to "employees"; it applies only to independent

10  contractors.  *See* Ordinance § 6.  To decide whether a driver coordinator has complied with the

11  Ordinance's provisions, the Director must decide whether the drivers at issue are "employees"

12  exempt from the Ordinance's coverage, or whether they are independent contractors within its

13  scope.  *See* § 6; § 3(M).  As the Director's determination is subject to judicial review in the state

14  courts, *id.* § 3(M), those courts ultimately will be required to decide whether for-hire drivers are

15  employees subject to the NLRA.

16       The NLRB has not resolved the employee status of for-hire drivers, and that issue is

17  currently pending before the NLRB.  *See* Steger Decl. ¶ 14; Kelsay Decl. ¶ 8.  The Ordinance is

18  therefore preempted because it injects municipal officials and state courts into matters subject to

19  the NLRB's exclusive jurisdiction before the NLRB has resolved the question.  *See Marine*

20  *Eng'rs Beneficial Ass'n*, 370 U.S. at 185 ("The need for protecting the exclusivity of NLRB

21  jurisdiction is obviously greatest when the precise issue brought before a court is in the process

22  of litigation through procedures originating in the Board.  While the Board's decision is not the

23  last word, it must assuredly be the first.").[3]

24       _____

       [3] The Ordinance is also preempted by the Washington Public Records Act,

25  RCW 19.56.070(1), which prohibits disclosure of public records containing trade secrets,
   because the City's use of the driver lists as public records to implement its Ordinance conflicts

26  with the purpose of the statute.

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

## II. ABSENT AN INJUNCTION, IRREPARABLE INJURY IS LIKELY

Absent preliminary relief, the Chamber's members are certain to suffer irreparable injury in five ways. *First*, "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Rodriguez v. Robbins*, 715 F.3d 1127, 1144–45 (9th Cir. 2013). The government thus causes irreparable injury when it subjects a business to regulations "which are likely unconstitutional because they are preempted." *Am. Trucking Assn's., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009).

*Second*, the disclosure of proprietary driver information constitutes irreparable injury. Compelled disclosure of confidential information, whether in the form of a trade secret or otherwise, constitutes irreparable harm because, once disclosed, the status quo can never be restored. *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999). As this Court has explained, a threat to disclose confidential information "will almost always certainly show irreparable harm." *Pac. Aero. & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003). Relief is therefore routinely granted to prevent such disclosure. *See, e.g.*, *HHS v. Alley*, 556 U.S. 1149 (2009) (FOIA disclosure); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010) (trade secret). The Chamber's members maintain the confidentiality of their driver information, and disclosure threatens grave harm to their businesses. Kelsay Decl. ¶13–17; Steger Decl. ¶17; Takar Decl. ¶12. As Lyft has explained, if driver data were disclosed, "competitors could and would seek to undermine Lyft's business relationships with its drivers," and would use the information "to gain competitive insight into the strategy and efficacy of Lyft's marketing activity, tactical growth, and long-term strategic plans." Kelsay Decl. ¶15. And even if the Teamsters attempts to keep this information secure, its possession increases the risk of accidental disclosure, intentional misuse by employees, and hacking by outside groups, especially given that it is seeking driver information from every driver coordinator in Seattle.

*Third*, disclosure of the driver lists triggers the union election process, during which the Teamsters will attempt to unionize drivers in violation of federal antitrust and labor law. As a

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 22
Case No.

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone (206) 624-0900*

1 consequence of this disruptive and burdensome process, the Chamber's members will have to

2 spend resources educating drivers about the consequences of voting for union representation—

3 resources that cannot be recovered through a damages action. Steger Decl. ¶ 20. If disclosure

4 occurs, the unlawful election process is certain to occur, and certain to cause irreparable harm.

5      *Fourth*, Chamber members are incurring substantial and growing compliance costs.

6 Kelsay Decl. ¶18–20; Steger Decl. ¶18–20. These costs defy precise measurement and will be

7 unrecoverable from the City through compensatory damages. *Fifth*, forced compliance with the

8 Ordinance will threaten the very existence of Chamber members in Washington by "disrupt[ing]

9 and change[ing]" the business of driver coordinators "in ways that most likely cannot be

10 compensated with damages." *Am. Trucking*, 559 F.3d at 1058. Uber and Lyft have created an

11 innovative business model that depends on partnering with independent contractors. The

12 Ordinance will severely disrupt the relationship between Chamber members and independent

13 contractor partners, impacting driver retention, rider service, safety, and reputation, and requiring

14 seismic changes to the businesses that the business models may fail to withstand.

