Honorable Robert S. Lasnik

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, | ) ) ) | |
|---|---|---|
| Plaintiff, | ) ) | No.      17-cv-00370-RSL |
| vs. | ) ) ) | DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| THE CITY OF SEATTLE; SEATTLE DEPARTMENT OF FINANCE AND ADMINISTRATIVE SERVICES; and FRED PODESTA, in his official capacity as Director, Finance and Administrative Services, City of Seattle, | ) ) ) ) ) ) ) | **NOTED ON CALENDAR FOR ORAL ARUGMENT: March 30, 2017 at 3:00 p.m.** |
| Defendants. | ) ) ) | |

18

19

20

21

22

23

24

25

26

27

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370)

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

I.    FACTUAL BACKGROUND .................................................................................1

    A.    The Ordinance .............................................................................................1

    B.    Implementation of the Ordinance ...............................................................2

    C.    Public availability of information on "qualifying driver" lists ...................3

II.   LEGAL STANDARD.............................................................................................3

III.  ARGUMENT ..........................................................................................................4

    A. The Chamber is unlikely to succeed on the merits of its claims....................4

        1.   The Chamber is unlikely to succeed on its NLRA *Machinists* preemption claim...............................................................................4

        2.   The Chamber is unlikely to succeed on its NLRA *Garmon* preemption claim...............................................................................8

        3.   The Chamber is unlikely to establish a federal antitrust claim.......10

            i.    The Chamber's antitrust claim is not ripe............................11

            ii.   The Chamber cannot pursue antitrust claims on behalf of its members....................................................................................12

            iii.  The *Parker* state action doctrine immunizes the Ordinance against the Chamber's antitrust claims .................................12

                a.    State policy authorizes displacement of competition in the taxi and for-hire driver industries in order to further safety and reliability interests .............................13

                b.    The Ordinance provides for active supervision of collective negotiations .........................................................16

            iv.   A single negotiation topic cannot render the entire Ordinance facially invalid .....................................................................19

    B. The Chamber has not demonstrated likely irreparable injury.......................20

        1.   Disclosure of publicly available driver information is not an irreparable injury....................................................................................20

        2.   Preemption would not itself establish irreparable injury .................22

         3.   The Chamber's remaining attempts to show irreparable harm also fail .........22

    C. The remaining equitable factors do not favor an injunction ........................23

CONCLUSION...............................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*American Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*,
  151 F.Supp.2d 723 (W.D. Va. 2001) ................................................. 12

*American Federation of Musicians v. Carroll*,
  391 U.S. 99 (1968) ........................................................................... 6

*American Petroleum Inst. v. Jorling*,
  710 F.Supp. 421 (N.D.N.Y. 1989) .................................................. 22

*American Trucking Ass'n, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ........................................................ 22

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S.Ct. 1378 (2015) ..................................................................... 22

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
  950 F.2d 1401 (9th Cir. 1991) ..................................................... 9, 12

*Baggett Transp. Co. v. Int'l Bhd. Teamsters*,
  270 So.2d 800 (Ala. 1972) ................................................................ 9

*Barsamian v. United Farm Workers Union*,
  1973 WL 1091 (E.D. Wisc. Jan. 29, 1973) ...................................... 5

*Beasley v. Food Fair of N.C.*,
  416 U.S. 653 (1974) .......................................................................... 6

*Bierman v. Dayton*,
  No. 14-3021, 2014 WL 4145410 (D. Minn. Aug. 20, 2014) ........... 11

*Bud Antle, Inc. v. Barbosa*,
  45 F.3d 1261 (9th Cir. 1994) ............................................................ 9

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
  68 F.3d 828 (3d Cir. 1995) ............................................................. 23

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986) ........................................................................ 12

*Caribbean Marine Serv. Co., Inc. v. Baldrige*,
  844 F.2d 668, 675 (9th Cir. 1988) .................................................. 21

*Chamber of Commerce v. Seattle*,
  No. C16-0322RSL, 2016 WL 4595981 (W.D. Wash. Aug. 9, 2016) ................ 11, 23

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - ii

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

*Chamber of Commerce v. Whiting,*
  563 U.S. 582 (2011)................................................................................................ 4

*City of Columbia v. Omni Outdoor Adver., Inc.,*
  499 U.S. 365 (1991)........................................................................................ 14, 15

*Clark v. U.S. Dist. Ct.,*
  840 F.2d 701 (9th Cir. 1988) ................................................................................ 24

*Coalition for Economic Equity v. Wilson,*
  122 F.3d 718 (9th Cir. 1997) ................................................................................ 23

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.,*
  111 F.3d 1427 (9th Cir. 1996) .............................................................................. 16

*Costco Wholesale Corp. v. Maleng,*
  522 F.3d 874 (9th Cir. 2008) .......................................................................... 18, 19

*Cotter v. Lyft, Inc.,*
  60 F.Supp.3d 1067 (N.D. Cal. 2015) .................................................................... 15

*Davenport v. Wash. Educ. Ass'n,*
  551 U.S. 177 (2007).................................................................................................. 5

*Doe v. Uber Technologies, Inc.,*
  184 F.Supp.3d 774 (N.D. Ca. 2016) ..................................................................... 15

*Earth Island Institute v. U.S. Forest Serv.,*
  351 F.3d 1291 (9th Cir. 2003) .............................................................................. 21

*Ebbey's Reserve for a Healthy, Safe & Peaceful Environment v. U.S. Dep't of the Navy,*
  122 F.Supp.3d 1068 (W.D. Wash. 2015)............................................................... 23

*Fin. & Sec. Prods. Ass'n v. Diebold, Inc.,*
  No. C04-04347WHA, 2005 WL 1629813 (N.D. Cal. Jul. 8, 2005) ........................ 12

*Fisher v. City of Berkeley,*
  475 U.S. 260 (1986).......................................................................................... 18, 19

*FTC v. Phoebe Putney,*
  133 S.Ct. 1003 (2013)...................................................................................... 14, 16

*FTC v. Ticor Title Ins. Co.,*
  504 U.S. 621 (1992).......................................................................................... 17, 18

*Gold Cross Ambulance & Transfer v. City of Kansas City,*
  705 F.2d 1005 (8th Cir. 1983) .............................................................................. 17

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - iii

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

*Golden Gate Restaurant Ass'n v. City of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008) ........................................................................... 24

*Golden State Transit Corp. v. City of Los Angeles,*
    726 F.2d 1430 (9th Cir. 1984) ........................................................................... 17

*Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.,*
    739 F.2d 466 (9th Cir. 1984) ............................................................................. 21

*Greene v. Dayton,*
    806 F.3d 1146 (8th Cir. 2015) ............................................................................. 5

*Hodgers-Durgin v. De La Vina,*
    199 F.3d 1037 (9th Cir. 1999) ............................................................................. 4

*Hunt v. Washington State Apple Advertising Comm'n,*
    432 U.S. 333 (1977).............................................................................................. 9

*Int'l Healthcare Mgt. v. Hawaii Coalition for Health,*
    332 F.3d 600 (9th Cir. 2003) ............................................................................. 19

*Int'l Longshoremen's Ass'n, AFL-CIO v. Davis,*
    476 U.S. 380 (1986).......................................................................................... 9, 10

*International Franchise Ass'n, Inc. v. City of Seattle,*
    803 F.3d 389 (9th Cir. 2015) ............................................................................. 21

*Jama v. Immigration and Customs Enforcement,*
    543 U.S. 335 (2005)........................................................................................... 7, 8

*King County v. Sheehan,*
    114 Wn.App. 325 (2002) ................................................................................... 20

*Lafayette v. Louisiana Power & Light Co.,*
    435 U.S. 389 (1978)........................................................................................... 13

*Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv.,*
    78 F.3d 1360 (9th Cir. 1995) ............................................................................. 10

*Machinists v. Wisc. Employment Relations Comm'n,*
    427 U.S. 132 (1976).............................................................................................. 4

*Marine Engineers v. Interlake S.S. Co.,*
    370 U.S. 173 (1962).............................................................................................. 9

*Maryland v. King,*
    567 U.S. 1301 (2012)......................................................................................... 24

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - iv

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................................................ 4

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ................................................................................................ 4

*N.C. State Bd. of Dental Examiners v. Federal Trade Comm'n,*
    135 S.Ct. 1101 (2015) ...................................................................... 13, 15, 16, 17

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932) ................................................................................................ 7

*New York State Rest. Ass'n v. New York City Bd. of Health,*
    545 F.Supp.2d 363 (S.D.N.Y. 2008) .................................................................... 22

*NLRB v. Friendly Cab Co.,*
    512 F.3d 1090 (9th Cir. 2008) ................................................................................ 6

*O'Connor v. Uber Technologies, Inc.,*
    82 F.Supp.3d 1133 (N.D. Cal. 2015) .................................................................... 15

*Oakland Tribune Inc. v. Chronicle Pub. Co., Inc.,*
    762 F.2d 1374 (9th Cir. 1985) .............................................................................. 21

*Parish v. Dayton,*
    761 F.3d 873 (8th Cir. 2014) ................................................................................ 11

*Parker v. Brown,*
    317 U.S. 341 (1943) ........................................................................................ *passim*

*Planned Parenthood of the Blue Ridge v. Camblos,*
    116 F.3d 707 (4th Cir. 1997) ................................................................................ 24

