1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                    )
CHAMBER OF COMMERCE OF THE          )          No. C17-0370RSL
UNITED STATES OF AMERICA,               )
                                                    )
                         Plaintiff,               )
         v.                                         )
                                                    )          ORDER GRANTING MOTION FOR
THE CITY OF SEATTLE, *et al.*,             )          PRELIMINARY INJUNCTIVE
                                                    )          RELIEF
                         Defendants.          )
_____)

         This matter comes before the Court on "Plaintiff's Motion for Temporary Restraining

Order and/or Preliminary Injunction." Dkt. # 2. In ruling on this motion, the Court has also

considered the request for preliminary injunctive relief filed by individual for-hire drivers in

Clark v. City of Seattle, C17-0382RSL. Having reviewed the memoranda, declarations, and

exhibits submitted in both cases and having heard the arguments of counsel for the Chamber, the

Clark plaintiffs, and the City, the Court finds as follows:

         In January 2016, City of Seattle Ordinance 124968 came into effect. The Ordinance

provides a mechanism through which for-hire drivers can collectively bargain with the

companies that hire, contract with, and/or partner with them. Dkt. # 39-1. Pursuant to the

procedures set forth in the Ordinance, Teamsters Local 117 gave notice to twelve "driver

coordinators" that it seeks to represent their drivers in collective bargaining. Dkt. # 39-1 at 7.

The driver coordinators had until April 3, 2017, to provide the names, contact information, and

license numbers of their drivers to the union so that it may solicit their interest in collective representation by the Teamsters.[1] Three of the driver coordinators, Eastside For Hire, Inc., Lyft, Inc., and Uber Technologies, Inc., are members of the plaintiff Chamber of Commerce. The Chamber seeks to enjoin enforcement of the Ordinance, arguing that it violates and is preempted by federal antitrust law and is preempted by the National Labor Relations Act ("NLRA"). The Clark plaintiffs argue that the Ordinance should be enjoined because it is preempted by the NLRA and violates the First Amendment and the Driver's Privacy Protection Act.

Although the procedure for obtaining a temporary restraining order differs from that which is applicable in the preliminary injunction context, the factors considered by the Court are the same. In order to obtain preliminary injunctive relief, plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008). In the Ninth Circuit, "if a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two Winter factors are satisfied." Feldman v. Ariz. Sec. of State's Office, 843 F.3d 366, 375 (9th Cir. 2016) (quoting Shell Offshore, Inc. v. Greenpeace, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013)) (internal quotation marks omitted, emphasis in original).

**A. ANTITRUST CLAIM**

The judicial power of the federal courts extends to "Cases" and "Controversies" pursuant to Article III, Sec. 2 of the United States Constitution. An Article III case or controversy exists if plaintiff can show that "(1) it has suffered an 'injury in fact' that is (a) concrete and

---

[1] At oral argument, the City agreed to postpone enforcement of and/or penalties for violation of the disclosure requirement until the Court rules on the Chamber's pending motion.

1    particularized and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is

2    fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to

3    merely speculative, that the injury will be redressed by a favorable decision." <u>Friends of the</u>

4    <u>Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180-81 (2000) (quoting <u>Lujan v.</u>

5    <u>Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)). An association, such as the Chamber, "has

6    standing to bring suit on behalf of its members when: (a) its members would otherwise have

7    standing to sue in their own right; (b) the interests it seeks to protect are germane to the

8    organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

9    participation of individual members in the lawsuit." <u>Hunt v. Wash. State Apple Advertising</u>

10   <u>Comm'n</u>, 432 U.S. 333, 343 (1977).

11          Section 16 of the Clayton Act, which governs claims for injunctive relief, provides in part

12   that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have

13   injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ."

14   15 U.S.C. § 26. By its very terms, § 16 authorizes suits by associations, but it, like every other

15   private litigant, "must have standing - in the words of § 16, [it] must prove "threatened loss or

16   damage" to [its] own interests in order to obtain relief." <u>Cal. v. Am. Stores Co.</u>, 495 U.S. 271,

17   296 (1990). The Supreme Court has found that "[i]t would be anomalous . . . to read the Clayton

18   Act to authorize a private plaintiff to secure an injunction against a threatened injury for which

19   he would not be entitled to compensation if the injury actually occurred" and that Congress did

20   not intend such a result. <u>Cargill, Inc. v. Monfort of Colo., Inc.</u>, 479 U.S. 104, 111 (1986).

