UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | No. C17-0370RSL |
| Plaintiffs, | |
| v. | |
| THE CITY OF SEATTLE, *et al.*, | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |
| Defendants. | |

This matter comes before the Court on "Defendants' Motion to Dismiss." Dkt. # 42. Having reviewed the Amended Complaint and the memoranda submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

In January 2016, City of Seattle Ordinance 124968 came into effect. The Ordinance provides a mechanism through which for-hire drivers in Seattle can collectively bargain with the companies that hire, contract with, and/or partner with them. The Ordinance applies only to for-hire drivers who are independent contractors, not employees. Pursuant to the procedures set forth in the Ordinance, Teamsters Local 117 notified three Chamber of Commerce members[1] that it would like to represent their drivers in collective bargaining. The Chamber, acting on behalf of its members, filed this action arguing that the Ordinance violates and is preempted by the

---

[1] The members are Eastside For Hire, Inc., Lyft, Inc., and Uber Technologies, Inc. These companies fall within the definition of "driver coordinator" as that term is used in the Ordinance.

Sherman Antitrust Act, is preempted by the National Labor Relations Act, violates 42 U.S.C. § 1983, is unauthorized by state law, violates the Washington Consumer Protection Act, and violates the Washington Public Records Act.

On April 4, 2017, the Court temporarily enjoined enforcement of the Ordinance because the Chamber had raised serious questions regarding its antitrust claim. Before the Court issued the injunction, defendants filed this motion seeking dismissal of all of the Chamber's claims. Only the response and reply memorandum therefore make reference to the Court's preliminary ruling. On April 11, 2017, the complaint was amended to add Rasier, LLC, a wholly-owned subsidiary of Uber Technologies, Inc., and Chamber member, as a plaintiff.[2]

Defendants seek dismissal of certain claims on standing or ripeness grounds: those challenges implicate the Court's subject matter jurisdiction and are considered under Fed. R. Civ. P. 12(b)(1). Where defendants challenge the adequacy of plaintiffs' claims under Fed. R. Civ. P. 12(b)(6), the Court must determine whether plaintiffs have alleged facts that state a claim for relief that is plausible, not merely possible. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

**A. ANTITRUST CLAIM**

**1. Standing**

The judicial power of the federal courts extends to "Cases" and "Controversies" pursuant to Article III, Sec. 2 of the United States Constitution. An Article III case or controversy exists if plaintiff can show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to

---

[2] On May 3, 2017, the City appealed the temporary restraining order. At oral argument, plaintiffs requested that the Court defer ruling on the motion to dismiss until the Ninth Circuit resolves the appeal. The standards governing the appellate court's review of a preliminary order are not the same as those applied to a motion to dismiss, however. Because there is only a small chance that the appeal will resolve any of the issues raised in defendant's motion, the request for a stay or continuance is denied.

merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). An association, such as the Chamber, can sometimes bring suit on behalf of its members even if it has not itself suffered an injury in fact. Associational standing exists "when: (a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).

Section 16 of the Clayton Act, which governs claims for injunctive relief, provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26. By its very terms, § 16 authorizes suits by associations, but the association, like every other private litigant, must have standing. In other words, it must prove a threatened "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). The Supreme Court has found that the same standing requirement applies to claims under § 4 and § 16 of the Clayton Act, noting that "[i]t would be anomalous . . . to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred" and that Congress did not intend such a result. Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111 (1986). Personal injury is therefore a prerequisite to instituting a private antitrust action – regardless of whether monetary or injunctive relief is sought.

The question is whether the "personal injury" language of Cargill precludes an association from seeking an injunction against actions that cause antitrust injury to its members. There are very few post-Cargill cases analyzing the point of intersection between Cargill and

Hunt. In Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n, 830 F.2d 1374, 1377-78 (7th Cir. 1987), the Seventh Circuit cited Cargill for the proposition that the antitrust injury requirement applies to antitrust claims for injunctive relief under § 16. The fact that the plaintiff-association had not demonstrated a threat of antitrust injury to itself was not dispositive: the court proceeded to apply the three part Hunt test when determining whether the association had standing to seek an injunction based on threatened antitrust injuries to its members. Id. at 1380 and n.2. In Fin. & Sec. Prods. Assoc. v. Diebold, Inc., 2005 WL 1629813, at *3 (N.D. Cal. July 8, 2005), the district court came to the opposite conclusion:

> [N]o appellate authority has ever extended [the Hunt] rule to override the Brunswick/Cargill requirements under federal antitrust laws. . . .  In the absence of clear Ninth Circuit or Supreme Court authority extending Hunt to antitrust cases, this Court is reluctant to ignore the Brunswick/Cargill requirement that a plaintiff must prove it has or will suffer antitrust injury itself. This alone is dispositive.

Given the split in what limited authority there is, it is not surprising that the parties in this litigation disagree whether Cargill has displaced the associational standing analysis of Hunt.

Having reviewed the parties' submissions and the relevant case law, the Court finds that Cargill does not resolve this issue. Cargill does not mention Hunt, nor does it discuss whether an association has standing to seek injunctive relief on behalf of its members. Defendants assert that Cargill effectively abrogated Hunt in the antitrust context, but do not explain why the associational standing analysis in antitrust claims would differ from that applied in other federal statutory schemes. It is true that the language of the antitrust statute presumes that the person bringing suit has been injured or threatened by conduct that violates the statute. But the same can be said for a wide array of federal legislation. Section 1983 of the Civil Rights Act of 1964, for example, makes every person who violates the statute "liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983 (emphasis added). Nevertheless, courts do not automatically reject § 1983 claims brought by an association simply because the association is seeking to vindicate the rights of its members. Rather, they

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -4-

apply <u>Hunt</u>'s three-part test to determine whether the association has standing. <u>See</u>, <u>e.g.</u>, <u>Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.</u>, 627 F.3d 547, 550-51 (5th Cir. 2010); <u>Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. and Rehab. Servs.</u>, 958 F.2d 1018, 1021 (10th Cir. 1992). The Supreme Court deliberately expanded the universe of viable plaintiffs in <u>Warth v. Seldin</u>, 422 U.S. 490, 511 (1975), when it held that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." The test for associational standing was later set out in <u>Hunt</u>. The Court is not persuaded that the Supreme Court expressly or by implication overruled decades of jurisprudence when it determined in <u>Cargill</u> that a plaintiff seeking injunctive relief under § 16 must show antitrust injury. The Court therefore concludes that an association may seek an injunction under § 16 on behalf of its members as long as it satisfies the <u>Hunt</u> test.