15 **III.    THE BALANCE OF HARDSHIPS SHARPLY FAVORS THE CHAMBER**

16      There is no countervailing risk of harm to any other party that outweighs these irreparable

17 harms. The government "cannot suffer harm from an injunction that merely ends an unlawful

18 practice." *Rodriquez*, 715 F.3d at 1145. And, in any event, the City faces no economic harm

19 from an injunction: far from causing the City to restructure its organization, an injunction will

20 merely require the city to delay implementation of the Ordinance pending resolution of this suit.

21 In fact, an injunction will benefit the City by saving it from expending resources on

22 implementing a law that will likely be struck down. Further, the "basic function of a preliminary

23 injunction is to preserve the status quo pending a determination of the action on the merits."

24 *Chalk v. United States Dist. Ct.*, 840 F.2d 701, 704 (9th Cir. 1988). While the City seeks to

25 upend the status quo by implementing the Ordinance and altering the labor relationships of the

26 Chamber's members, the Chamber merely seeks "to preserve" the status quo, a fact that

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 23
Case No.

1  "strengthens" its position, *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (9th Cir. 2004), especially

2  given the City's prior successful efforts to foreclose earlier judicial consideration.

3  **IV.    THE PUBLIC INTEREST SUPPORTS AN INJUNCTION**

4          The public interest also favors an injunction, as the public always has an interest in

5  preventing the state from violating federal law, *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006,

6  1029 (9th Cir. 2013), and in preventing the violation of a party's constitutional rights, *see*

7  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).  Moreover, there plainly is no public

8  interest in the Ordinance's immediate implementation, as the Ordinance itself deferred

9  implementation for six to eight months, *see* Ordinance § 3, and the City delayed it even further.

10  Also, collective bargaining will likely increase the costs of business for driver coordinators,

11  which could cause those businesses to contract with fewer drivers, resulting in fewer jobs.  The

12  Ordinance may also force many drivers to unionize against their will because the City has strictly

13  limited those who can vote for a QDR, while requiring all drivers to be represented by an elected

14  EDR and abide by the contract it negotiates.  Ordinance § 3(F)(2).  Ultimately, the

15  implementation of the Ordinance threatens the ability of driver coordinators to operate in Seattle

16  and western Washington, eliminating the extensive public benefits brought by these companies.

17  **V.     THE "SERIOUS QUESTIONS" TEST WARRANTS PRELIMINARY RELIEF**

18          If the balance of hardships tips sharply in the plaintiff's favor, then "serious questions

19  going to the merits," rather than a likelihood of success on the merits, is sufficient to warrant

20  relief.  *See Wild Rockies*, 632 F.3d at 1135.  Here, the balance of hardships does tilt sharply in

21  the Chamber's favor, *see supra* Part III, and there are, at a minimum, serious questions going to

22  the merits, *see supra* Part I.  The Chamber is therefore entitled to preliminary relief.

23                                      **CONCLUSION**

24          The Court should grant the Chamber's motion for a TRO or preliminary injunction.

25

26

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 24
Case No.

1   Dated: March 9, 2017                 Respectfully submitted,

2                                        By: s/*Timothy J. O'Connell*

3   Lily Fu Claffee                      Timothy J. O'Connell, WSBA 15372
    (D.C. Bar No. 450502)                STOEL RIVES LLP
4   (pro hac vice pending)               600 University Street, Suite 3600
                                         Seattle, WA 98101
5   Kate Comerford Todd                  (206) 624-0900
    (D.C. Bar No. 477745)                (206) 386-7500 FAX
6   (pro hac vice pending)               Tim.oconnell@stoel.com

7   Steven P. Lehotsky
    (D.C. Bar No. 992725)                Michael A. Carvin
8   (pro hac vice pending)               (D.C. Bar No. 366784)
                                         (pro hac vice pending)
9   Warren Postman
    (D.C. Bar. No. 995083)               Jacqueline M. Holmes
10  (pro hac vice pending)               (D.C. Bar No. 450357)
                                         (pro hac vice pending)
11  U.S. CHAMBER LITIGATION
    CENTER                               Christian G. Vergonis
12                                       (D.C. Bar No. 483293)
    1615 H Street, N.W.                  (pro hac vice pending)
13  Washington, D.C. 20062
    (202) 463-3187                       Robert Stander
14  slehotsky@uschamber.com              (D.C. Bar No. 1028454)
                                         (pro hac vice pending)
15
                                         JONES DAY
16                                       51 Louisiana Avenue, N.W.
                                         Washington, D.C.  20001
17                                       (202) 879-3939
                                         (202) 616-1700 FAX
18                                       mcarvin@jonesday.com

19                                       ATTORNEYS FOR PLAINTIFF

20

21

22

23

24

25

26

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION - 25
Case No.