*Rousso v. State,*
    170 Wn.2d 70 (2010) ............................................................................................ 15

*Sampson v. Murray,*
    415 U.S. 61 (1974) .................................................................................................. 4

*San Diego Building Trades Council v. Garmon,*
    359 U.S. 236 (1959) .................................................................................... 4, 8, 9, 10

*San Diego County Gun Rights Cte. v. Reno,*
    98 F.3d 1121 (9th Cir. 1996) .................................................................................. 9

*San Francisco Real Estate Investors v. Real Estate Investment Trust of Am.,*
    692 F.2d 814 (1st Cir. 1982) ................................................................................ 23

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - v

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

*Southern Motor Carriers Rate Conf., Inc. v. U.S.*,
471 U.S. 48 (1986) ........................................................................................ *passim*

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
770 F.3d 1282 (9th Cir. 2014) ................................................................... 10, 12

*Texas v. United States*,
523 U.S. 296 (1998) ................................................................................... 11

*Tom Hudson & Associates, Inc. v. City of Chula Vista*,
746 F.2d 1370 (9th Cir. 1984) ................................................................... 16, 17

*Town of Hallie v. City of Eau Claire*,
471 U.S. 34 (1985) ..................................................................................... 16

*Tri-State Rubbish, Inc. v. Waste Management, Inc.*,
998 F.2d 1073 (1st Cir. 1993) .................................................................... 16

*U.S. v. Salerno*,
481 U.S. 739 (1987) ................................................................................... 4

*United Farm Workers of Am., AFL-CIO v. Ariz. Agricultural Employment Relations Bd.*,
669 F.2d 1249 (9th Cir. 1982) .................................................................... 5

*United Farm Workers of Am., AFL-CIO v. Ariz. Agricultural Employment Relations Bd.*,
727 F.2d 1475 (9th Cir. 1984) .................................................................... 5

*Veasey v. Perry*,
769 F.3d 890 (5th Cir. 2014) ..................................................................... 24

*Villegas v. Princeton Farms, Inc.*,
893 F.2d 919 (7th Cir. 1990) ..................................................................... 5

*Willmar Poultry Co., Inc. v. Jones*,
430 F. Supp. 573 (D. Minn. 1977) ............................................................. 5

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................... 3, 4, 22

*Yakima Valley Mem. Hosp. v. Wash. Dep't of Health*,
654 F.3d 919 (9th Cir. 2011) ..................................................................... 18, 19

**Statutes and Ordinances**

15 U.S.C. §26 ............................................................................................. 12

29 U.S.C. §152 ....................................................................................... 4, 5, 6

29 U.S.C. §164 ........................................................................................... 6, 7

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - vi

Cal. Gov't Code §3507.1 ................................................................................................ 8

Cal. Labor Code §1164 ................................................................................................ 8

RCW 41.56.450 ........................................................................................................... 8

RCW 46.72.001 .............................................................................................. 2, 14, 16

RCW 46.72.160 ........................................................................................................ 14

RCW 81.72.200 .................................................................................................. 2, 14

RCW 81.72.210. ........................................................................................................ 14

SMC 6.310.735 ............................................................................................... 3, 18, 21

**Legislative Materials**

H.R. Rep. No. 80-245 (1947)......................................................................................... 6

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

The Chamber contends that immediate injunctive relief is needed to stop implementation of a law "that threatens the very existence of the for-hire and rideshare transportation system in western Washington." Mot. (Dkt. #2) at 1. That threat, it argues, is imminent because the Ordinance requires Uber, Lyft, and Eastside-for-Hire to turn over purportedly confidential lists of qualifying drivers on April 3, 2017. *Id.* at 1, 22. Rhetoric aside, the Chamber's assertion of irreparable harm lacks any basis. The lists do not reveal trade secrets or highly confidential information; as recently determined by the King County Superior Court, the information is already publicly available (and competitors Uber and Lyft already have it). The lists will be disclosed only to one recipient, which may use them solely for specified purposes; there is no reason to believe they will fall into competitors' hands. Finally, the Chamber's purported remaining injuries are either speculative and non-imminent or otherwise fail to withstand analysis.

The Chamber has also not demonstrated likely success on the merits on its facial challenge. Its National Labor Relations Act ("NLRA") preemption arguments fail because in excluding independent contractors from the NLRA's coverage Congress left local and state governments free to regulate such relationships, and because the Chamber provides no evidence that Uber, Lyft or Eastside's drivers could reasonably be deemed employees under federal labor law—a showing that the Chamber not only declines to attempt to make, but affirmatively alleges to be false. The Chamber's antitrust claims are unlikely to succeed because they are unripe and cannot be pursued by an association on behalf of its members, because the state action exemption to antitrust liability applies, and because the Ordinance involves unilateral state action.

# I     FACTUAL BACKGROUND

## A. The Ordinance

On December 14, 2015, the Seattle City Council adopted the Ordinance Relating to Taxicab, Transportation Network Company, and For-Hire Vehicle Drivers. Mot. at 3. The Council enacted the Ordinance "to ensure safe and reliable for-hire and taxicab transportation service." Ordinance ("Ord.," attached as Ex. A to the Declaration of Matt Eng) §1.C. The Council explained that "driver coordinators"—the term the Ordinance uses for entities that provide for-hire

---

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 1

transportation services to the public—"establish the terms and conditions of their contracts with their drivers unilaterally," and may impose changes without advance warning or input from the drivers. *Id.* §1.E. In the Council's judgment, this can adversely affect for-hire drivers' ability to provide "safe, reliable, stable, cost-effective, and economically viable" transportation service, and lead to unrest and service disruptions. *Id.* §1.E, F. The Council determined, based on outcomes in other industries, that providing a means through which for-hire drivers could address the terms and conditions of their contractual relationships collectively would improve the safety and reliability of for-hire transportation services by, among other things, reducing turnover, increasing driver commitment and experience, and alleviating the pressure drivers face to provide transportation services in an unsafe manner (such as by working too many hours, operating vehicles at unsafe speeds, or ignoring necessary maintenance). *Id.* §1.I, J. The Council's authority to enact the Ordinance derives from RCW 46.72.001 and RCW 81.72.200, which authorize Seattle to regulate for-hire and taxicab transportation services to ensure safety and reliability, and exempt such regulation from antitrust liability.

To permit for-hire drivers to have input in establishing the terms and conditions of their contractual relationships, the Ordinance establishes a process for independent contractor drivers to designate an "Exclusive Driver Representative" ("EDR") to negotiate with their driver coordinators. The Ordinance applies only to independent contractors, and expressly excludes from its coverage drivers who are "employees" for purposes of the NLRA. Ord. §6.

**B. Implementation of the Ordinance**

Following lengthy public comment, the City issued four rules relating to the Ordinance on December 29, 2016. Eng Decl. ¶5. The City announced the remainder of the proposed rules on March 6, 2017. *Id.* ¶6. On January 17, 2017, Uber's subsidiary filed a writ in Superior Court challenging the first four rules as arbitrary and capricious and seeking injunctive relief; Eastside intervened. Declaration of Michael K. Ryan ("Ryan Decl.") ¶3. On March 17, 2017, Judge Beth M. Andrus denied the writ. *Id.* No appeal has been filed to date. *Id.*

Only Teamsters Local 117 applied for status as a Qualified Driver Representative

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 2

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1    ("QDR"), allowing it to seek recognition as an EDR. Eng Decl. ¶7. Local 117 was certified as a

2    QDR on March 3, 2017, and then gave notice to all twelve identified driver coordinators seeking

3    a list of their qualifying drivers. Mot. at 4. Uber, Lyft, and Eastside must provide Local 117 these

4    lists by April 3, 2017. SMC 6.310.735.D; Mot. at 4. If it elects to collect statements of interest

5    from a company's qualifying drivers, Local 117 will have 120 days to collect and submit them to

6    the City, and the Director will then determine whether Local 117 has shown support from a

7    majority of drivers; if it has, Local 117 will be certified as an EDR for that driver coordinator, and

8    negotiations over certain specified subjects will take place. SMC 6.310.735.F.1-3, H.1.

9       **C. Public availability of information on "qualifying driver" lists**

10          The City requires all for-hire drivers who provide rides originating within the City to obtain

11   business licenses. Declaration of Kara Main-Hester ¶3. For-hire driver business licensees can be

12   searched online at http://www.seattle.gov/licenses/find-a-business, to generate records that include

13   their name, address, and phone number. *Id.* ¶¶4-5 & Ex. A. A spreadsheet listing this information

14   for taxi drivers was produced in response to a public records request received by the City in late

15   2015. *Id.*, Exs. B, C. In response to another public records request, the City has also disclosed a

16   list showing the driver coordinator and Vehicle Identification Numbers ("VINs") for all for-hire

17   vehicles in the City. *Id.* ¶¶13-14, 16 & Exs. H-J. Lyft and Uber both sought to enjoin that disclosure,

18   arguing that drivers' identities could be ascertained from VINs so the disclosure would allow

19   competitors to create lists of all Lyft drivers and all Uber drivers. Ryan Decl., Exs. A at 5, 9-10; B

20   at 1, 4-5, 11-13, 18-19; C ¶¶12-13, 19-20; D ¶¶5-7. Judge Andrus rejected this trade secret claim

21   on the ground that information allowing the creation of such driver lists was already publicly

22   available; after no appeal was filed, the unredacted information was disclosed to the requestor, to

23   Lyft, and to Uber in late 2016. Ryan Decl., Ex. E at 6-7; Main-Hester Decl. ¶16 & Ex. J.

24                              **II    LEGAL STANDARD**

25          "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

26   *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff must establish that (1) it is likely

27   to succeed on the merits, (2) it or its members will likely suffer irreparable harm absent preliminary

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 3

1   relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *See*

2   *id.* at 20. Irreparable injury must be "*likely.*" *Id.* at 22 (emphasis in original). It must also be

3   "present or imminent." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010).