21   Personal injury is therefore a prerequisite to instituting a private antitrust action – regardless of

22   whether monetary or injunctive relief is sought.[2]

23   ───────────────────

24          [2] One of the cases on which the Chamber relies, <u>Nat'l Constructors Ass'n v. Nat'l Elec.</u>
     <u>Contractors Ass'n</u>, 498 F. Supp. 510 (D. Md. 1980), recognized that this rule was supported by "long-
25   standing authority," but concluded that a broader, more flexible standing requirement should be applied.
     <u>Id.</u> at 518-19. The case was decided before the Supreme Court reiterated in <u>Cargill</u> that a private
26   plaintiff may exercise the remedy provided in § 16 only on a showing of "threatened loss or damage"

1    Nevertheless, the Court will assume, for purposes of this motion only, that although the

2    Chamber itself does not face a "threatened loss or damage," it may sue on behalf of its members

3    if it can satisfy the three-part Hunt test. See Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area

4    Planning Ass'n, 830 F.2d 1374, 1380-81 (7th Cir. 1987). The City does not dispute that the

5    Chamber's interests in this litigation are germane to its organizational purposes, but argues that

6    the antitrust claim cannot be pursued without the participation of individual members in the

7    lawsuit. Hunt, 432 U.S. at 343. The Chamber has the burden of proving that its members,

8    Eastside, Uber, and Lyft, have suffered antitrust injury, which is "injury of the type the antitrust

9    laws were intended to prevent and which flows from that which makes defendants' acts

10   unlawful." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (internal

11   quotation marks and citations omitted). Simply showing "injury causally linked to an illegal

12   presence in the market" will not suffice if the injury flows from aspects of the Ordinance that are

13   beneficial or neutral to competition. Id.; Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1433

14   (9th Cir. 1995). Based on the limited record evidence, one can reasonably infer that the

15   Ordinance will reduce, if not extinguish, any variability in the terms and conditions on which

16   for-hire drivers offer their services to the driver coordinators. The anticompetitive potential of all

17   price-fixing agreements is likely to arise and may justify facial invalidation of the Ordinance

18   without the need for Eastside, Uber, and/or Lyft to be party to this litigation. The Court is willing

19   to assume that the Chamber will be able to satisfy the third prong of the Hunt analysis. 432 U.S.

20   at 343.

21   Whether the Chamber will succeed on the merits of its antitrust claim is unclear, however.

22   Federal antitrust laws do not prohibit states or their political subdivisions from protecting their

23   citizens' interests through reasonable regulation, even if those regulations have anticompetitive

24   effects. Parker v. Brown, 317 U.S. 341 (1943). A municipality like the City of Seattle may

25

26   that is personal to the plaintiff.

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF           -4-

enable a price-fixing scheme that would otherwise violate the antitrust laws "when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that is the State's own." FTC v. Phoebe Putney Health Sys., Inc., __ U.S. __, 133 S. Ct. 1003, 1010 (2013) (internal quotation marks omitted). The challenged regulation must "be one clearly articulated and affirmatively expressed as state policy" and "the policy must be actively supervised by the State itself." Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980) (internal quotation marks omitted).

The statutes on which the City relies clearly contemplate anticompetitive effects in the for-hire transportation industry. The taxi industry in Washington is heavily regulated at a local level under regulatory schemes that allow or require agreements which, in most other contexts, would be invalid as anticompetitive or monopolistic. The statutes have been used in a fairly consistent way, however, namely to allow municipalities to establish rates and other regulatory requirements in the taxi industry. They have never, as far as the Court is aware, been used to authorize collusion between individuals in the industry in order to establish a collective bargaining position in negotiations with another private party. There can be no doubt that rideshare companies such as Uber and Lyft have, at a truly startling rate, created havoc in this industry using a business model that simply did not exist before its recent technological development. Whether existing state law covers, or was intended to cover, the sort of regulation the City attempts through the Ordinance is far from clear. Questions also remain regarding the level of state supervision contemplated by the Ordinance. The City does not establish the terms and conditions under which for-hire transportation is offered. Rather, those terms and conditions are negotiated between private parties, and there is no requirement that the City evaluate the competitive effects of the agreements reached. The City's sole role is to review and approve the negotiated terms. While approval may be sufficient to trigger state immunity under governing case law, it is troubling that a disapproval again places the matter back into the hands of private parties, with no state oversight. Id., at 105-06. The novelty of the City's claim for antitrust