An association "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Hunt</u>, 432 U.S. at 343. In the context of the <u>Hunt</u> analysis, the City does not dispute that Uber, Lyft, Eastside for Hire, and, presumably, Rasier have standing to bring an antitrust action in their own right[3] or that the Chamber's interests in this litigation are germane to its organizational purposes. Rather, it argues that the claim for injunctive relief cannot be pursued without the participation of individual members because the relief would have to be narrowly tailored to address the threatened loss or damage each is experiencing. The Court disagrees. The Chamber, on behalf of its members, seeks a declaration that the Ordinance is unenforceable and an injunction on the ground that the Ordinance violates and is preempted by federal antitrust law. Plaintiffs allege that the Ordinance permits independent economic actors to collude on the prices they will accept for their services,

---

[3] The City's ripeness argument is considered below.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                          -5-

a per se antitrust violation. Plaintiffs further allege that defendants' enactment and enforcement of the Ordinance constitutes an antitrust violation. In this context, the anticompetitive potential of the Ordinance can be shown and an appropriate remedy fashioned without the need for Eastside, Uber, and/or Lyft to be party to this litigation. The third prong of the Hunt analysis is satisfied. 432 U.S. at 343.

### 2. Ripeness

Defendants argue that the federal and state antitrust claims asserted in this litigation are not constitutionally ripe because they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Tex. v. U.S., 523 U.S. 296, 300 (1998). At the time this litigation was filed, the Chamber's members were faced with an imminent deadline to disclose the names and contact information of their drivers, thereby triggering a five-month representation drive and certification process. While it is possible that the representation efforts will be unsuccessful, a specific representative has targeted specific Chamber members under a process designed to horizontally fix the price and terms on which driver coordinators can contract with drivers. Ripeness is a justiciability doctrine that prevents courts from entangling themselves in abstract disagreements, untethered to concrete facts and effects. Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003). Neither the constitutional nor prudential components of ripeness prevent plaintiffs' antitrust claim at this point in time. Now that a qualified driver representative has stepped forward and begun the organizing procedures, all of the relevant facts and parties are known, and the Court can resolve a concrete disagreement regarding whether the Ordinance is preempted by the antitrust laws and/or whether its enactment (as opposed to its enforcement) constitutes an antitrust violation. Plaintiffs should not be required to wait until they actually suffer antitrust injury to raise the primarily legal challenges at issue here. The City's ripeness objection is therefore overruled.

### 3. State Action Immunity from Federal Antitrust Claims

The Court assumes, for purposes of the immunity analysis, that collusion between

1   independent economic actors to set the prices they will accept for their services in the market is a

2   per se antitrust violation. The Supreme Court has found, however, that even in the face of clearly

3   anticompetitive conduct, neither the language nor the legislative history of the Sherman Act

4   suggests that "it was intended to restrain state action or official action directed by a state."

5   Parker v. Brown, 317 U.S. 341, 350-51 (1943). Although municipalities like the City of Seattle

6   do not enjoy Parker-like immunity from the antitrust laws with regards to their own policy

7   pronouncements (Town of Haillie v. Eau Claire, 471 U.S. 34, 38 (1985)), a municipality may

8   restrict competition if its regulation is "an authorized implementation of state policy" (City of

9   Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 370 (1991)). The challenged

10  regulation must "be one clearly articulated and affirmatively expressed as state policy" and "the

11  policy must be actively supervised by the State itself." Cal. Retail Liquor Dealers Ass'n v.

12  Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980) (internal quotation marks omitted) (hereinafter,

13  "Midcal"). Although state-action immunity is disfavored in light of the "fundamental national

14  values of free enterprise and economic competition that are embodied in the federal antitrust

15  laws" (FTC v. Phoebe Putney Health Sys., Inc., 568 U.S. 216, __, 133 S. Ct. 1003, 1010 (2013)),

16  the Supreme Court found that the states must be permitted "to use their municipalities to

17  administer state regulatory policies free of the inhibitions of the federal antitrust laws" as long as

18  the state's purposes are clear (City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 415

19  (1978)).

### a. Clearly Articulated and Affirmatively Expressed State Policy

20

21          City of Seattle Ordinance 124968 was enacted under the authority of RCW 46.72.001

22  and RCW 81.72.200. RCW 46.72.001 provides that privately operated for-hire transportation

23  services are a vital part of the state's transportation system and that regulating them to promote

24  safety, reliability, and stability are essential government functions. The statute specifically states

25  that "it is the intent of the legislature to permit political subdivisions of the state to regulate for

26

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -7-

1   hire transportation services without liability under federal antitrust laws."[4] RCW 46.72.160 and

2   RCW 81.72.210 authorize local regulation of for-hire vehicles and taxicabs with regards to

3   license requirements, fees for service, routes and operations, safety and equipment requirements,

4   and "[a]ny other requirements adopted to ensure safe and reliable for hire vehicle transportation

5   [or taxicab] service." The Ordinance, by its terms, is an attempt to exercise the authority granted

6   by these state statutes to ensure safe and reliable for-hire and taxicab transportation services

7   within the City of Seattle. The City Council made a number of specific findings related to how

8   allowing for-hire drivers to have more control over their schedules and working conditions

9   would improve the safety, reliability, stability, and economic benefits of the local transportation

10  network.

11      The statutes on which the City relies clearly delegate authority for regulating the for-hire

12  transportation industry to local government units and authorize them to use anticompetitive

13  means in furtherance of the goals of safety, reliability, and stability. The state "affirmatively

14  contemplated" that municipalities would displace competition in the for-hire transportation

15  market, a situation which satisfies the "clearly articulated and affirmatively expressed"

16  requirement for state immunity. Phoebe Putney, 133 S. Ct. at 1011. See also S. Motor Carriers

17  Rate Conference, Inc. v. U.S., 471 U.S. 48, 63 (1985) (explicit state statutory authorization for

18  collective action by common carriers ends the inquiry as to the first prong of the Midcal test);

19  Midcal, 445 U.S. 97, 105 (explicit state statutory authorization for resale price maintenance is a

20  state policy forthrightly stated and clear in its anticompetitive purpose); New Motor Vehicle Bd.