4   "[S]ubstantial" injuries, "in terms of money, time and energy necessarily expended ... are not

5   enough" without a showing that the injury is "irreparable." *Sampson v. Murray*, 415 U.S. 61, 90

6   (1974). To enjoin an activity of a state or local government, federalism requires the showing of

7   both "substantial and immediate irreparable injury." *Hodgers-Durgin v. De La Vina*, 199 F.3d

8   1037, 1042 (9th Cir. 1999). Absent a "clear showing" on all these factors, injunctive relief is not

9   warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

10   A "high threshold must be met if a state law is to be preempted for conflicting with the

11   purposes of a federal Act." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (quotation

12   omitted). To succeed in its facial challenge, the Chamber must show that "no set of circumstances

13   exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987).

## III   ARGUMENT

### A. The Chamber is unlikely to succeed on the merits of its claims.

16   The Chamber cannot establish likely success on the merits for several reasons. The NLRA

17   preemption claims lack any merit, and the Chamber does not have associational standing to assert

18   the *Garmon* NLRA preemption claim. The Chamber's antitrust claim is unripe because it is

19   entirely speculative whether any collective bargaining involving price-related terms will occur.

20   Even if it were ripe, the challenge would not be properly brought by the Chamber through

21   associational standing, and it would lack merit because the Ordinance involves state action that

22   cannot be challenged on an antitrust theory.

### 1.  The Chamber is unlikely to succeed on its NLRA *Machinists* preemption claim.

24   The Chamber contends that the Ordinance's grant of certain collective negotiation rights

25   to independent contractors is preempted under the doctrine established by *Machinists v. Wisc.*

26   *Employment Relations Comm'n*, 427 U.S. 132 (1976), because the NLRA excludes independent

27   contractors from its definition of "employee." *See* 29 U.S.C. §152(3) ("The term 'employee' ...

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION (17-cv-00370) - 4

shall not include any individual … having the status of independent contractor."). According to the Chamber, this shows that Congress intended to preclude any state or local regulation of the work relationships of independent contractors. Mot. at 20.

However, the Chamber acknowledges that the NLRA excludes a number of groups from its definition of "employee," while *permitting* state regulation of those workers' employment relationships. The same provision that excludes independent contractors from the definition of "employee" (and thus from the NLRA's coverage) also excludes, *inter alia*, agricultural laborers, domestic workers, and public employees. 29 U.S.C. §§152(2), (3). The Ninth Circuit has explained that where Congress excluded a group of workers from the NLRA's coverage, "nothing in the [NLRA] … suggest[s] that Congress intended to preempt … state action by legislating for the entire field. Indeed, we draw precisely the *opposite* inference from Congress' exclusion of agricultural employees from the Act." *United Farm Workers of Am., AFL-CIO v. Ariz. Agricultural Employment Relations Bd.*, 669 F.2d 1249, 1257 (9th Cir. 1982) (emphasis added) ("*UFWA I*"); *see also United Farm Workers of Am., AFL-CIO v. Ariz. Agricultural Employment Relations Bd.*, 727 F.2d 1475, 1476 (9th Cir. 1984) (regulation of agricultural workers' labor relations "is left to the states"). Based on this reasoning, courts have uniformly held that the NLRA does not preempt state or local regulation of such excluded groups of individuals. *See, e.g.*, *Greene v. Dayton*, 806 F.3d 1146, 1149 (8th Cir. 2015) (agricultural and domestic service workers "are treated identically in the text of the [NLRA]," and "Congress did not demonstrate an intent to shield these workers from all regulation").[1] Here, similarly, Congress' exclusion of independent contractors from NLRA coverage leaves states and localities free to regulate such workers.

The Chamber contends that independent contractors differ from the other excluded groups because those groups are "traditional 'employees'" exempted for policy reasons. Mot. at 15. But neither the text nor the legislative history identifies this rationale. States and localities may regulate

---

[1] *See also, e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 181 (2007); *Villegas v. Princeton Farms, Inc.*, 893 F.2d 919, 921 (7th Cir. 1990); *Willmar Poultry Co., Inc. v. Jones*, 430 F. Supp. 573, 577-78 (D. Minn. 1977); *Barsamian v. United Farm Workers Union*, 1973 WL 1091, *1 (E.D. Wisc. Jan. 29, 1973).

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION (17-cv-00370) - 5

PETER S. HOLMES
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1   the labor relations of groups excluded from NLRA coverage not because of the purported policy

2   justifications for permitting such regulation, *see* Mot. at 17, but because courts assume that when

3   Congress *excludes* a group from federal regulation, it intends to allow "states ... to legislate as they

4   see fit." *UFWA I*, 669 F.2d at 1257.[2]

5         Most important, the statutory text of the NLRA treats independent contractors like other

6   excluded groups, not like supervisors. Although Congress amended the NLRA in 1947 to exclude

7   both independent contractors and supervisors from the NLRA's definition of "employee," and

8   courts have interpreted the 1947 amendments to preclude state and local regulation of *supervisors'*

9   labor relations, Mot. at 15-16, the statutory text governing those two exclusions differs in a crucial

10  manner (which the Chamber neglects to mention). With respect to supervisorial employees,

11  Congress *expressly* preempted states and localities from requiring bargaining with supervisors:

> [N]o employer subject to this subchapter shall be compelled to deem individuals
> defined herein as supervisors as employees for the purpose of any law, either
> national or local, relating to collective bargaining.

14

15  29 U.S.C. §164(a).[3] *No similar express preemption provision* applies to independent contractors,

---

16  [2] The Chamber asserts that collective negotiations by independent contractors are "inconsistent with the fundamental
purpose of labor relation under the NLRA" because, in its view, independent contractors have entrepreneurial freedom

17  and autonomy that employees lack. Mot. at 15-16. But the NLRA's authorization of collective bargaining based on
employees' lack of individual power in no way conflicts with another governmental entity's determination that other

18  groups of workers (here, independent contractor drivers) need the ability to speak collectively as well. In enacting the
Ordinance, the City Council concluded that for-hire drivers "lack the power to negotiate [the terms and conditions of

19  their contractual relationship] effectively on an individual basis." Ord. §1.G; *see also id.* §1.E-I. As the Ninth Circuit
has pointed out, "where, as here, Congress has chosen not to create a national labor policy in a particular field, the

20  states remain free to legislate as they see fit, and may apply their own views of proper public policy ... insofar as it is
subject to their jurisdiction." *UFWA I*, 669 F.2d at 1257. In any event, *NLRB v. Friendly Cab Co.*, 512 F.3d 1090,

21  1098 (9th Cir. 2008) (cited at Mot. at 15) did not say that all workers who are classified by their employers as
independent contractors enjoy entrepreneurial opportunities. Rather, in rejecting a taxi company's classification of its

22  drivers as independent contractors, the court noted that "[t]he ability to operate an independent business and develop
entrepreneurial opportunities" is an important factor in determining a worker's status. *Id.*

[3] "Supervisor" is defined in 29 U.S.C. §152(a). Congress protected employers against any obligation to recognize or

23  bargain with unions representing supervisors because "supervisors were management obliged to be loyal to their
employer's interests, and their identity with the interests of the rank-and-file employees might impair that loyalty and

24  threaten realization of the basic ends of federal labor legislation." *Beasley v. Food Fair of N.C.*, 416 U.S. 653, 659-60
(1974); *see also* H.R. Rep. No. 80-245, at 14-17 (1947) ("Management, like labor, must have faithful agents.... [T]here

25  must be in management and loyal to it persons not subject to influence or control of unions"; discussing problem that
supervisor unions were subservient to unions of rank and file employees whom they supervised). No such similar

26  concern about "divided loyalty" by those entrusted to represent management's interests exists with respect to
independent contractors. In fact, the Supreme Court has recognized that the interests of employees and independent

27  contractors may often be closely intertwined. *See American Federation of Musicians v. Carroll*, 391 U.S. 99, 107

                                               (Cont'd ....)

---

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 6

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1    and the Chamber offers no reason why this Court could imply one in the absence of any support

2    in the NLRA's text. To the contrary, the existence of an explicit preemption provision with respect

3    to supervisors shows Congress' understanding that, in the absence of such a prohibition, states and

4    municipalities may regulate labor relations for workers not covered by the NLRA, and that when

5    Congress meant to prohibit such state and local regulation it knew how to do so. *See Jama v.*

6    *Immigration and Customs Enforcement*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that

7    Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and

8    our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows

9    how to make such a requirement manifest.").

10       Nor does the Chamber's argument that state and local regulation of independent contractors

11    undermines national uniformity carry any force. Had Congress intended to ensure such national

12    uniformity, it would have included an express preemption provision comparable to 29 U.S.C.