1   immunity, the potential absence of any state oversight of the agreements, the lack of any

2   evaluation of competitive effect, and the potential impact on an important transportation option

3   for thousands of Seattle residents and visitors cannot be ignored. The Court finds that the

4   Chamber has raised serious questions regarding both prongs of the immunity analysis.

5   **B. NATIONAL LABOR RELATIONS ACT CLAIM**

6   The Chamber and the <u>Clark</u> plaintiffs argue that the Ordinance is preempted by the

7   NLRA because (1) it regulates activity that arguably falls within the statute, including the

8   determination of whether a particular individual is an employee or an independent contractor

9   (known as "<u>Garmon</u> preemption") and (2) it regulates conduct Congress intended to leave

10  unregulated, such as bargaining between independent contractors and the entities that hire them

11  (known as "<u>Machinists</u> preemption"). The NLRA does not contain an express preemption

12  provision. Nevertheless, the courts have found that certain areas of labor law are under the

13  federal government's exclusive power. Other areas, however, are subject to state regulation even

14  where they "intercede in the relationships between employees and employers." <u>Babler Bros., Inc.</u>

15  <u>v. Roberts</u>, 995 F.2d 911, 914 (9th Cir. 1993). The line between permissible interference and

16  preemption is set forth in case law, in light of congressional intent, and "is continually

17  evolving." <u>Id.</u>.

18  **1. <u>Garmon</u> Preemption**

19  In <u>San Diego Bldg. Trades Council v. Garmon</u>, 359 U.S. 239, 242 (1959), the Supreme

20  Court noted that "Congress has entrusted administration of the labor policy for the Nation to a

21  centralized administrative agency, armed with its own procedures, and equipped with its

22  specialized knowledge and cumulative experience." Determining which of "the variegated laws

23  of the several States are displaced by a single, uniform, national rule" had proved difficult,

24  however. <u>Id.</u> at 241. The interest in a uniform labor policy was often in direct conflict with the

25  judiciary's regard for our federal system, including local control over activities that had long

26  been the subject of state regulation. <u>Id.</u> at 243-44. After evaluating prior case law, the Supreme

Court held that, in the context of activities that "may fairly be assumed" to be protected by § 7 of the NLRA (such as collective bargaining, the right to strike, the right to picket, etc.) or to constitute an unfair labor practice under § 8 of the statute (such as interfering with § 7 rights or discriminating between union and non-union employees), state regulation and jurisdiction must yield. Id. at 244. Where it is not clear whether a particular activity is governed by § 7 or § 8, the Court deemed it "essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board." Id. at 244-45.

The Chamber argues that the Ordinance is facially and categorically preempted because it allows local officials and courts to make a factual determination (whether the for-hire drivers covered by the Ordinance are "employees" or "independent contractors") that must be left in the first instance to the Board. "The precondition for pre-emption" – that the conduct be arguably or fairly assumed to be protected under § 7 or prohibited under § 8 of the NLRA – "is not without substance. It is not satisfied by a conclusory assertion of pre-emption and would therefore not be satisfied in this case by a claim, without more, that [a for-hire driver] was an employee rather than [an independent contractor]." Int'l Longshoremen's Ass'n v. Davis, 476 U.S. 380, 394 -95 (1986). Neither the Chamber nor the individual plaintiffs has made even a bare assertion that for-hire drivers are employees: both have taken the position that the for-hire drivers covered by the Ordinance are independent contractors and not subject to the NLRA. Thus, the Chamber's claim of Garmon pre-emption is not tethered to the facts alleged. Because no party has asserted that for-hire drivers are employees, the issue will not be considered or resolved in this litigation. It is not enough for the Chamber to simply raise the possibility that for-hire drivers may ultimately prove, in some other case, that they are properly classified as employees.