21  of Cal. v. Orrin W. Fox Co., 439 U.S. 96, 109 (1978) (explicit state statutory authorization "to

22  displace unfettered business freedom in the matter of the establishment and relocation of

23  automobile dealerships" falls outside the reach of the antitrust laws under the state action

24

25  _____

26      [4] RCW 81.72.200 relates to privately operated taxicab transportation services and contains the
    same antitrust language.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -8-

1  exemption); <u>Bates v. State Bar of Ariz.</u>, 433 U.S. 350, 355-56 (1977) (state Supreme Court rule

2  which prohibited advertisements and limited competition immunized state bar association from

3  antitrust claim related to enforcement of the rule); <u>Parker</u>, 317 U.S. at 346 (explicit state

4  statutory authorization for marketing programs that restrict competition among growers and

5  maintain prices is a reflection of state policy).[5]

6      Plaintiffs argue, however, that the state's authorization of anticompetitive regulations

7  should be limited to the type of regulations identified in RCW 46.72.160 and the way in which

8  municipalities have used the authorization in the past. In ruling on the motion for preliminary

9  injunctive relief, the Court similarly expressed concern that the City's use of the statutes to

10  regulate the relationship between for-hire drivers and the ride referral companies that contract

11  with them was novel and went far beyond the establishment of rates and regulatory

12  requirements. Dkt. # 49 at 5. After full consideration of this matter, the Court finds that a

13  municipality's creativity in its attempts to promote the goals specified in the statute does not

14  abrogate state immunity. A municipality need not "be able to point to a specific, detailed

15  legislative authorization before it properly may assert a <u>Parker</u> defense to an antitrust suit." <u>City</u>

16  <u>of Lafayette</u>, 435 U.S. at 415. The fact that RCW 46.72.160 does not expressly authorize

17  collective negotiation regarding the terms and conditions under which for-hire drivers provide

18  their services does not alter the fact that the state clearly contemplated and authorized

19  regulations with anticompetitive effects in the for-hire transportation sphere.

20      As long as the State as sovereign clearly intends to displace competition in a
        particular field with a regulatory structure, the first prong of the <u>Midcal</u> test is
21      satisfied. . . . If more detail than a clear intent to displace competition were
        required of the legislature, States would find it difficult to implement through
22

23

24      [5] Plaintiffs rely on a number of cases in which the delegating statute did not explicitly permit the
        displacement of competition. <u>See</u> Dkt. # 52 at 18 and 20. In those circumstances, the Court must
25      determine "if suppression of competition is the 'foreseeable result' of what the statute authorized."
        <u>Omni Outdoor Advertising</u>, 499 U.S. at 373. In this case, anti-competitive results were not merely
26      foreseeable, they were expressly authorized.

regulatory agencies their anticompetitive policies. Agencies are created because
they are able to deal with problems unforeseeable to, or outside the competence of,
the legislature. Requiring express authorization for every action that an agency
might find necessary to effectuate state policy would diminish, if not destroy, its
usefulness. . . . Therefore, we hold that if the State's intent to establish an
anticompetitive regulatory program is clear, as it is in Mississippi, the State's
failure to describe the implementation of its policy in detail will not subject the
program to the restraints of the federal antitrust laws.

S. Motor Carriers, 471 U.S. at 64-65.

To the extent plaintiffs are arguing that the City's regulation is substantively defective
because it exceeds the scope of the delegated authority, the argument fails as a matter of fact and
law. RCW 46.72.160 expressly authorizes a wide array of municipal regulation including "[a]ny
other requirement adopted to ensure safe and reliable for hire vehicle transportation service."
The Ordinance, while an admittedly novel approach to achieving the specified purposes, falls
within the scope of the "other requirement" delegation from the state. In enacting the Ordinance,
the City Council expressly found that:

Collective negotiation processes in other industries have achieved public heath and
safety outcomes for the general public and improved the reliability and stability of
the industries at issue including, but not limited to, job security provisions,
scheduling predictability, job training, methods of communicating health and
safety information and enforcing health and safety standards, processes for
resolving disputes with minimal rancor or conflict, and reductions in industrial
accidents, vehicular accidents, and inoperative or malfunctioning equipment. In
other parts of the transportation industry, for example, collective negotiation
processes have reduced accidents and improved driver and vehicle safety
performance.

Dkt. # 39-1 at 4-5. In the context of the Parker immunity analysis, the Court will not second-
guess the efficacy of the means the municipality has chosen to promote safety, reliability, and
stability in for-hire transportation services. Otherwise, federal courts would be bogged down in
local policy decisions and procedural reviews whenever it is alleged that the municipality,
though possessing the delegated authority to act, has exercised that authority in an unwise or

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -10-

procedurally defective way. Omni Outdoor, 499 U.S. at 371-72. Once the Court concludes that the challenged conduct falls within the clearly articulated and affirmatively expressed state policy to displace competition in a particular field, no more is needed to satisfy the first prong of the Midcal test.

At oral argument, plaintiffs argued that their conduct does not fall within the clearly articulated state policy set forth in RCW 46.72.001 or RCW 81.72.200 because they are not "privately operated for hire transportation services" or "privately operated taxicab transportation services." Plaintiffs maintain that they provide technological support to individuals who happen to offer for-hire transportation services and that they are no more subject to regulation under the statutes than the manufacturer of a GPS device would be if a driver happened to use it when offering rides. Until the state clearly articulates and affirmatively expresses a policy to allow anticompetitive regulations of technology companies, the argument goes, the Sherman Act bars the City's efforts in this sphere. This argument fails for at least two reasons. First, it is simply a variant on the arguments discussed above. Plaintiffs demand a specific authorization for the exact type of regulation at issue here before Parker immunity applies. Such a rule would require prescience on the part of the state legislature and deprive municipalities of the flexibility they need to address new problems in the for-hire transportation network as they arise. Second, the argument takes too narrow a view of the reach of RCW Ch. 46.72 and the state's authorization of anticompetitive regulations. When determining whether the challenged Ordinance falls within the purview of the state policy, the Court takes a broad view of the authority granted by the statutes, broader even than would be applied when determining whether the municipality's action were legal under state law. Omni Outdoor, 499 U.S. at 372. The statutes at issue in this case are broad to begin with: they authorize municipalities to regulate "privately operated for hire [and taxicab] transportation service" within their boundaries for specified purposes. Plaintiffs fall within the reach of these statutes. They have contractual relationships with drivers regarding the provision of privately operated transportation services, the very services state law