13    §164(a). Where Congress excludes particular working relationships from NLRA coverage without

14    prohibiting state or local regulation of those workers, the "laws may be ... drastically different in

15    neighboring states," and "there is absolutely nothing inappropriate in such a state of affairs."

16    *UFWA I*, 669 F.2d at 1256-57. "[W]here, as here, Congress has chosen not to create a national

17    labor policy in a particular field, the states remain free to legislate as they see fit, and may apply

18    their own views of proper public policy to the collective bargaining process insofar as it is subject

19    to their jurisdiction." *Id.* at 1257.[4]

20       Alternatively, the Chamber argues that the Ordinance's imposition of requirements that are

21    *different* from the NLRA's (namely, the requirement of interest arbitration and the Director's

22    authority to disapprove negotiated agreements) renders it preempted. Mot. at 19-20. But the

23    (1968) (holding that orchestra leaders, who were independent contractors, were "labor group" under federal labor law due to economic interrelationship with employees).

24    [4] Nor should the novelty of the Ordinance give this Court pause; it is an example of the state and local experimentation
25    that the federal system is intended to protect and encourage. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State
26    may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."). As the economy rapidly changes, forms of worker organization adapt, and by leaving the regulation of the new working relationships emerging from those economic changes to states and localities, Congress
27    allows state and local governments to test different possible responses instead of establishing a single national policy.

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 7

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

Chamber's authority consists exclusively of cases involving employees who *are* covered by the NLRA, not groups of workers who are *excluded*. *Id*. The Chamber does not explain why the NLRA would allow state and local regulation of excluded workers only insofar as such regulation parallels the NLRA. In fact, many local and state labor laws covering workers excluded from the NLRA (such as public employees) impose requirements that are different from the NLRA, and no courts have held them preempted on such grounds.[5]

### 2. The Chamber is unlikely to succeed on its NLRA *Garmon* preemption claim.

The Chamber also argues that the Ordinance is preempted under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), because local officials and state courts might have to determine whether for-hire drivers are "employees" under the NLRA (and so exempt from the Ordinance) or independent contractors (and so subject to the Ordinance). Mot. at 21. However, simply because a state or local official may be required to determine whether a worker is an NLRA "employee" does not establish preemption. If it did, every law covering agricultural laborers, for example, would be preempted simply because disputes over whether some workers are covered might arise. *See, e.g., Produce Magic*, 311 NLRB 1277 (addressing dispute over whether "cutter-packers" are NLRA employees or agricultural laborers). As the Chamber acknowledges, "the Ordinance does not apply to 'employees.'" Mot. at 21 (citing Ord. §6). That there may hypothetically be a future dispute over whether some specific group of workers is covered by the NLRA and so exempt from the Ordinance does not establish *facial* preemption.

To be sure, the *application* of the law to a particular group of drivers *could* be challenged as *Garmon* preempted if those drivers were arguably employees and so arguably covered by the NLRA. But here, the Chamber's Complaint specifically alleges that the drivers at issue are independent contractors, *not employees*, and the Chamber members have all filed declarations attesting to the same. Compl. (Dkt. #1) ¶¶16-18; Takar Decl. (Dkt. #3) ¶8; Kelsay Decl. (Dkt. #4)

---

[5] *See, e.g.*, RCW 41.56.450 (authorizing interest arbitration for certain public employees); Cal. Gov't Code §3507.1 (requiring local government recognition of union based on submission of authorization cards); Cal. Labor Code §1164 (providing for mandatory mediation of agricultural worker contracts).

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 8

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1  ¶¶8, 10; Steger Decl. (Dkt. #5) ¶9. No party to this case takes the position that the Chamber's

2  members' drivers are even "arguably" employees. This dooms the Chamber's *Garmon* preemption

3  claim. As the Supreme Court held, "The precondition for pre-emption, that the conduct be

4  'arguably' protected or prohibited, ... is not satisfied by a conclusory assertion of pre-emption"

5  such as "a claim, without more, that [the worker in question] was an employee rather than a

6  supervisor." *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 394-95 (1986). Rather,

7  a party who contends that a worker is "arguably" an NLRA employee so that state or local

8  regulation of that worker's relationship with an employer is preempted "is required to demonstrate

9  that his case is one that the [NLRB] could legally decide in his favor" by "put[ting] forth *enough*

10  *evidence to enable the court to find that the [NLRB] reasonably could uphold a claim* based on

11  such an interpretation." *Id.* (citing *Marine Engineers v. Interlake S.S. Co.*, 370 U.S. 173, 184

12  (1962)). Here, the Chamber contends the drivers are *not* employees and puts forth *no* evidence that

13  they could reasonably be held to be "employees" by the NLRB. *Id*; *cf. Baggett Transp. Co. v. Int'l*

14  *Bhd. Teamsters*, 270 So.2d 800, 802-03 (Ala. 1972).[6]

15       The Chamber is also unlikely to succeed because its *Garmon* claim requires individualized

16  proof about its members' drivers, so it lacks associational standing. *See San Diego County Gun*

17  *Rights Cte. v. Reno*, 98 F.3d 1121, 1131 (9th Cir. 1996) (citing *Hunt v. Washington State Apple*

18  *Advertising Comm'n*, 432 U.S. 333, 343 (1977)) (no associational standing when claims require

19  participation of individual members); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ.*

20  *Equity*, 950 F.2d 1401, 1408 (9th Cir. 1991) (no associational standing if claims require

21  individualized proof). As explained, a party claiming *Garmon* preemption cannot simply point to

---

22  [6] Nor does it matter that the employee or non-employee status of some for-hire drivers for Lyft and Uber is currently
23  pending before the NLRB. Mot. at 21. That a charge is under NLRB investigation does not excuse the Chamber from
    its obligation to produce *evidence* showing that drivers for Lyft and Uber are arguably employees. *See, e.g., Bud Antle,*
24  *Inc. v. Barbosa*, 45 F.3d 1261, 1274-75 (9th Cir. 1994) (requiring evidentiary showing that workers were arguably
    "employees" covered by the NLRA despite prior and pending NLRB proceedings). If the NLRB ultimately were to
25  determine that Lyft and/or Uber drivers are employees, the Ordinance would not apply to them. And presumably if
    the NLRB were to hold those drivers are independent contractors, not employees, the Chamber would concede there
26  would be no *Garmon* preemption claim. Indeed, because the NLRA's test for distinguishing employees from
    independent contractors is fact- and context-specific, the determination could vary for different groups of drivers in
27  different localities or states, even if they drive for the same company. The Chamber's facial challenge to the Ordinance,
    however, does not require this Court to consider such issues at this point in time.

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION (17-cv-00370) - 9

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

the theoretical applicability of the NLRA, but must "put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation." *Int'l Longshoremen's Ass'n*, 476 U.S. at 395 (internal quotations omitted). That is, the Court must determine whether there is evidence that the workforce *of any specific Chamber member* is comprised of drivers who are arguably employees rather than independent contractors under the NLRA's multi-factor, fact-specific analysis. *See supra* at 9. Any answer would depend upon the specific factual circumstances of the driver coordinator in question.[7] The participation of individual Chamber members whose driver workforces might "arguably" be subject to the NLRA is thus required for any litigation of the Chamber's *Garmon* claim. When variations in the individualized circumstances of an association's members affect the nature of their injuries or claims, those claims "are not susceptible to judicial treatment as systematic policy violations that make extensive individual participation unnecessary," and associational standing is improper. *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1293 (9th Cir. 2014) (internal quotation marks and ellipses omitted); *see also, e.g.*, *Lake Mohave Boat Owners Ass'n v. Nat'l Park Serv.*, 78 F.3d 1360, 1367 (9th Cir. 1995) (member participation required where legal issues involved member-by-member variations and therefore required "individualized proof").

### 3. The Chamber is unlikely to establish a federal antitrust claim.

The Chamber's federal antitrust preemption claim is also unlikely to succeed. Because the purported violations of federal antitrust law are not imminent, the Chamber's antitrust preemption claim is unripe and would not justify emergency relief. The Chamber also lacks standing to pursue federal antitrust claims on behalf of its members. And in any event, the Chamber is unlikely to succeed on the merits for two reasons: a challenge to one of the numerous topics of potential bargaining between EDRs and driver coordinators is insufficient to require the Ordinance's *facial*

---

[7] Moreover, any injunctive relief would necessarily be tailored to that driver coordinator's specific circumstances—such as by providing for expiration of the injunction should the NLRB determine that the coordinator's drivers are independent contractors or should the coordinator make a material change in the drivers' working conditions that clarifies their status as independent contractors.

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 10

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1  invalidation, and the Ordinance is an exercise of the City's regulatory power that is immune from

2  antitrust challenge. *See, e.g., Parker v. Brown*, 317 U.S. 341 (1943).