Even if the employee/independent contractor issue had been raised in this litigation, the Chamber would have the burden of putting forth enough evidence to enable the Court to find that the Board could reasonably conclude that for-hire drivers are employees subject to the protections and prohibitions of the NLRA. Davis, 476 U.S. at 395. Whether a driver is an

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF            -7-

employee or an independent contractor depends on the details of the relationship between a
specific driver coordinator and its drivers, including numerous factors such as the degree of
control the coordinator exercises. See NLRB v. United Ins. Co. of Am., 390 U.S. 254, 256
(1968). The driver coordinators' participation in this litigation would then be necessary to ensure
that the preemption analysis proceeds on actual facts regarding a coordinator's operations and
relationship with its drivers rather than some stylized amalgam arising from the industry at large.
Based on the existing record, it appears that the operations and relationships experienced by
Eastside drivers varies significantly from those who drive for Lyft. Because the participation of
its individual members is required, the Chamber lacks associational standing to pursue the
Garmon preemption claim (Hunt, 432 U.S. at 343) and cannot show a likelihood of success on
the merits..

The Clark plaintiffs argue that the Ordinance authorizes conduct that is expressly
prohibited by § 8(e) of the NLRA and is therefore preempted. The drivers are concerned that the
Teamsters and the driver coordinators will negotiate an agreement that requires the drivers to
become union members (i.e., a union shop agreement) and argue that such an agreement would
violate § 8(e). There are three distinct problems with this argument. First, the issue is not ripe for
judicial determination. There are too many facts that need to be developed before the preemptive
effect of § 8(e) could be properly addressed. Contrary to the drivers' repeated assertion, the
Ordinance does not "require that the driver coordinator cease doing business with drivers
unwilling to accept Teamsters' representation." Clark v. City of Seattle, C17-0382RSL (Dkt.
# 13 at 16). Section H.4. of the Ordinance authorizes the negotiation of a union shop provision,
but it neither requires nor precludes such an arrangement. Dkt. # 39-1 at 11. Whether the
Teamsters will obtain statements of interest from a majority of qualified drivers working for any
particular driver coordinator, whether the Teamsters will be certified as the "exclusive driver
representative," and whether the union will successfully negotiate a union shop provision must
all be resolved before the identified conflict between § 8(e) and the Ordinance could appear. The

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF          -8-

1    Court is loath to offer an advisory opinion or to declare rights in a hypothetical case. Neither the

2    factual readiness of the issue for adjudication nor the potential hardships that would be caused

3    by awaiting the negotiation of the contract terms justify the exercise of jurisdiction at the

4    moment. Nat'l Park Hosp. Ass'n v. Dep't of the Interior, 538 U.S. 803, 807 (2003).[3] Second,

5    other than a conclusory statement that "Section 8(e)'s prohibitions apply with particular force to

6    a union signatory agreement that targets independent contractors who operate motor vehicles"

7    (Clark v. City of Seattle, C17-0382RSL (Dkt. # 13 at 15)), the drivers offer no analysis or

8    authority showing that a section of the statute prohibiting agreements to boycott other employers

9    has any applicability in these circumstances. The drivers have been variously described as

10   independent contractors, customers, and clients: they are not employers in their own right. See

11   Local 3, Int'l Bhd. of Elec. Workers (N.Y. Elec. Contractors Ass'n, Inc.), 244 NLRB. 357, 357

12   (1979). Third, § 8 of the NLRA prohibits certain activities on the part of labor organizations.

13   "Labor organization" is defined as an organization in which employees participate for particular

14   purposes. 29 U.S.C. § 152(5). As discussed above, none of the parties to this dispute contends

15   that the drivers are employees, making it doubtful that the driver representative is a labor

16   organization for purposes of § 8. Pac. Maritime Assoc. v. Local 63, Int'l Longshoremen's Union,

17   198 F.3d 1078, 1081 (9th Cir. 1999).[4]

18       The Clark plaintiffs also argue that the Ordinance is preempted because it conflicts with

19   § 8(b)(4) of the NLRA. Section 8(b)(4) makes it an unfair labor practice for a labor organization

20

21   ───────────────

22       [3] In their reply memorandum, the Clark plaintiffs take the position that a violation of § 8(e) will
     arise as soon as the Teamsters are certified as the exclusive bargaining representative. Section 8(e)

23   precludes a labor organization and an employer from entering into a certain type of agreement. The
     terms of the contract, not the designation as a bargaining representative, is the key to a § 8(e) violation.