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -11-

authorizes municipalities to regulate. Plaintiffs, through various software applications, match the for-hire drivers with whom they have contracted with customers in search of rides. Plaintiffs handle the billing and payment functions associated with these transactions. The same cannot be said for the manufacturer of the GPS device the driver uses or the mechanic who fixes her car. Until very recently, plaintiffs were proud of their role in the transportation sector: in their Amended Complaint, plaintiffs credit their ride-referral applications with helping to meet unmet demand for passenger motor vehicle services in the cities where they operate. Dkt. # 53 at ¶ 27.[6] Given the undisputed facts regarding plaintiffs' role in organizing and facilitating the provision of private cars for-hire in the Seattle market, it is disingenuous to argue that they are beyond the reach of a statute that deems "privately operated for hire transportation services" vital to the state's transportation system and authorizes regulation thereof. Plaintiffs' technology and contractual relationships, which control a number of the very activities RCW 46.72.160 and RCW 81.72.210 expressly authorize municipalities to regulate, put plaintiffs squarely within the scope of local regulation under those statutes. The fact that plaintiffs use "independent contractors" rather than "employees" – or "apps" rather than telephones – to derive compensation from the transport of passengers does not mean they are not engaged in privately operated for-hire transportation services, especially when the authorizing statute is read broadly as the Supreme Court directs.[7] Combined with the express authority to suppress competition in

---

[6] In a slightly different context, Judge Chen of the Northern District of California rejected Uber Technologies' argument that it is purely a technology company, not a transportation company. O'Connor v. Uber Techs., Inc., 82 F. Supp.3d 1133 (N.D. Cal. 2015). Judge Chen concluded that Uber's focus "on the mechanics of its platform (i.e., the use of internet enabled smartphones and software applications) rather than on the substance of what Uber actually does (i.e., enable customers to book and receive rides)" is unduly narrow, that "Uber is most certainly a transportation company, albeit a technologically sophisticated one," and that "Uber's own marketing bears this out, referring to Uber as 'Everyone's Private Driver,' and describing Uber as a 'transportation system' and the 'best transportation service in San Francisco.'" Id. at 1141-42.

[7] The 2015 statute that plaintiffs raised for the first time at oral argument does not change this analysis. The Commercial Transportation Services Act imposes upon companies such as Uber and Lyft

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                       -12-

1   this sphere, no more is needed to establish either the City's authority to regulate and or its

2   antitrust immunity.

3                    **b. Active Supervision by the State**

4           In its order granting preliminary injunctive relief, the Court also questioned whether the

5   level of state supervision contemplated by the Ordinance satisfies the second prong of the

6   Midcal test. "State supervision" is not an accurate description of the oversight required in this

7   case. When the entity accused of anticompetitive conduct is a municipality, the active state

8   supervision requirement does not apply: all the municipality has to show is that it is acting

9   pursuant to a clearly articulated and affirmatively expressed state policy allowing displacement

10  of competition in a certain field. Town of Haillie, 471 U.S. at 46. Thus, to the extent plaintiffs

11  have alleged that the City itself violated the Sherman Act when it enacted the Ordinance, the

12  City is immune from antitrust liability. When a municipal regulation allows private parties to

13  engage in anticompetitive conduct, as is contemplated under the Ordinance, the municipality

14  (not the state) must actively supervise the conduct. See, e.g., S. Motor Carriers, 471 U.S. at 62

15  (non-sovereign agency adequately supervised ratemaking activities of private parties for

16  purposes of the second prong of the Midcal test); Tom Hudson & Assocs., Inc. v. City of Chula

17  Vista, 746 F.2d 1370, 1374 (9th Cir. 1984) (city's review and approval of rate proposals

18  submitted by private party deemed sufficient to show state supervision).[8]

19  _____

20  the primary obligation to secure for its drivers an automobile insurance policy that covers the app-based
    commercial transportation services they provide. RCW 48.177.010. The statute itself recognizes,

21  however, that the required coverage may already be in place under the purview of RCW Ch. 46.72: if
    that is the case, no additional coverage is needed. Nothing in the 2015 statute suggests that a

22  "commercial transportation service provider" required to purchase insurance under the new law is not
    also subject to regulation as part of the "privately owned for hire transportation services" network under

23  RCW Ch. 46.72. The ambiguous statement in the legislative staff synopsis of the 2015 law is not part of
    the legislation, is not a statement of legislative intent, and cannot alter the meaning or circumscribe the

24  reach of prior legislative enactments.

25          [8] The Court rejects plaintiffs' argument that the state must supervise municipal programs in order

26  to preserve state immunity. None of the cases identified by plaintiffs requires that result, nor is there any

1    Regardless whether the state or a non-sovereign government entity is providing oversight,

2    there must be "more than a mere facade of state involvement, for it is necessary in light of

3    Parker's rationale to ensure the states accept political accountability for anticompetitive conduct

4    they permit and control." N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n, __ U.S.

5    __, 135 S. Ct. 1101, 1111 (2015). Under the Ordinance, the City's Director of Finance and

6    Administrative Services establishes criteria for the identification of qualifying drivers whose

7    "work for a driver coordinator is significant enough to affect the safety and reliability of for-hire

8    transportation" in Seattle. SMC 6.310.110 (definition of "qualifying driver"). The Director must

9    review applications from entities which want to represent drivers. SMC 6.310.735.B. If an

10    application is denied, the applicant may appeal to the Hearing Examiner. SMC 6.310.735.C. If

11    an application is approved, the newly-qualified driver representative ("QDR") may solicit

12    interest among the qualifying drivers in being represented and submit statements of interest to

13    the Director, who must determine if the statements are sufficient to designate the QDR as the

14    exclusive driver representative ("EDR") for that driver coordinator. SMC 6.310.735.E and F.