### i. The Chamber's antitrust claim is not ripe.

4  The Chamber is unlikely to succeed on its federal antitrust preemption claim in the first

5  instance because that claim is not ripe. "A claim is not ripe for adjudication if it rests upon

6  contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*

7  *v. United States*, 523 U.S. 296, 300 (1998). Here, the Chamber's antitrust claim is premised entirely

8  on its concern that for-hire drivers will "form unions and collectively bargain over the *price terms*

9  of their contracts with driver coordinators," which the Chamber considers to be "horizontal price

10  fixing." Mot. at 5 (emphasis added). But before any bargaining at all can occur, Local 117 would

11  need to procure statements of interest from a majority of qualifying drivers for a particular driver

12  coordinator and then be certified by the City as the EDR. Whether Local 117 will ever succeed in

13  procuring majority support from drivers for Uber, Lyft, or Eastside—and indeed, whether it will

14  even pursue statements of interest from one of those company's qualifying drivers after receiving

15  the required lists—is entirely speculative. Because the Chamber's antitrust claim is premised upon

16  these uncertain future events, that claim is not yet ripe and cannot justify emergency relief. *See*

17  *Chamber of Commerce v. Seattle*, No. C16-0322RSL, 2016 WL 4595981, *2-4 (W.D. Wash. Aug.

18  9, 2016) (concluding that any injury to Uber or Eastside For Hire resulting from collective

19  negotiations required by ordinance is too speculative to establish Article III standing); *cf., e.g.,*

20  *Parish v. Dayton*, 761 F.3d 873, 876 (8th Cir. 2014) (challenge to law permitting collective

21  bargaining by childcare workers unripe where "[t]he election of an exclusive representative [was]

22  not certainly impending"); *see also Bierman v. Dayton*, No. 14-3021, 2014 WL 4145410, *4-6 (D.

23  Minn. Aug. 20, 2014) (claim challenging implementation of exclusive union representation was

24  unripe when results of union election were still unknown). The Chamber's antitrust preemption

25  claim should be decided if, and only if, the negotiations over price terms of which the Chamber

26  complains are *likely*. Such a conclusion is consistent with the requirement that, in addition to

27  Article III requirements, the Chamber must also demonstrate a specific "antitrust injury." *See, e.g.,*

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 11

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1 │ *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110-11 (1986).

2 │ **ii. The Chamber cannot pursue antitrust claims on behalf of its members.**

3 │ The language of Section 16 of the Clayton Act (which governs claims for injunctive relief)

4 │ prohibits associations from bringing antitrust claims on their members' behalf by requiring that

5 │ claims be brought only by a party "threatened [with] loss or damage by a violation of the antitrust

6 │ laws." 15 U.S.C. §26; *see, e.g., Fin. & Sec. Prods. Ass'n v. Diebold, Inc.*, No. C04-04347WHA,

7 │ 2005 WL 1629813, *3 (N.D. Cal. Jul. 8, 2005); *see also Am. Chiropractic Ass'n, Inc. v. Trigon*

8 │ *Healthcare, Inc.*, 151 F.Supp.2d 723, 730 (W.D. Va. 2001); *Beverly Area Planning Ass'n*, 830

9 │ F.2d 1374, 1380 n.3 (7th Cir. 1987) (comparable language in Section 4 of the Clayton Act "does

10 │ not encompass an association which has not itself suffered such injury"). Because the Chamber

11 │ does not contend that *the Chamber itself* is threatened with loss or damage, the Chamber cannot

12 │ pursue its federal antitrust preemption claim.

13 │ Further, as explained earlier, *supra* at 9-10, in order to pursue claims on its members' behalf

14 │ the Chamber must establish that *neither* the relief requested *nor* the claim proffered demands

15 │ individualized proof from the association's members. *See Associated Gen. Contractors*, 950 F.2d

16 │ at 1408. Even if Section 16 did not preclude associational standing, any analysis of the damage to

17 │ the Chamber's members (as required by Section 16) will require detailed factual inquiries

18 │ regarding the impact of the Ordinance on those companies' operations, market share, and financial

19 │ performance, and any injunction would need to be tailored to the loss or damage to those members.

20 │ The Court cannot evaluate the impact of the Ordinance on the Chamber's members or accomplish

21 │ the necessary tailoring without their participation. *See, e.g., Spinedex*, 770 F.3d at 1293 (when

22 │ variations in circumstances of association's members affect nature of injuries or claims, claims

23 │ "are not susceptible to judicial treatment as systematic policy violations that make extensive

24 │ individual participation unnecessary").

25 │ **iii.    The *Parker* state action doctrine immunizes the Ordinance against the**
     │ **Chamber's antitrust claims.**

26 │

27 │ The Chamber is also unlikely to succeed on its antitrust claim because the federal antitrust

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION (17-cv-00370) - 12

1   laws do not prohibit states and their political subdivisions from protecting their citizens' interests

2   through reasonable state regulation. As the Supreme Court explained in *Parker*, the federal

3   antitrust laws should not be read "to restrain a state or its officers or agents from activities directed

4   by its legislature." 317 U.S. at 350-51. "The *Parker* decision was premised on the assumption that

5   Congress, in enacting the Sherman Act, did not intend to compromise the States' ability to regulate

6   their domestic commerce," including in ways that would otherwise violate antitrust laws. *Southern*

7   *Motor Carriers Rate Conf., Inc. v. U.S.*, 471 U.S. 48, 56 (1986).

8          **a.   State policy authorizes displacement of competition in the taxi and for-
                hire driver industries in order to further safety and reliability interests.**

9           The first requirement for *Parker* immunity is that the regulation or conduct at issue be

10  "clearly articulated and affirmatively expressed as state policy." *N.C. State Bd. of Dental*

11  *Examiners v. Federal Trade Comm'n*, 135 S.Ct. 1101, 1110 (2015). The Chamber contends that

12  the Ordinance fails this standard because Washington law does not expressly authorize collective

13  bargaining between for-hire drivers and driver companies. Mot. at 8-12. But a party relying on

14  *Parker* immunity "need not 'point to a specific, detailed legislative authorization' for its

15  challenged conduct." *Southern Motor Carriers*, 471 U.S. at 64 (quoting *Lafayette v. Louisiana*

16  *Power & Light Co.*, 435 U.S. 389, 415 (1978)). Rather, it suffices to show that "the State as

17  sovereign clearly intends to displace competition in a particular field with a regulatory structure."

18  *Id.* In other words, so long as the State intended to displace competition within the field in question,

19  the specific actions taken to effectuate that state policy need not be expressly authorized. *See id.*

20  at 64-66 (holding that legislative intent to displace price competition among common carriers is

21  sufficient to immunize collective ratemaking activity). The clear authorization test may be satisfied

22  even if the policy of displacing competition is merely "implicit" or is "defined at so high a level

23  of generality as to leave open critical questions about how and to what extent the market should

24  be regulated." *N. C. Dental Examiners*, 135 S.Ct. at 1112.

25          Thus, it does not matter whether Washington expressly authorized *collective bargaining*

26  between for-hire drivers and driver companies as a *specific* mechanism to further state objectives.

27

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 13

1   All that matters is that state law *does* affirmatively authorize the displacement of competition in

2   the for-hire transportation industry. The Legislature has explained "that privately operated for hire

3   transportation service is a vital part of the transportation system," making "the safety, reliability,

4   and stability" of such service a matter of "statewide importance" and regulation of that service "an

5   essential governmental function." RCW 46.72.001; *see also* RCW 81.72.200 (same with respect

6   to taxi companies). Given the importance of such regulations to protecting the public, Washington

7   law specifically provides that "it is the intent of the legislature to permit political subdivisions of

8   the state to regulate for hire transportation services *without liability under federal antitrust laws*."

9   RCW 46.72.001 (emphasis added); *see also* RCW 81.72.200 (same for taxi companies).

10  Washington's intent to authorize the City of Seattle to displace competition in the for-hire

11  transportation industry could not any be more explicit.[8]

12      State law gives cities like Seattle broad authority over how to regulate the for-hire driver

13  industry, including in manners that displace competition. It authorizes municipalities to "license,

14  control, and regulate all for hire vehicles operating within their respective jurisdictions," and

15  specifies that this power "includes" a number of delineated subjects as well as "[a]ny other

16  requirements adopted to ensure safe and reliable for hire vehicle transportation service." RCW

17  46.72.160(6); *see also* RCW 81.72.210. The City Council adopted the Ordinance pursuant to that

18  statutory authority. Ord. §1.B. The Ordinance expressly sets forth its purpose of protecting safety

19  and reliability, and requires the Director to determine that any agreement reached by the parties or

20  in interest arbitration furthers the City's purposes before it may take effect. Ord. §1.A, C, E-F, J.[9]

---

21  [8] The Ninth Circuit statement the Chamber cites in arguing that the Legislature must have contemplated the specific

22  "kinds of actions alleged to be anticompetitive" was issued *before Southern Motor Carriers* clarified the clear
    articulation requirement. Mot. at 8-9. Moreover, because the intent to displace competition here is explicit, this Court

23  need not ascertain whether "displacement of competition [i]s the inherent, logical, or ordinary result of the exercise
    of authority delegated by the state legislature." *FTC v. Phoebe Putney*, 133 S.Ct. 1003, 1013 (2013); *see also City of*

24  *Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 372-73 (1991) (displacement of competition need not be
    expressly authorized, so long as "suppression of competition is the foreseeable result of what the statute authorizes").

25  [9] To the extent the Chamber contends that Seattle lacks authority to regulate "driver coordinators" or "ride-referral
    companies" because such companies are not "transportation providers," *see, e.g.*, Mot. at 10, its contention is meritless.