24
         [4] The Clark plaintiffs suggest that, because the Teamsters represent NLRA-covered employees in
25   other contexts, it qualifies as a "labor organization" in all contexts. Clark v. City of Seattle, C17-
     0382RSL (Dkt. # 34 at 6). The case cited in support of this proposition says nothing of the sort,

26   however.

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF          -9-

to "threaten, coerce, or restrain any person engaged in commerce" with the object of forcing a self-employed person to join the labor organization[5] or forcing any person to cease doing business with any other person. For the reasons discussed above, this claim is not ripe for resolution. Ripeness is "peculiarly a question of timing designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 1999) (internal citations and quotation marks omitted). In this case, whether the Teamsters will be designated as the representative of any group of for-hire drivers, whether it will be able to negotiate a union shop provision with the driver coordinator, and whether any of the Clark plaintiffs will be affected have yet to be seen. In addition, plaintiffs have not shown that they are likely to establish that § 8(b)(4) applies to an organization representing independent contractors.

### 2. Machinists Preemption

In Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers v. Wis. Emp't Relations Comm'n, 427 U.S. 132 (1976), the employer attempted to obtain a declaration from the NLRB that its employees' concerted refusal to work overtime during contract negotiations was an unfair labor practice. The NLRB dismissed the charge, finding that the concerted effort was neither protected nor prohibited by the NLRA and therefore was not conduct cognizable by the Board. The employer then sought and obtained a cease and desist order from the Wisconsin Employment Relations Commission against the same conduct. The state appellate courts upheld the cease and desist order, and certiorari was granted. Garmon preemption did not apply because the concerted refusal to work overtime was not expressly protected under § 7 or prohibited under § 8. Instead, the Supreme Court looked to and expanded on a second line of cases that focused

---

[5] In their reply, the Clark plaintiffs conflate union representation with union membership. Section 8(b)(4) precludes a labor organization from requiring a self-employed person to join the organization: it does not preclude universal representation of members and non-members in a work group.

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF                    -10-

1  "upon the crucial inquiry whether Congress intended that the conduct be unregulated because

2  left 'to be controlled by the free play of economic forces.'" <u>Machinists</u>, 427 U.S. at 140 (quoting

3  <u>NLRB v. Nash-Finch Co.</u>, 404 U.S. 138, 144 (1971)). The Supreme Court concluded that

4  Congress' specific descriptions of the types of economic weapons that were both prohibited and

5  protected left no room for the states to either forbid or encourage other forms of economic

6  pressure tactics. The Supreme Court reasoned that if the state law

7          can be applied to proscribe the same type of conduct which Congress focused upon
           but did not proscribe when it enacted [the NLRA], the inevitable result would be to
8          frustrate the congressional determination to leave this weapon of self-help
           available, and to upset the balance of power between labor and management
9          expressed in our national labor policy. For a state to impinge on the area of labor
           combat designed to be free is quite as much an obstruction of federal policy as if
10         the state were to declare picketing free for purposes or by methods which the
11         federal Act prohibits.

12

13  <u>Machinists</u>, 427 U.S. at 146-47 (quoting <u>Local 20, Teamsters, Chauffeurs & Helpers Union v.</u>

14  <u>Morton</u>, 377 U.S. 252, 259-60 (1964) (internal quotation marks and citation omitted)). Because

15  the Wisconsin law was utilized to overcome self-help efforts that were permitted under the

16  NLRA when the employer's own economic power proved to be insufficient, there was "simply

17  no question that the Act's processes would be frustrated . . . were the State's ruling permitted to

18  stand." <u>Machinists</u>, 427 U.S. at 148-49.