15    If the Director certifies an EDR, the EDR and the driver coordinator must negotiate

16    regarding subjects identified by the Director, including but not limited to vehicle equipment

17    standards, safe driving practices, driver screening, driver earnings, and hours and conditions of

18    work. SMC 6.310.735.H.1. If the EDR and the driver coordinator reach agreement regarding the

19    specified subjects, they present the agreement to the Director who "shall review the agreement

20    for compliance with the provisions of this Chapter 6.310, and to ensure that the substance of the

21    agreement promotes the provision of safe, reliable, and economical for-hire transportation

22    _____

23    indication that the City of Seattle would have the power or authority to compel a state actor to fill the
      roles assigned to the Director under the Ordinance. Plaintiffs' interpretation of the "state supervision"

24    requirement would result in situations where, despite a clearly articulated and affirmatively expressed
      state policy to allow municipalities to displace competition in a particular market, non-sovereign

25    agencies and local governments would be barred from regulating in compliance with state law because
      they could not satisfy the state supervision requirement. Such an interpretation would eviscerate Parker

26    and has no support in the case law.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -14-

1  services . . . ." SMC 6.310.735.H.2. The Director has the right to consider evidence outside the

2  agreement when determining whether to accept it or any part of it and shall issue a written

3  explanation of all conclusions. If the proposed agreement is acceptable, the Director makes a

4  written finding and the agreement is deemed final and binding on the EDR and the driver

5  coordinator.  If the agreement is not satisfactory, the Director will remand it to the EDR and

6  driver coordinator for further negotiations.

7  If the parties are unable to reach agreement within ninety days of the certification of the

8  EDR, either may initiate mandatory arbitration. SMC 6.310.735.I. The arbitrator shall propose to

9  the Director a fair and reasonable agreement concerning the subjects of mandatory bargaining

10  that furthers the interests of safety, reliability, and economy in for-hire transportation services.

11  The Director shall review the proposal under the standards set forth in SMC 6.310.735.H.2 and

12  shall consider any objections raised by the parties. If the arbitrator's proposal is satisfactory, the

13  Director makes a written finding and the agreement is deemed final and binding on the EDR and

14  the driver coordinator. If the proposal fails to fulfill the requirements of 6.310.735.H.2, the

15  Director shall provide a written explanation of the defects and sent it back to the arbitrator. SMC

16  6.310.735.I.4. The parties may seek judicial review of the Director's final determination in King

17  County Superior Court.

18  During the term of an agreement, the Director has the authority to approve amendments to

19  or withdraw approval of the agreement after consideration of the provisions of Chapter 6.310

20  and the public policy goals of safety, reliability, and economy. SMC 6.310.735.J. The Director

21  also has the power to administratively enforce the Ordinance, with an appeal to the Hearing

22  Examiner and, ultimately, judicial review. Finally, the Director has the power to decertify an

23  EDR based on a petition and statements of interest from qualifying drivers. SMC 6.310.735.L.

24  The question is whether the Director's role is merely "a gauzy cloak of state involvement

25  over what is essentially a private price-fixing arrangement" (Midcal, 445 U.S. at 106) or does the

26  Director "have and exercise power to review particular anticompetitive acts of private parties

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -15-

1   and disapprove those that fail to accord with state policy" (N.C. State Bd., 135 S. Ct. at 1112

2   (quoting Patrick v. Burget, 486 U.S. 94, 101 (1988))). At various points in the process, the

3   Director must play an active role in ensuring that the policy objectives that motivated RCW

4   46.72.001 are furthered. From the designation of qualified drivers to the acceptance or rejection

5   of agreements (whether bargained or arbitrated), the Director must consider safety, reliability,

6   economy, and the specific policy justifications set forth in the Ordinance. The Director's role is

7   at least as substantial as that approved in Parker, where market participants proposed

8   anticompetitive zones and programs for different crops and the state's role was limited to

9   adopting the proposed program and enforcing it with penal sanctions in furtherance of the state's

10  policy. Although the City of Seattle will not establish the terms and conditions under which for-

11  hire transportation will be offered, the Director may not passively accept the agreement proposed

12  by the parties (or the arbitrator), but must compare the proposal to the legislative goals before

13  determining whether to accept or reject it and issuing a written explanation. As was the case in

14  Tom Hudson, any collectively bargained or arbitrated agreement that goes into effect will be

15  "directly attributable to the action of the city, not mere acquiescence in an anticompetitive policy

16  adopted on a private party's initiative." 746 F.2d 1370, 1374 (9th Cir. 1984) (internal quotations

17  marks and alterations omitted).

18      The Court finds that the City's role in enacting and enforcing the Ordinance, including

19  authorizing private parties in the for-hire transportation industry to collectively bargain, is

20  immune from suit under the federal antitrust laws. The City has not, therefore, violated the

21  Sherman Act. Nor does that Act preempt the Ordinance: Parker is premised on the theory that

22  Congress did not intend to restrain or otherwise interfere with state action, and plaintiffs make

23  no attempt to support either an express or implied preemption argument. Plaintiffs' federal

24  antitrust claims (Counts One and Two) are therefore DISMISSED. In light of these findings, the

25  Court need not consider the City's "unilateral action" argument.

26

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -16-

1

**4. State Antitrust Claim[9]**

2   The Washington Consumer Protection Act ("CPA") makes unlawful "[e]very contract,

3   combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce."

4   RCW 19.86.030. Although Count Seven of the Amended Complaint is entitled "Violation of the

5   Washington Consumer Protection Act," plaintiffs state that they are not, in fact, asserting that

6   the City violated RCW 19.86.030. Rather, plaintiffs are "pursuing a common-law cause of action

7   analogous to its federal preemption claim." Dkt. # 52 at 25. Based on the cases plaintiffs cite,

8   they are apparently relying for their preemption argument on Art. XI, § 11 of the Washington

9   Constitution, which authorizes local municipalities "to make and enforce within its limits all

10   such police, sanitary and other regulations as are not in conflict with general laws." Plaintiffs do

11   not explain why the Ordinance is preempted by this constitutional provision or any other state

12   law of general applicability. As discussed above, the Ordinance was enacted pursuant to the

13   authority provided by RCW 46.72.001 and RCW 81.72.200. Plaintiffs make no effort to

14   establish a conflict between the Ordinance and any state law.

15   To the extent plaintiffs are alleging that the City violated RCW 19.86.030, the claim fails

16   as a matter of law. The state Supreme Court has determined that "the legislature intended to

17   exempt municipal corporations from the operation but not the benefits of the Consumer

18   Protection Act." Wash. Nat. Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County, 77 Wn.2d

19   94, 98 (1969). See also Witham v. Clallam County Pub. Hosp. Dist. 2, 2009 WL 3346041, at *6-

20   7 (W.D. Wash. Oct. 15, 2009).[10]

21

22

---

23   [9] In its reply memorandum, defendant argues that the Court should decline to exercise
supplemental jurisdiction over the state law claims if the federal causes of action are dismissed. The
24   Court will not consider an argument first raised in reply.