26  As the Chamber admits, Washington law gives Seattle "general regulatory authority over persons and businesses
    providing for-hire transportation services," *id.*, which necessarily includes the power to regulate companies like Uber,

27  Lyft, and Eastside that indisputably provide transportation services regardless of how they style themselves. Multiple

                                                                                      (Cont'd ....)

---

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1    Contrary to the Chamber's contentions, no more is required to establish clear authorization

2    under *Parker*. "If more detail than a clear intent to displace competition were required of the

3    legislature," as the Chamber contends, that would interfere with the ability of state agencies or

4    municipal authorities to address issues not foreseen by the state legislature. *Southern Motor*

5    *Carriers*, 471 U.S. at 64. Such interference is particularly inappropriate in the context of municipal

6    regulation: "[M]unicipalities are electorally accountable ... lack the kind of private incentives

7    characteristic of active participants in the market .... [and] exercise[] a wide range of governmental

8    powers across different economic spheres," such that the concern that regulation might be used to

9    "pursue private interests" is substantially reduced. *N.C. Dental Examiners*, 135 S.Ct. at 1112-13.

10    In short, the "authorization requirement" does not "dictate[] transformation of state

11    administrative review into a federal antitrust job." *City of Columbia*, 499 U.S. at 372 (internal

12    quotations omitted). This Court therefore need not determine whether the City has complied with

13    applicable procedural and substantive requirements of Washington law, or acted for the reasons or

14    purposes authorized by state law. *Id.* at 371.[10] Likewise, the Court need not determine whether the

15    Ordinance is permissible as a matter of state law. "[I]n order to prevent *Parker* from undermining

16    the very interests of federalism it is designed to protect, it is necessary to adopt a concept of

17    authority broader than what is applied to determine the legality of the municipality's action under

18    _____

19    federal courts have already rejected the claim that companies like Lyft and Uber are not transportation companies. *See Cotter v. Lyft, Inc.*, 60 F.Supp.3d 1067, 1078 (N.D. Cal. 2015) ("[T]he argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is not a serious one."); *Doe v. Uber Technologies, Inc.*, 184 F.Supp.3d 774,

20    786 (N.D. Ca. 2016) (rejecting argument that Uber "is not a common carrier but ... a 'broker' of transportation services"); *O'Connor v. Uber Technologies, Inc.*, 82 F.Supp.3d 1133, 1141 (N.D. Cal. 2015) (argument that Uber is

21    "merely a technological intermediary between potential riders and potential drivers ... is fatally flawed in numerous respects"). Moreover, if this contention had merit, *all* municipal regulation of companies like Uber and Lyft would be

22    invalid. In fact, however, the Chamber's members have been subject to Seattle's regulations for years, never once claiming the City lacked the authority to regulate them.

23    [10] The Court can disregard the Chamber's attack upon the Council's determination that the negotiation process established by the Ordinance will improve the safety and reliability of for-hire transportation services within Seattle.

24    *See also, e.g., Rousso v. State*, 170 Wn.2d 70, 75 (2010) ("It is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature.") (citation and quotation omitted). Notably, the only authority

25    cited in support of the Chamber's attack on that determination is decade-old testimony by the FTC (an agency with an institutional interest in applying antitrust laws broadly but no particular expertise in transportation policy or

26    collective worker negotiations) regarding collective bargaining by pharmacies with health plans. *See* Mot. at 11. Such irrelevant testimony provides no basis for this Court to second-guess the Council's legislative judgments.

27    (Cont'd ....)

---

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 15

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

state law." *Id.* at 372. The statutory authorization to displace competition, and the specific grant of authority to adopt regulations furthering the purposes of safety and reliability, establish the "clear authorization" prong of *Parker* immunity doctrine, and no further inquiry regarding the scope of the City's authority under state law is necessary.[11]

### b. The Ordinance provides for active supervision of collective negotiations.

The Chamber further alleges that *Parker* immunity does not apply because no State of Washington officials supervise the collective negotiations required under the Ordinance. Mot. at 12-13.[12] However, *Parker* does not require the supervision of private activity to be provided by *state* rather than *local* officials. As *Tom Hudson & Associates, Inc. v. City of Chula Vista*, 746 F.2d 1370 (9th Cir. 1984), held, *Parker*'s "active state supervision" requirement is satisfied where potentially anticompetitive proposals made by private parties are "reviewed" for reasonableness and then "approved" by a municipality, such that any approved proposals are "directly attributable to action of the city." *Id.* at 1374; *see also Southern Motor Carriers*, 471 U.S. at 57 n.20 ("Although its anticompetitive conduct must be taken pursuant to a clearly articulated state policy, a municipality need not be supervised by the State in order to qualify for *Parker* immunity."); *Tri-State Rubbish, Inc. v. Waste Management, Inc.*, 998 F.2d 1073, 1079 (1st Cir. 1993) (endorsing view "that municipal supervision of private actors is adequate" to establish *Parker* immunity, and

---

[11] The Chamber contends that a different result is required under *Phoebe Putney* and *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427 (9th Cir. 1996), but in both cases the statutory authorizations for the actions at issue were insufficient to trigger *Parker* immunity because they said nothing whatsoever about displacing competition. *See Phoebe Putney*, 133 S.Ct. at 1011-12 (hospital entity had been granted only "general corporate powers"); *Columbia Steel Casting*, 111 F.3d at 1438 (statutory authorization could have but did not authorize "exclusive service" by utilities). By contrast, Washington clearly intended to empower the City to regulate the for-hire transportation industry "without liability under federal antitrust laws." RCW 46.72.001.

[12] To the extent the Chamber contends that a Washington official must actively supervise any law enacted by the City pursuant to its authorization to enact potentially anticompetitive regulations, the Chamber is wrong. *Town of Hallie v. City of Eau Claire* specifically held that "the active state supervision requirement should not be imposed in cases in which the actor is a municipality." 471 U.S. 34, 46 (1985); *see also, e.g., N.C. Dental Examiners*, 135 S.Ct. at 1112 ("[M]unicipalities are subject exclusively to [the] 'clear articulation' requirement.") (quotation omitted). In arguing to the contrary, the Chamber misquotes *Town of Hallie*. Compare Mot. at 12 (arguing that active supervision is required "where state or municipal regulation [of] a private party is involved") (alteration by Chamber), *with Town of Hallie*, 471 U.S. at 46 n.10 ("Where state or municipal regulation *by* a private party is involved, however, active state supervision must be shown, even where a clearly articulated state policy exists.") (emphasis added). Here, because the Director maintains the ultimate decision-making authority and there is no "regulation *by* a private party," this Court need not even apply *Parker*'s second prong. *Infra* at 18-19. But even assuming it does apply, it is easily satisfied.

(Cont'd ....)

---

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 16

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1  noting that view is "supported by the greater weight of authority" and "endorsed by the leading

2  antitrust treatise"); *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005,

3  1014-15 (8th Cir. 1983).[13] Requiring the State to supervise local regulation of for-hire

4  transportation options not only "would erode local autonomy" but also "makes little sense"

5  because there is no good reason "to require a state to invest its limited resources in supervisory

6  functions that are best left to municipalities." *Golden State Transit Corp. v. City of Los Angeles*,

7  726 F.2d 1430, 1434 (9th Cir. 1984).

8       The Chamber also contends that the "active state supervision" requirement is not met here

9  because the Director has "no independent authority to specify the terms of a collective-bargaining

10  agreement." Mot. at 13. The active supervision requirement does not, however, mandate that a

11  government official be able to dictate an agreement's terms. Rather, "[t]he active supervision

12  requirement demands, *inter alia*, that state officials have and exercise power to *review* particular

13  anticompetitive acts of private parties and *disapprove* those that fail to accord with state policy."

14  *N.C. Dental Examiners*, 135 S.Ct. at 1112 (quotation omitted) (emphases added). The purpose of

15  the requirement is to ensure that "the details of the rates or prices have been established as a product

16  of deliberate state intervention, not simply by agreement among private parties." *FTC v. Ticor*

17  *Title Ins. Co.*, 504 U.S. 621, 634-35 (1992). That purpose is served so long as the supervisor can

18  "*review* the substance of the anticompetitive decision, not merely the procedures followed to

19  produce it;" "the supervisor [has] the *power to veto or modify* particular decisions to ensure they

20  accord with state policy;" and the supervisor actually makes a decision rather than merely having

21  the potential ability to intervene. *N.C. Dental Examiners*, 133 S.Ct. at 1116-17 (citations and

22  internal quotations omitted; emphases added).

23       Here, the Ordinance requires the Director to review *every* proposed agreement "to ensure

24  that the substance of the agreement promotes the provision of safe, reliable, and economical for-

25  [13] The Chamber contends *Tom Hudson* merely "assumed that municipal supervision of private parties is sufficient,"

26  Mot. at 13 n.2, but the issue there was whether Chula Vista's supervision of private parties was sufficient for *Parker* immunity purposes, and the Ninth Circuit held it was. *Tom Hudson* is thus binding authority on that question. The

27  cases the Chamber cites simply restate the *Parker* immunity requirements in the most general terms, and do not even purport to consider whether municipal supervision is sufficient for *Parker* immunity. Mot. at 12.

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 17

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1   hire transportation services and otherwise advance the [Ordinance's] policy goals." SMC

2   6.310.735.H.2, I.3. In conducting such review, the Director may gather evidence, hold public

3   hearings, and request additional information, and must issue a written explanation of conclusions.