19          The Ordinance at issue in this case authorizes independent contractors to bargain

20  collectively, in part because the NLRA specifically excludes independent contractors from the

21  definition of "employee" and the protections of the Act. 29 U.S.C. § 152(3). Other groups are

22  also excluded: "any individual employed as an agricultural laborer, or in the domestic service of

23  any family or person at his home, or any individual employed by his parent or spouse, or any

24  individual having the status of an independent contractor, or any individual employed as a

25  supervisor, or any individual employed by an employer subject to the Railway Labor Act," or

26  public employees are not "employees" under the NLRA. 29 U.S.C. § 152(2) and (3). The

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF            -11-

excluded groups are not treated alike for preemption purposes, however. Courts have found that, for some of these groups of workers such as agricultural and domestic workers, this exclusion means that "Congress has chosen not to create a national labor policy . . . [and] the states remain free to apply their own views of proper public policy to the collective bargaining process insofar as it is subject to their jurisdiction." United Farm Workers of Am. v. Ariz. Agric. Emp't Relations Bd., 669 F.2d 1249, 1257 (9th Cir. 1982). With regards to supervisors, however, the courts have concluded that any state law that pressures employers to treat supervisors as employees is preempted. Beasley v. Food Fair of N.C., 416 U.S. 653, 662 (1974). The Chamber argues that Congress chose to treat independent contractors like supervisors and leave them to their own economic fates, confident in their individual bargaining power, and that the Ordinance is therefore preempted by an affirmative national labor policy that precludes independent contractors from collectively bargaining.[6] The City argues that Congress simply chose not to regulate the collective conduct of independent contractors, just as it did with agricultural and domestic workers, leaving it to the states to develop their own policies in light of local needs and concerns.

For purposes of this motion, the Court must determine whether the Chamber is likely to show that the exclusion of independent contractors represents a congressional determination that workers in that category should be prevented from bargaining collectively, as opposed to evidencing a willingness to allow state regulation of the balance of power between independent

---

[6] The Chamber also argues that the Ordinance conflicts with Congress' choice to leave the actual negotiations and adoption of working conditions to the parties, without government interference. If, however, the NLRA does not apply because for-hire drivers are independent contractors, the right to bargain collectively and the procedures through which that right is exercised will be determined by state law, as is the case with public employees and agricultural workers.

The Clark plaintiffs assert that "the NLRA preempts the Ordinance under Machinists to the extent that it facilitates and/or regulates union tactics permitted by Sections 8(e) and 8(b)(4)." Clark v. City of Seattle, C17-0382RSL (Dkt. # 13 at 23). As is the case for the Chambers' alternative argument, if the NLRA does not apply because for-hire drivers are not employees, state law would provide the parameters for representation and collective bargaining.

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF            -12-

contractors and those who hire them. In the absence of controlling case law, the Court turns to the language of the statute and its legislative history. When the NLRA was enacted in 1935, neither supervisors nor independent contractors were expressly excluded from the definition of "employee." See NLRB v. Hendricks County Rural Elec. Membership Corp., 454 U.S. 170, 178 (1981) (noting that the 1935 act excluded only agricultural laborers, domestic workers, and individuals employed by a parent or spouse from the definition of "employee"). Between 1935 and 1947, the NLRB certified unions of supervisors, a practice which Congress deemed "inconsistent with the purpose of the act to increase output of goods that move in the stream of commerce," "inconsistent with the policy of Congress to assure to workers freedom from domination or control by their supervisors in their organizing and bargaining activities," and "inconsistent with our policy to protect the rights of employers." H.R. Rep. No. 80-245, at 14 (1947). Congress amended the NLRA to exclude supervisors from the definition of employee. 29 U.S.C. § 152(3). It also added § 14(a):

> Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

29 U.S.C. § 164(a). Although supervisors could still organize and employers could voluntarily recognize a union of supervisors, the amendments ensured "[t]hat no one, whether employer or employee, need have as his agent one who is obligated to those on the other side, or one whom, for *any* reason, he does not trust." H.R. Rep. No. 80-245, at 17 (emphasis in original).

In 1944, the Supreme Court, following the NLRB's lead, interpreted the term "employee" broadly to encompass individuals who, under the common law, were clearly independent contractors. NLRB v. Hearst Publ'ns, Inc., 322 U.S. 111, 126-29 (1944). Congress was not impressed, noting the differences between employees and independent contractors and confirming its original intent to include the former in the NLRA scheme and to exclude the

1  latter. Congress rejected the NLRB's effort to expand the definition of employee beyond the
2  common understanding at the time the NLRA was enacted. H.R. Rep. No. 80-245, at 18. The
3  NLRA was amended in 1947: independent contractors and supervisors were both excluded from
4  the meaning of "employee" at that time.