25   [10] In the specific factual context of this case, an express statutory exemption may also apply.
Pursuant to RCW 19.86.170, "labor" is not an article of commerce for purposes of the CPA. Thus, the
26   collusive organization of labor for purposes of collective bargaining does not violate the Act.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                            -17-

**B. NATIONAL LABOR RELATIONS ACT CLAIM**

The Court has reviewed the arguments raised in support of and opposition to the motion to dismiss plaintiffs' National Labor Relations Act ("NLRA") claims and finds no reason to alter its preliminary evaluation of these claims. Plaintiffs argue that the Ordinance is preempted by the NLRA because (1) it regulates activity that arguably falls within the statute, including the determination of whether a particular individual is an employee or an independent contractor (known as "Garmon preemption") and (2) it regulates conduct Congress intended to leave unregulated, such as bargaining between independent contractors and the entities that hire them (known as "Machinists preemption"). The NLRA does not contain an express preemption provision. Nevertheless, the courts have found that certain areas of labor law are under the federal government's exclusive power. Other areas, however, are subject to state regulation even where they "intercede in the relationships between employees and employers." Babler Bros., Inc. v. Roberts, 995 F.2d 911, 914 (9th Cir. 1993). The line between permissible interference and preemption is set forth in case law, in light of congressional intent, and "is continually evolving." Id..

**1. Garmon Preemption**

In San Diego Bldg. Trades Council v. Garmon, 359 U.S. 239, 242 (1959), the Supreme Court noted that "Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." Determining which of "the variegated laws of the several States are displaced by a single, uniform, national rule" had proved difficult, however. Id. at 241. The interest in a uniform labor policy was often in direct conflict with the judiciary's regard for our federal system, including local control over activities that had long been the subject of state regulation. Id. at 243-44. After evaluating prior case law, the Supreme Court held that, in the context of activities that "may fairly be assumed" to be protected by § 7 of the NLRA (such as collective bargaining, the right to strike, the right to picket, etc.) or to

constitute an unfair labor practice under § 8 of the statute (such as interfering with § 7 rights or discriminating between union and non-union employees), state regulation and jurisdiction must yield. Id. at 244. Where it is not clear whether a particular activity is governed by § 7 or § 8, the Court deemed it "essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board." Id. at 244-45.

Plaintiffs argue that the Ordinance is facially and categorically preempted because it allows local officials and courts to make a factual determination (whether the for-hire drivers covered by the Ordinance are "employees" or "independent contractors") that must be left in the first instance to the Board. "The precondition for pre-emption" – that the conduct be arguably or fairly assumed to be protected under § 7 or prohibited under § 8 of the NLRA – "is not without substance. It is not satisfied by a conclusory assertion of pre-emption and would therefore not be satisfied in this case by a claim, without more, that [a for-hire driver] was an employee rather than [an independent contractor]." Int'l Longshoremen's Ass'n v. Davis, 476 U.S. 380, 394 -95 (1986). Neither the Chamber nor the individual plaintiff has made even a bare assertion that for-hire drivers are employees: both have taken the position that the for-hire drivers covered by the Ordinance are independent contractors and not subject to the NLRA. Thus, the Chamber's claim of Garmon pre-emption is not tethered to the facts alleged. Because no party has asserted that for-hire drivers are employees, the issue will not be considered or resolved in this litigation. It is not enough for the Chamber to simply raise the possibility that for-hire drivers may ultimately prove, in some other case, that they are properly classified as employees. Plaintiffs' Garmon claim therefore fails as a matter of law.[11]

---

[11] The Chamber's Garmon claim would fail for lack of standing even if the employee/independent contractor issue had been properly raised in this litigation. Plaintiffs would then have the burden of putting forth enough evidence to enable the Court to find that the Board could reasonably conclude that for-hire drivers are employees subject to the protections and prohibitions of the NLRA. Davis, 476 U.S. at 395. Whether a driver is an employee or an independent contractor depends on the details of the relationship between a specific driver coordinator and its drivers, including

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -19-

**2. Machinists Preemption**

In <u>Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers v. Wis. Emp't Relations Comm'n</u>, 427 U.S. 132 (1976), the employer attempted to obtain a declaration from the NLRB that its employees' concerted refusal to work overtime during contract negotiations was an unfair labor practice. The NLRB dismissed the charge, finding that the concerted effort was neither protected nor prohibited by the NLRA and therefore was not conduct cognizable by the Board. The employer then sought and obtained a cease and desist order from the Wisconsin Employment Relations Commission against the same conduct. The state appellate courts upheld the cease and desist order, and certiorari was granted. <u>Garmon</u> preemption did not apply because the concerted refusal to work overtime was not expressly protected under § 7 or prohibited under § 8. Instead, the Supreme Court looked to and expanded on a second line of cases that focused "upon the crucial inquiry whether Congress intended that the conduct be unregulated because left 'to be controlled by the free play of economic forces.'" <u>Machinists</u>, 427 U.S. at 140 (quoting <u>NLRB v. Nash-Finch Co.</u>, 404 U.S. 138, 144 (1971)). The Supreme Court concluded that Congress' specific descriptions of the types of economic weapons that were both prohibited and protected left no room for the states to either forbid or encourage other forms of economic pressure tactics. The Supreme Court reasoned that if the state law

> can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe when it enacted [the NLRA], the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management

---

numerous factors such as the degree of control the coordinator exercises. <u>See</u> <u>NLRB v. United Ins. Co. of Am.</u>, 390 U.S. 254, 256 (1968). The driver coordinators' participation in this litigation would then be necessary to ensure that the preemption analysis proceeds on actual facts regarding a coordinator's operations and relationship with its drivers rather than some stylized amalgam arising from the industry at large. Based on the evidence provided in the preliminary injunction context, it appears that the operations and relationships experienced by Eastside drivers varies significantly from those who drive for Lyft. Because the participation of its individual members is required, the Chamber lacks associational standing to pursue the <u>Garmon</u> preemption claim. <u>Hunt</u>, 432 U.S. at 343.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -20-

expressed in our national labor policy. For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.