4   *Id.* Only if the Director finds the agreement furthers those goals does it take effect. SMC

5   6.310.735.H.2.a, c, I.4.a, c.[14] Otherwise, the Director must return the agreement to the parties (or

6   interest arbitrator) with a written explanation of its deficiencies and, if the Director chooses,

7   recommendations to remedy those problems. SMC 6.310.735.H.2.b, I.4.b.[15] These provisions on

8   their face (which is all that is at issue here) fulfill the requirement that a government official review

9   and have authority to disapprove the specific acts by private parties that the Ordinance authorizes,

10  and therefore satisfy *Parker*'s "active supervision" prong.

11      Indeed, the Director's control over the ultimate terms of any agreement means that the

12  Ordinance permits only unilaterally imposed restraints on trade, which are categorically exempt

13  from antitrust preemption. *See Yakima Valley Mem. Hosp. v. Wash. Dep't of Health*, 654 F.3d 919,

14  926 (9th Cir. 2011) ("To determine whether a regulation facially conflicts with Sherman Act

15  [Section] 1, we first consider whether the challenged regulation involves (1) unilateral action by

16  the state and is thus not subject to preemption (because there is no concerted action)[.]"); *Costco*

17  *Wholesale Corp. v. Maleng*, 522 F.3d 874, 891 (9th Cir. 2008) ("[A] unilaterally imposed restraint

18  of the sovereign ... is not subject to preemption."); *Fisher v. City of Berkeley*, 475 U.S. 260, 270

19  (1986). Although the Ordinance permits certain terms to be proposed to the Director in the form

20  of an agreement reached through collective negotiations or interest arbitration, those proposals

21  have *no effect* unless and until they are reviewed and approved by the Director based on a finding

---

22  [14] This case does not involve the kind of "negative option regime" at issue in *Ticor*, where private parties' price-fixing

23  agreements became effective unless the government exercised its veto. *Ticor* held *Parker* immunity was not available
    under such a regime where the facts showed "that the potential for state supervision was not realized in fact." 504 U.S.

24  at 638-40; *but see id.* at 639 (explaining why the "negative option regime" in *Southern Motor Carriers* was sufficient).
    While a party might in the future assert an as-applied challenge to the Ordinance on the theory that the Director is not

25  actually exercising his authority (should such facts develop), no such as-applied challenge is possible in this lawsuit
    because the Director has not yet reviewed any agreements and the Chamber challenges the Ordinance on its face.

26  [15] Any amendments to agreements must also be approved. SMC 6.310.735.J. And if "the Director determines that the
    agreement no longer ... promotes the provision of safe, reliable, and economical for-hire transportation services and

27  the public policy goals" of the Ordinance, the Director may withdraw approval of the agreement after following
    specified procedures. SMC 6.310.735.J.1.

---

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION (17-cv-00370) - 18

1   that the terms will promote the safety and reliability of for-hire transportation services in Seattle.

2   Pursuant to the Ordinance's terms, only *the Director* can impose arguably anticompetitive

3   restraints on trade. Just as in *Fisher*, where the challenged rent-control ordinance was held a

4   unilateral restraint on trade even though private parties had "some power to trigger the enforcement

5   of its provisions," 475 U.S. at 269, and in *Yakima Valley Memorial Hospital*, where a state-

6   imposed ban on new cardiac care facilities was held unilateral even though it enabled incumbent

7   care providers to exclude new competition, 654 F.3d at 930, the Director—not any private party—

8   unilaterally imposes any and all restraints on trade authorized by the Ordinance. Because such a

9   unilateral decision does not involve the "concerted action" required to sustain an antitrust claim,

10  *Fisher*, 475 U.S. at 266, the Ordinance cannot be challenged on an antitrust preemption theory.

11         **iv.  A single negotiation topic cannot render the entire Ordinance facially invalid.**

12         The Chamber's claim is also unlikely to succeed because it is premised on only one of the

13  numerous topics of collective negotiation between EDRs and driver coordinators—specifically,

14  negotiations regarding "the price terms of [drivers'] contracts with the driver coordinators." Mot.

15  at 7. Even if such negotiations *were* "*per se* illegal," that would not justify enjoining the entire

16  Ordinance. It would instead support only a limited injunction prohibiting such price term

17  negotiations (which, as previously explained, may never even occur). Other conduct authorized by

18  the Ordinance—including collective negotiations regarding other topics, such as driver safety—

19  would be subject to the antitrust "rule of reason" analysis rather than being deemed "unlawful *per*

20  *se*."[16] And because that conduct is not "per se" unlawful, it could not support a claim that the

21  Ordinance is facially preempted or justify the injunctive relief sought herein.[17]

22

23

24

---

25  [16] *See, e.g., Int'l Healthcare Mgt. v. Hawaii Coalition for Health*, 332 F.3d 600, 605 (9th Cir. 2003) ("joint efforts to

26  modify *non-fee* terms of [a participating physician agreement] is not in a class of restraints previously held to be per se unreasonable") (emphasis added).

    [17] *See, e.g., Costco*, 522 F.3d at 885-86 ("[T]o be struck down, the regulation or restraint must effect a per se violation

27  of the Sherman Act.").

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 19

**B.  The Chamber has not demonstrated likely irreparable injury.**

**1.  Disclosure of publicly available driver information is not an irreparable injury.**

The Chamber's argument that it will suffer irreparable harm from the disclosure of qualifying driver lists containing "confidential, trade secret information," Mot. at 1; *see also id.* at 22, is wrong for many reasons.

First, the disclosure that the Chamber complains would irreparably injure its members involves information that is already publicly available. Any member of the public may access a computer database containing the name, telephone number, and address of all licensed for-hire drivers in the City. Main-Hester Decl. ¶¶5-6 & Ex. C.[18] Other information could be obtained through a public records request. *Id.* ¶9. And information allowing a competitor to create an "aggregate" list of drivers who work for Lyft and/or Uber has already been disclosed to a television station, to Uber, and to Lyft in response to a public records request. Main-Hester Decl. ¶16 & Ex. J.[19] On that basis alone, there could be no irreparable harm caused by disclosing that information.

Notably, the Chamber does not contend that Washington's Uniform Trade Secrets Act supports its claim, perhaps because Uber and Lyft have already lost that argument in state court. Judge Andrus previously held that aggregate information concerning the identities of Lyft and Uber drivers is not a trade secret, reasoning that the "driver's identities are not secret" because "[i]n order for a driver to obtain a business license ... they have to submit that license application to the City, and that information—their name, their address—is all publicly available information." Ryan Decl., Ex. E at 6. Withholding the information "for the purpose of protecting the identity of Uber and LYFT drivers would be fruitless, as that information is already available to [Uber and LYFT] from other sources." *Id.* at 6-7. The court thus ordered disclosure over objections by Uber and Lyft that doing so would irreparably harm them by allowing their competitors to learn the identities of all of their drivers, and neither Uber nor Lyft appealed. Ryan Decl., Ex. A at 5, 9-10;

---

[18] Names do not have special private status under Washington state law. *See King County v. Sheehan*, 114 Wn.App. 325, 346 (2002).

[19] Lyft and Uber, who have the only substantial presence in the TNC market, Ryan Decl., Ex. D ¶5, thus already have the information they need to create lists of one another's drivers, with contact information.

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 20

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

B at 1, 4-5, 11-13, 18-19; C ¶¶12-13, 19-20; D ¶¶5-7; Main-Hester Decl. ¶18. As a result, Uber now possesses Lyft's VINs (allowing it to ascertain Lyft's drivers), and vice versa. *Id.*

Second, the Ordinance provides for disclosure of the lists of qualifying drivers *only to a QDR*, and requires that the QDR use those lists *only* to contact drivers to solicit their support; the QDR "may not sell, publish, or otherwise disseminate the driver contact information" to any other person or entity. SMC 6.310.735.E. The Chamber submits no evidence that the QDR (Teamsters Local 117) will violate the law by disclosing the lists of qualifying drivers to Uber's, Lyft's, or Eastside's competitors. If Local 117 disclosed this information improperly, it would be subject to hefty fines, and any injured entity would have a private right of action to seek damages and equitable relief. SMC 6.310.735.M. Misuse could also potentially subject Local 117 to a misappropriation claim. Irreparable injury cannot be established based on mere speculation about such possible misuse. *See Earth Island Institute v. U.S. Forest Serv.*, 351 F.3d 1291, 1311 (9th Cir. 2003) ("The law does not require the identified injury to be certain to occur, but it is not enough to identify a purported injury which is only theoretical or speculative.").

Third, even if the Chamber *had* demonstrated that the lists contained confidential information that would likely fall into the hands of its members' competitors, its irreparable injury showing would be deficient. The Chamber's evidence of injury consists of conclusory and boilerplate assertions that competitors "could" or "can" use the lists to raid drivers. *See* Steger Decl. ¶17; Takar Decl. ¶12; Kelsay Decl. ¶¶15-16. The declarations do not identify any competitor that is likely to do so, nor otherwise show that such raiding is *likely*. Further, they fail to explain with any specificity how such raiding would harm the business of the Chamber's members. *See* Steger Decl. ¶17; Takar Decl. ¶12; Kelsay Decl. ¶15. Such speculative and conclusory testimony is insufficient to show *likely* irreparable injury justifying a preliminary injunction. *See Caribbean Marine Serv. Co., Inc. v. Baldrige*, 844 F.2d 668, 671-72, 675 (9th Cir. 1988); *Oakland Tribune Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984); *cf. International Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411-12 (9th Cir. 2015).