5      The Chamber relies on this coincidence of timing and argues that "the two parallel
6  exemptions should be read *in pari materia* and interpreted to have the same scope." Dkt. # 2 at
7  22 (internal quotation marks and citation omitted). The legislative history on which the Chamber
8  relies shows that supervisors and independent contractors were excluded from the reach of the
9  NLRA for different reasons. The unionization of supervisors was deemed a threat to the very
10  purposes of the Act as well as the interests of both labor and management. See Beasley, 416 U.S.
11  at 659-62 (summarizing legislative history of the 1947 amendments). These deleterious effects
12  would arise regardless of whether supervisors unionized under the NLRA or under state law.
13  The reference to independent contractors, on the other hand, was added to correct an NLRB
14  interpretation that had wandered from Congress' original intent. While Congress undoubtedly
15  had its reasons for not subjecting independent contractors to the NLRA, allowing them to
16  unionize was not identified as a threat to the free flow of goods, nor is there any indication that
17  allowing them to participate in collective action would threaten the independence of labor
18  organizations or the rights of management. The legislative history does not support the
19  Chamber's argument that Congress intended to treat independent contractors and supervisors the
20  same for preemption purposes.

21      Just as importantly, Congress included an express preemption provision related to
22  supervisors, but not to independent contractors. When the Supreme Court was asked to
23  determine whether state laws promoting supervisor unionization are preempted, it relied heavily
24  on the existence of § 14(a) to support its conclusion that any law that requires an employer to
25  treat supervisors as employees is unenforceable. Beasley, 416 U.S. at 657-59. The statutory text
26  thus treats independent contractors more like the other excluded groups who have long been the

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF          -14-

1  subject of state regulation. It is at least as likely, if not more so, that Congress was indifferent to

2  the labor rights of independent contractors – just as it was to the rights of agricultural and

3  domestic workers – because their disputes were thought to be of insufficient magnitude to affect

4  commerce. S. Rep. No. 79-1184, at 3 (1934). The Chamber has not shown that it is likely to

5  succeed on the merits of its Machinists claim.

6  **C. FIRST AMENDMENT RIGHTS OF SPEECH AND ASSOCIATION**

7  The Clark plaintiffs assert that, by allowing the majority of qualifying drivers to designate

8  a bargaining representative, the Ordinance will deprive them of the right to speak for themselves

9  and will compel them to associate with a representative they oppose in violation of the First

10  Amendment. These harms are not associated with the April 3rd driver list deadline and will arise

11  only after an exclusive driver representative is certified. The absence of preliminary injunctive

12  relief is not, therefore, likely to result in irreparable harm.

13  **D. DRIVER'S PRIVACY PROTECTION ACT**

14  Once a qualified driver representative makes a request, the Ordinance requires the driver

15  coordinator to disclose the names, addresses, and, if available, email addresses and phone

16  numbers of its qualifying drivers. The implementing rules also require disclosure of for-hire

17  driver's license/permit numbers and the state driver's license numbers. The Clark plaintiffs argue

18  that this disclosure violates and is preempted by the Driver's Privacy Protection Act ("DPPA"),

19  18 U.S.C. § 2722(a). The DPPA precludes a state department of motor vehicles from disclosing

20  personal information obtained about an individual in connection with a motor vehicle record

21  unless the information is sought for a permissible purpose. 18 U.S.C. § 2721. The statute also

22  makes it unlawful for private actors to knowingly obtain or further disclose "personal

23  information, from a motor vehicle record, for any use not permitted" by the statute. 18 U.S.C.

24  § 2722.

25  The Clark plaintiffs do not allege and have made no attempt to show that the Ordinance

26  will require Eastside, Lyft, or Uber to obtain information from the state department of motor

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF          -15-

vehicle records. Plaintiffs allege that they provided copies of their drivers' licenses to the driver

coordinators when they applied to drive for Lyft and/or Uber. Clark v. City of Seattle, C17-

0382RSL (Dkt. # 1 at ¶ 48). All of the information required by the Ordinance (names and

addresses) and some of the information required by the implementing rules (drivers' license

numbers) can be gleaned from the document plaintiffs provided without any need to acquire or

disclose information from the state department of motor vehicles.