Machinists, 427 U.S. at 146-47 (quoting Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 259-60 (1964) (internal quotation marks and citation omitted)). Because the Wisconsin law was utilized to overcome self-help efforts that were permitted under the NLRA when the employer's own economic power proved to be insufficient, there was "simply no question that the Act's processes would be frustrated . . . were the State's ruling permitted to stand." Machinists, 427 U.S. at 148-49.

The Ordinance at issue in this case authorizes independent contractors to bargain collectively, in part because the NLRA specifically excludes independent contractors from the definition of "employee" and the protections of the Act. 29 U.S.C. § 152(3). Other groups are also excluded: "any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act," or public employees are not "employees" under the NLRA. 29 U.S.C. § 152(2) and (3). The excluded groups are not treated alike for preemption purposes, however. Courts have found that, for some of these groups of workers such as agricultural and domestic workers, this exclusion means that "Congress has chosen not to create a national labor policy . . . [and] the states remain free to apply their own views of proper public policy to the collective bargaining process insofar as it is subject to their jurisdiction." United Farm Workers of Am. v. Ariz. Agric. Emp't Relations Bd., 669 F.2d 1249, 1257 (9th Cir. 1982). With regards to supervisors, however, the courts have concluded that any state law that pressures employers to treat supervisors as employees is preempted. Beasley v. Food Fair of N.C., 416 U.S. 653, 662 (1974). The Chamber

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                                    -21-

argues that Congress chose to treat independent contractors like supervisors and leave them to their own economic fates, confident in their individual bargaining power, and that the Ordinance is therefore preempted by an affirmative national labor policy that precludes independent contractors from collectively bargaining.[12] The City argues that Congress simply chose not to regulate the collective conduct of independent contractors, just as it did with agricultural and domestic workers, leaving it to the states to develop their own policies in light of local needs and concerns.

The issue, then, is whether the exclusion of independent contractors represents a congressional determination that workers in that category should be prevented from bargaining collectively or whether the exclusion reflects a willingness to allow state regulation of the balance of power between independent contractors and those who hire them. In the absence of controlling case law, the Court turns to the language of the statute and its legislative history. When the NLRA was enacted in 1935, neither supervisors nor independent contractors were expressly excluded from the definition of "employee." See NLRB v. Hendricks County Rural Elec. Membership Corp., 454 U.S. 170, 178 (1981) (noting that the 1935 act excluded only agricultural laborers, domestic workers, and individuals employed by a parent or spouse from the definition of "employee"). Between 1935 and 1947, the NLRB certified unions of supervisors, a practice which Congress deemed "inconsistent with the purpose of the act to increase output of goods that move in the stream of commerce," "inconsistent with the policy of Congress to assure to workers freedom from domination or control by their supervisors in their organizing and bargaining activities," and "inconsistent with our policy to protect the rights of employers." H.R. Rep. No. 80-245, at 14 (1947). Congress amended the NLRA to exclude supervisors from the

---

[12] The Chamber also argues that the Ordinance conflicts with Congress' choice to leave the actual negotiations and adoption of working conditions to the parties, without government interference. If, however, the NLRA does not apply because for-hire drivers are independent contractors, the right to bargain collectively and the procedures through which that right is exercised will be determined by state law, as is the case with public employees and agricultural workers.

definition of employee. 29 U.S.C. § 152(3). It also added § 14(a):

> Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining.

29 U.S.C. § 164(a). Although supervisors could still organize and employers could voluntarily recognize a union of supervisors, the amendments ensured "[t]hat no one, whether employer or employee, need have as his agent one who is obligated to those on the other side, or one whom, for *any* reason, he does not trust." H.R. Rep. No. 80-245, at 17 (emphasis in original).

In 1944, the Supreme Court, following the NLRB's lead, interpreted the term "employee" broadly to encompass individuals who, under the common law, were clearly independent contractors. NLRB v. Hearst Publ'ns, Inc., 322 U.S. 111, 126-29 (1944). Congress was not impressed, noting the differences between employees and independent contractors and confirming its original intent to include the former in the NLRA scheme and to exclude the latter. Congress rejected the NLRB's effort to expand the definition of employee beyond the common understanding at the time the NLRA was enacted. H.R. Rep. No. 80-245, at 18. The NLRA was amended in 1947: independent contractors and supervisors were both excluded from the meaning of "employee" at that time.

The Chamber relies on this coincidence of timing and argues that the two exemptions should be given the same scope and effect. The legislative history on which the Chamber relies shows that supervisors and independent contractors were excluded from the reach of the NLRA for different reasons, however. The unionization of supervisors was deemed a threat to the very purposes of the Act as well as the interests of both labor and management. See Beasley, 416 U.S. at 659-62 (summarizing legislative history of the 1947 amendments). These deleterious effects would arise regardless of whether supervisors unionized under the NLRA or under state law. The reference to independent contractors, on the other hand, was added to correct an NLRB

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -23-

interpretation that had wandered from Congress' original intent. While Congress undoubtedly had its reasons for not subjecting independent contractors to the NLRA, allowing them to unionize was not identified as a threat to the free flow of goods, nor is there any indication that allowing them to participate in collective action would threaten the independence of labor organizations or the rights of management. The legislative history does not support the Chamber's argument that Congress intended to treat independent contractors and supervisors the same for preemption purposes.

Just as importantly, Congress included an express preemption provision related to supervisors, but not to independent contractors. When the Supreme Court was asked to determine whether state laws promoting supervisor unionization are preempted, it relied heavily on the existence of § 14(a) to support its conclusion that any law that requires an employer to treat supervisors as employees is unenforceable. Beasley, 416 U.S. at 657-59. The statutory text thus treats independent contractors more like the other excluded groups who have long been the subject of state regulation. The Court finds, therefore, that Congress was indifferent to the labor rights of independent contractors – just as it was to the rights of agricultural and domestic workers – because their disputes were thought to be of insufficient magnitude to affect commerce. S. Rep. No. 79-1184, at 3 (1934). Plaintiffs' Machinists claim therefore fails as a matter of law.