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

### 2. Preemption would not itself establish irreparable injury.

The Chamber also argues that "deprivation" of a constitutional right through application of a preempted law "constitutes irreparable injury." Mot. at 22. But the Chamber's only "constitutional" claim is a preemption claim arising under the Supremacy Clause. The sole authority cited for the proposition that likely preemption establishes irreparable harm, *American Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009), predates the Supreme Court's clarification that the Supremacy Clause protects the structure of government, and does not convey a personal constitutional right. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S.Ct. 1378, 1383 (2015) ("[T]he Supremacy Clause is not the 'source of any federal rights'" and does not "give affected parties a constitutional ... right to enforce federal laws against the States") (internal quotations omitted). Given the structural nature of preemption claims, any presumption that violations of *individual* constitutional rights cause irreparable harm would be inapplicable.

In any event, *American Trucking* cannot bear the weight the Chamber places on it. There, the Ninth Circuit was concerned that by being forced to sign agreements that were likely preempted, the plaintiff "will be forced to incur large costs which, if it manages to survive those, will disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone." 559 F.3d at 1058. Such discussion of costs and business disruption would have been unnecessary if the Supremacy Clause violation had alone been sufficient. Indeed, under the Chamber's theory, much of the irreparable harm discussion in the case law would be unnecessary, and *Winter*'s mandate that irreparable injury be *likely* would become irrelevant in all cases raising federal statutory claims against local and state officials.[20]

### 3. The Chamber's remaining attempts to show irreparable harm also fail.

The Chamber further contends that its members "will have to spend resources educating

---

[20] One would expect to find discussion of such a significant doctrinal shift in the case law. Instead, the few decisions to expressly address the issue have held otherwise. *See, e.g., New York State Rest. Ass'n v. New York City Bd. of Health*, 545 F.Supp.2d 363, 367 (S.D.N.Y. 2008) ("*[P]er se* irreparable harm is caused only by violations of 'personal' constitutional rights[,] to be distinguished from provisions of the Constitution that serve 'structural' purposes, like the Supremacy Clause") (quotation and alterations omitted), *rev'd on other grounds*, 556 F.3d 114 (2d Cir. 2009); *American Petroleum Inst. v. Jorling*, 710 F.Supp. 421, 432 (N.D.N.Y. 1989) ("[A]sserted violation of the Supremacy Clause cannot, without more, serve as the basis for a finding of irreparable harm.").

---

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

drivers about the consequences of voting for union representation" and "are incurring substantial and growing compliance costs." Mot. at 22-23. But "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." *Citizens of the Ebbey's Reserve for a Healthy, Safe & Peaceful Environment v. U.S. Dep't of the Navy*, 122 F.Supp.3d 1068, 1083 (W.D. Wash. 2015) (Zilly, J.) (internal quotations omitted); *see also Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995); *San Francisco Real Estate Investors v. Real Estate Investment Trust of Am.*, 692 F.2d 814, 818 (1st Cir. 1982) (Breyer, J.). Just as the Chamber cannot "parlay actions taken to a risk of harm into" Article III injury, *Chamber of Commerce v. Seattle*, No. C16-0322RSL, 2016 WL 4595981, * 4 (W.D. Wash. Aug. 9, 2016), it cannot rely on such actions, none of which the Ordinance mandates, to establish irreparable injury.

Moreover, the Chamber's declarations about costs are general, conclusory, and non-specific, and may not be relied on for the reasons discussed *supra* at 21. The only concrete cost the Chamber points to is a four-cent increase that is not attributable to the Ordinance. Main-Hester Decl. ¶¶19-23. Even if it were, the amount to be refunded if the Ordinance were struck down would be easy to calculate.

Finally, the Chamber asserts that the Ordinance "will threaten the very existence of Chamber members" by "requiring seismic changes to the businesses that the business models may fail to withstand." Mot. at 23. But it cites no evidence to support its alarmist speculation. Moreover, the Chamber does not acknowledge that its members could face such harm only if a series of contingent events all occurred: Local 117 would have to decide to seek statements of interest from the Chamber's members' drivers, secure such statements from a majority of those drivers, be certified by the City as an EDR, and in the ensuing negotiations seek and obtain provisions that would disrupt the Chamber's members' businesses. No one knows whether any (much less all) of those events will occur, and so the Chamber cannot prove that such harm is likely or imminent.

**C. The remaining equitable factors do not favor an injunction.**

"[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir.

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION (17-cv-00370) - 23

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1997); *see also Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.") (internal quotation omitted). The Ordinance was enacted to address the public's interest in safe and reliable transportation, and to allow drivers a say over the terms and conditions of their work. Ord. §1.C-J. When, as here, "the responsible public officials ... have already considered th[e] public interest," a court's "consideration of the public interest is constrained." *Golden Gate Restaurant Ass'n v. City of San Francisco*, 512 F.3d 1112, 1126-27 (9th Cir. 2008) (court could conclude injunction is in public interest only "if it were *obvious* that the Ordinance was unconstitutional or preempted") (emphasis added); *see also Planned Parenthood of the Blue Ridge v. Camblos*, 116 F.3d 707, 721 (4th Cir. 1997) (state has "interest in ensuring that the laws enacted by the General Assembly and signed into law by the Governor are implemented"); *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, Circuit Justice, in chambers).

Thus, a preliminary injunction would cause irreparable harm to the City and deprive the public of its interest in the implementation of laws adopted by their elected representatives. In the Council's legislative judgment, allowing for-hire drivers to collectively negotiate was a means to create a safer, more reliable for-hire industry. Stopping this first-of-its-kind law in its tracks, based on speculative and non-existent harms, is not in the public interest.[21] An injunction also would not preserve the status quo, because the Ninth Circuit has held that a duly enacted ordinance constitutes the status quo. *See Golden Gate Restaurant Ass'n*, 512 F.3d at 1116.[22]

## CONCLUSION

For these reasons, the Chamber's preliminary injunction motion should be denied.

---

[21] The Chamber contends that the delayed implementation date and further deferral show "there plainly is no interest in the Ordinance's immediate implementation." Mot. at 24. But the delayed "Commencement Date" allowed the adoption of implementation rules. Eng Decl. ¶4 & Ex. B. And the need to further delay that date arose because the Chamber's members refused to provide data the City requested, which required the City to explore other methods including driver surveys to gather such information. *Id.*

[22] *Clark v. U.S. Dist. Ct.*, 840 F.2d 701 (9th Cir. 1988), cited by the Chamber, did not involve an enacted law.

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION (17-cv-00370) - 24

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

DATED March 21, 2017

PETER S. HOLMES
Seattle City Attorney

By:      /s/Michael K. Ryan
         WSBA #32091
         Gregory C. Narver, WSBA #18127
         Sara O'Connor-Kriss, WSBA #41569
         Josh Johnson, WSBA #33570
         Assistant City Attorneys
         Seattle City Attorney's Office
         701 Fifth Avenue, Suite 2050
         Seattle, WA 98104
         Phone: (206) 684-8207 — Michael K. Ryan
         Phone: (206) 684-8233 — Gregory C. Narver
         Phone: (206) 615-0788 — Sara O'Connor-Kriss
         Phone: (206) 386-1099 — Josh Johnson
         Fax: (206) 684-8284
         E-mail: michael.ryan@seattle.gov
         E-mail: gregory.narver@seattle.gov
         E-mail: sara.oconnor-kriss@seattle.gov
         E-mail: josh.johnson@seattle.gov

         Stephen P. Berzon (pro hac vice)
         Stacey M. Leyton (pro hac vice)
         P. Casey Pitts (pro hac vice)
         Altshuler Berzon LLP
         177 Post Street, Suite 300
         San Francisco, CA  94108
         Phone: (415) 421-7151
         Fax: (415) 362-8064
         E-mail: sberzon@altber.com
         E-mail: sleyton@altber.com
         E-mail: cpitts@altber.com

         Attorneys for Defendants

DEFENDANTS' OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION  (17-cv-00370) - 25

PETER S. HOLMES
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104

1

2

3

4

5

## CERTIFICATE OF SERVICE

I hereby certify that on this March 21, 2017, I electronically filed this DEFENDANTS'

OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

below-listed:

6

7

8

9

10

11

| | |
|---|---|
| Timothy J. O'Connell | tim.oconnell@stoel.com |
| Michael A. Carvin | mcarvin@jonesday.com |
| Jacqueline M. Holmes | jholmes@jonesday.com |
| Christian G. Vergonis | cvergonis@jonesday.com |
| Robert Stander | rstander@jonesday.com |
| Lily Fu Claffee | lfclaffee@uschamber.com |
| Steven P. Lehotsky | slehotsky@uschamber.com |
| Warren Postman | wpostman@uschamber.com |
| Kathryn Comerford Todd | ktodd@uschamber.com |

12

DATED this 21st of March, 2017, at Seattle, Washington.

13

14

15

16

By:    /s/Michael K. Ryan
       Michael K. Ryan, WSBA #32091
       michael.ryan@seattle.gov

17

18

19

20

21

22

23

24

25

26

27

**PETER S. HOLMES**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104