Plaintiffs argue that obtaining and disclosing information from a state-issued license,

rather than from the state department of motor vehicles, is prohibited by the DPPA because the

license itself is "a motor vehicle record." Pavone v. Law Offices of Anthony Mancini, Ltd., __ F.

Supp.3d __, 2016 WL 4678311, at *4 (N.D. Ill. Sept. 7, 2016). There is a split within the

Northern District of Illinois on this issue (O'Brien v. Quad Six, Inc., 219 F. Supp.2d 933, 934

(N.D. Ill. 2002)), and the Court doubts that the legislative purpose or statutory language support

Pavone or plaintiffs' argument. In enacting the DPPA, Congress was concerned that many states

were collecting personal information as a condition of granting a driver's license and then selling

the information to generate revenue for the state. 139 Cong. Rec. 29466, 29468, 29469 (1993);

140 Cong. Rec. 7929 (1994). To combat this practice, Congress expressly prohibited the state

department of motor vehicles from disclosing personal information obtained by the department

in connection with a motor vehicle record except for specified purposes. 18 U.S.C. § 2721. "The

Act also regulates the resale and redisclosure of drivers' personal information by private persons

who have obtained that information from a state DMV." Reno v. Condon, 528 U.S. 141, 143-44

(2000).

The Court finds that, although the purposes of the statute strongly suggest that the source

of the personal information must be taken into consideration when evaluating a DPPA, the Clark

plaintiffs have raised serious questions regarding its application in this case. Whether

information is universally protected from disclosure because it originated from the state

department of motor vehicles, because it is in the possession of the state department of motor

1  vehicles, or simply because it happens to be on a motor vehicle record (such as a license) is

2  debatable.

3  **E. IRREPARABLE HARM**

4        The Chamber and the <u>Clark</u> plaintiffs assert that they will be irreparably harmed if the

5  names and addresses of for-hire drivers are turned over to the Teamsters. Although there is no

6  trade secret protections or confidentiality attached to this basic identifying information, the

7  Court finds that forcing the driver coordinators to disclose their most active and productive

8  drivers is likely to cause competitive injury that cannot be repaired once the lists are released.

9  More importantly, the disclosure requirement is the first step in a process that threatens the

10  business model on which the Chamber's members depend. The driver coordinators operate

11  through mobile application software and independent contractors, an innovative model that is

12  likely to be disrupted in fundamental and irreparable ways if the Ordinance is implemented.

13  **F. BALANCE OF THE HARDSHIPS**

14        The balance of hardships strongly favors the Chamber at this point in the litigation.

15  Against the likelihood of competitive injury caused by the disclosure of a subset of prolific

16  drivers and the potential destruction of the existing business model, the City has not articulated

17  any harm that will arise from an injunction other than that it would delay the implementation of

18  the Ordinance according to its internal time line.

19  **G. PUBLIC INTEREST**

20        The attempt by the City of Seattle to bring some measure of regulation to the rideshare

21  industry is clearly based on reasonable public policy concerns. But the public not only has an

22  interest in safe and reliable transportation networks, but also in the enforcement of the laws

23  Congress has passed. The Court is cognizant of the fact that the public is interested in this

24  litigation and its outcome: that the issues raised here may well impact not only for-hire

25  transportation, but also other sectors of the economy that have come to rely heavily on

26  independent contractors instead of employees. The issues raised in this litigation are novel, they

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF          -17-

1    are complex, and they reside at the intersection of national policies that have been decades in the
2    making. The public will be well-served by maintaining the status quo while the issues are given
3    careful judicial consideration as to whether the City's well-meaning Ordinance can survive the
4    scrutiny our laws require.

5

6        For all of the foregoing reasons, the Chamber's motion for preliminary injunctive relief is
7    GRANTED. The April 3rd disclosure requirements are hereby enjoined until this matter is
8    finally resolved. The Court emphasizes that this Order should not be read as a harbinger of what
9    the ultimate decision in this case will be when all dispositive motions are fully briefed and
10    considered. The plaintiffs have raised serious questions that deserve careful, rigorous judicial
11    attention, not a fast-tracked rush to judgment based on a date that has no extrinsic importance.

12

13        Dated this 4th day of April, 2017.

14

15                 Robert S. Lasnik
                       United States District Judge

16

17

18

19

20

21

22

23

24

25

26

ORDER GRANTING MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF       -18-