## C. AUTHORITY UNDER STATE LAW

The Chamber alleges that the Ordinance is not authorized by RCW 46.72.160 or RCW 81.72.210 because it goes beyond the enumerated grants of regulatory power. In particular, plaintiffs object to the City's regulation of third-party businesses that do not offer for-hire transportation services and the authorization of collective bargaining on behalf of for-hire drivers. Dkt. # 53 at ¶ 97. As discussed above, the statutes expressly authorize a wide array of municipal regulation of for-hire and taxicab transportation services, including "[a]ny other requirement adopted to ensure safe and reliable for hire vehicle transportation service." RCW

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -24-

1   46.72.160(6). See also RCW 81.72.210(6). Plaintiffs acknowledge this broad grant of regulatory
2   authority, but nevertheless argue that it cannot justify regulations that have impacts far beyond
3   the promotion of safety and reliability.

4        In Washington, a municipal corporation's authority "is limited to those powers expressly
5   granted and to powers necessary or fairly implied in or incident to the power expressly granted,
6   and also those essential to the declared objects and purposes of the corporation. However, if
7   there is a doubt as to whether the power is granted, it must be denied." Arborwood Idaho, LLC
8   v. City of Kennewick, 151 Wn.2d 359, 374 (2004). In Arborwood, the relevant statutes
9   authorized municipalities to establish local ambulance services and fund them through excise
10   taxes on those served and/or business and occupation taxes on those who provide ambulance
11   services. Id. at 362. The City of Kennewick did neither. Rather, it imposed a monthly charge on
12   its residents' utility bill that did not meet the definition of an excise tax (Id. at 367-70) and could
13   not be characterized as a fee authorized under the municipality's police power (Id. at 370-73).
14   Not only was there no express authorization for the tax Kennewick chose to impose, but the
15   legislature's explicit provision of specific funding alternatives forestalled the municipality from
16   choosing other funding sources.

17        In the case at hand, the City's novel approach to improving safety, reliability, and
18   stability in transportation services is in no way inconsistent with the legislature's purpose or the
19   enumerated powers granted to local governments. As discussed above, the City made findings
20   regarding the link between collective negotiation processes and improved public health and
21   safety outcomes, and the driver coordinators are proper targets of local regulation aimed at
22   privately operated for hire transportation services. The Ordinance therefore falls squarely within
23   the scope of the "other requirement" provision. In this context, the City is not, as plaintiffs
24   would have it, confined to exercising its regulatory authority as all other municipalities have
25   done in the past. In City of Tacoma v. Taxpayers of City of Tacoma, 108 Wn. 2d 679 (1987), the
26   municipality relied on RCW 35.92.050 to adopt a payment plan to electric utility customers who

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -25-

1   installed conservation devices. The statute had not previously been used to make such payments:

2   the state Supreme Court noted that "[a] full appreciation of conservation's role as an electrical

3   energy resource had not yet developed." Id. at 689. While the court recognized that a

4   municipality's authority is limited to the powers expressly granted or fairly implied as incidental

5   to those powers, it found that "the rule of strict construction does not apply to the mode or means

6   a municipal corporation uses to carry out its grant of power." Id. at 692.[13]

7        Plaintiffs have not identified a state statutory bar or limitation that would preclude the

8   type of regulation at issue here, a procedural defect surrounding the enactment of the Ordinance,

9   or an inherent arbitrariness or illegality that could justify a declaration that the Ordinance is

10  unlawful under Washington law. Count Six therefore fails as a matter of law.

11  **D. WASHINGTON PUBLIC RECORDS ACT**

12       Plaintiffs assert a claim under the Washington Public Records Act ("PRA") based on the

13  bald assertion that the driver coordinators' records are "public records" subject to the statute.

14  Dkt. # 53 at ¶ 111. "Public record" is a defined term and includes "any writing containing

15  information relating to the conduct of government or the performance of any governmental or

16  proprietary function prepared, owned, used, or retained by any state or local agency." RCW

17  42.56.010(3). Plaintiffs argue that the driver coordinators' driver lists are "public records"

18  because they will be used by the City to implement the Ordinance. This argument ignores the

19  purposes of the statute, its requirements, and common sense. The PRA was enacted to ensure

20  that the public remains informed regarding what their public servants are doing. RCW

21  42.56.030. Information regarding non-governmental documents – meaning documents that were

22  not prepared, utilized, or retained by a government agency or office – would not provide insight

23

24      [13] Strict construction is also not appropriate where a municipal corporation is acting in a

25  proprietary capacity and operating a business enterprise (such as a water or electric utility) for the
    private advantage of the municipality. See Branson v. Port of Seattle, 115 Wn. App. 695, 698 n.3

26  (2003).

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -26-

1   into any government function. As for the mechanics of the PRA, the statute requires government

2   agencies and offices to make their records available for inspection and copying (subject to

3   certain exemptions), a requirement that makes no sense if "public records" includes documents

4   entirely unrelated to the government and held by private parties. While it is clear that an agency

5   or office subject to the PRA cannot avoid its disclosure requirements through the simple

6   expedient of declining to take possession of reports, specifications, documents, and other

7   information it uses in performing its functions, in this case the City has never seen the driver

8   lists, much less employed or applied them for some purpose or process. Concerned Ratepayers

9   Ass'n v. Pub. Utility Dist. No. 1 of Clark County, 138 Wn.2d 950, 958-59 (1999). Confidential

10  business documents prepared by and in the exclusive possession of a private party are not

11  "public records" under any reasonable interpretation of the statute.[14]

12  **E. SECTION 1983**

13      Plaintiffs' Section 1983 claim is based on the alleged deprivation of a federal right or

14  privilege. No such deprivation has been shown.

15

16

17

18

19

20

21

22

23

24  [14] Once the driver list is produced to the QDR, it is likely that it will be transmitted to the City in
    order to show that a majority of qualifying drivers from the list supplied a statement of interest. At that
25  point, the list will become a public record subject to the PRA. To the extent a request for disclosure is
    made under the PRA and the Chambers' members hope to preclude further disclosure of the list, they
26  will have to use the third-party injunction procedures set forth in the act. RCW 42.56.540.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                    -27-

1     For all of the foregoing reasons, defendants' motion to dismiss (Dkt. # 42) is GRANTED

2  and all of the claims in this matter are DISMISSED. The preliminary injunction entered in this

3  case on April 4, 2017, will remain in effect until the Court resolves the motion to dismiss that is

4  pending in the companion case, Clark v. City of Seattle, C17-0382RSL.

5

6     Dated this 1st day of August, 2017.

7

8                                         Robert S. Lasnik
                                          United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS                         -28-